**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| WENDY DAVIS, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | SA-11-CA-788-OLG-JES-XR |
| | § | [Lead Case] |
| RICK PERRY, *et al.*, | § | |
| Defendants. | § | |
| LEAGUE OF UNITED LATIN | § | |
| AMERICAN CITIZENS (LULAC), | § | |
| DOMINGO GARCIA, | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | SA-11-CA-855-OLG-JES-XR |
| | § | [Consolidated Case] |
| RICK PERRY, *et al.*, | § | |
| Defendants. | § | |

## DEFENDANTS' MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

Defendants Rick Perry, in his official capacity as Governor, Hope Andrade, in her official capacity as Secretary of State, and the State of Texas (collectively, "Defendants") respectfully file this Motion to Dismiss and for Judgment on the Pleadings.[1]  Plaintiffs' claims challenging senate district 10 in Plan S148 are late and meritless.  They reurge Fifteenth Amendment theories that this Panel rejected as a matter of law less than three months ago.  They advance a novel and infirm reading of the Voting Rights Act in which they claim a coalition of minority groups can state a claim under Section 2.  They plead facts insufficient to establish an intentional

---

[1] This Motion is Defendants' responsive pleading to the complaint filed by LULAC and Domingo Garcia, which the Court recently consolidated with the case styled *Davis v. Perry*, SA-11-CA-788-OLG-JES-XR. *See* LULAC Complaint, Civil Action No. 5:11-cv-00855 (Doc. 1).  Defendants move to dismiss the claims brought by LULAC and Domingo Garcia and move for judgment on the pleadings as to the complaint filed by Davis, *et al.*

discrimination claim.  Their Privileges or Immunities claim under the Fourteenth Amendment fails as a matter of law.   And they inexplicably and unjustifiably withheld their challenges in a manner that maximized prejudice to the State, Defendants, and numerous third-parties.  For these reasons, the following claims should be dismissed:

(1) Plaintiffs' claims of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

(2) Plaintiffs' claims under the Privileges or Immunities Clause of the Fourteenth Amendment;

(3) Plaintiffs' claims alleging violations of Section 2 of the Voting Rights Act.

## INTRODUCTION

This is a redistricting case.  Review of state redistricting legislation "represents a serious intrusion on the most vital of local functions" because redistricting "is primarily the duty and responsibility of the State."  *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (citing numerous authorities).  In conducting this review, courts must presume the legislature's good faith and "exercise extraordinary caution."  *Id.* at 915-16.  These principles of caution and avoiding intrusion into state affairs inform a court's "[determination of] whether to permit discovery or trial to proceed" in a redistricting case.  *Id.* at 917.  Here, Plaintiffs' pleadings reveal their case to be ripe for dismissal.

Despite extensive discovery in two companion cases, Defendants have failed to allege any facts that would support their serious allegations of purposeful discrimination in the enactment of S.B.31 ("Plan S148").  Apart from conclusory allegations of intent, their pleadings base their purposeful discrimination claims on awareness of racial demographics, awareness of consequences, and disparate impact.  *See* Davis Complaint ¶ 40, Civil Action No. 5:11-cv-00788

(Doc. 1).   Consciousness of race and consequences coupled with disparate impact cannot establish discriminatory purpose as a matter of law.  *See Bush v. Vera*, 517 U.S. 952, 968 (1996); *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977).

Plaintiffs' Section 2 claims hinge on the viability of a vote dilution theory that places a coalition of different minority groups on equal footing with a single cohesive minority group. Davis Complaint ¶¶ 3, 35, 42.  The Voting Rights Act protects minorities from discrimination "on account of race or color."  42 U.S.C § 1973(a).  It does not protect political alliances among different ethnic groups to advance shared political or policy preferences.  *See Bartlett v. Strickland*, 129 S. Ct. 1231, 1243 (2009).   Protecting alliances is "interest-group politics rather than a rule hedging against racial discrimination."  *Thornburg v. Gingles*, 478 U.S. 30, 83 (1985) (White, J., concurring).  Yet, Plaintiffs urge a reading of Section 2 that would compel excluding Anglos from districts to enshrine the political power of multi-ethnic interest groups.  *Cf. LULAC v. Perry*, 548 U.S. 399, 486 (2006).  This reading raises serious constitutional questions and stands at odds with Supreme Court precedent.  *Id.*; *see also Bartlett*, 129 S. Ct. at 1243.

Plaintiffs' Privileges or Immunities claims and Fifteenth Amendment claims fail as a matter of law.  Under the Fifteenth Amendment, vote dilution is not cognizable.  *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000).  This Court restated this proposition less than three months ago.  *See* Order, Civil Action No. 5:11-cv-00360 (Doc. 275).   Additionally, the Privileges or Immunities Clause does not protect rights that inhere in State citizenship.  *See, e.g.*, *Snowden v. Hughes*, 321 U.S. 1, 7 (1944).  The right to cast votes for state senators is a privilege of state, not federal, citizenship, and therefore lies beyond the sweep of the Privileges or Immunities Clause.  *Broyles v. Texas*, 618 F. Supp. 2d 661, 688 (S.D. Tex. 2009).

Finally, the defense of laches operates to bar Plaintiffs' claims in whole or in part. Plaintiffs have failed to offer any justification for delaying their claims, other than the United States Department of Justice's decision not to object to Plan S148 in the preclearance proceeding. This justification rings hollow in light of Plaintiffs' decision to intervene in the preclearance proceedings in July. Plaintiffs' interests are well-represented in that proceeding and there was no need for delay in bringing their S148 challenges before this Court.

## FACTS

Plaintiffs in this matter have known of their objections to Plan S148 since at least May 10, 2011. *See* David Montgomery, *Tarrant Democrat Says Senate Redistricting Map Targets Her District*, Fort Worth Star Telegram, May 10, 2011, *available at* http://www.star-telegram.com/2011/05/10/3065773/state-senate-redistricting-map.html. At that time, Plaintiff Wendy Davis, the incumbent in Senate District 10, stated that she was "very sure we will be in a court battle" over her district. *Id.* (internal quotation marks omitted). One week later, she specified the legal basis of her complaint when she stated that Plan S148 "violates the [federal] Voting Rights Act." *See* Terrence Stutz, *Texas Senate Approves Redistricting Plan After Rejecting Fort Worth Amendments*, Dallas Morning News, May 17, 2011, *available at* http://www.dallasnews.com/news/politics/texas-legislature/headlines/20110517-texas-senate-approves-redistricting-plan-after-rejecting-fort-worth-amendments.ece. Like Ms. Davis, Plaintiff Marc Veasey serves as an elected official in the Texas Legislature. He therefore would have had an opportunity to assess his objections to S148 as early as May 2011, when the Legislature considered Plan S148 for enactment.

On May 21, 2011, the Texas Legislature enacted Plan S148.  *See* Texas Legislative Council, Texas Redistricting News Archive, http://www.tlc.state.tx.us/redist/news_archive.html. On June 17, 2011, the Governor signed Plan S148 into law.  *See id.*

On July 15, 2011, Mr. Veasey filed an action challenging the State's recently enacted congressional plan, C185.  *See* Complaint, Civil Action No. 5:11-cv-00592 (Doc. 1).  This Court consolidated that action with other actions challenging the State's congressional and Texas House plans.  *See* Order Civil Action No. 5:11-cv-00360 (Doc. 63).  The Perez Plaintiffs and the NAACP Plaintiffs in the consolidated actions had originally asserted challenges to Plan S148 in addition to their Texas House and congressional challenges, but they ultimately dropped the Plan S148 claims.  *See, e.g.*, Perez Complaint at 4, Civil Action No. 5:11-cv-00360 (Doc. 1); NAACP Complaint at 8 Civil Action No. 5:11-cv-00360 (Doc. 56).  J. Gerald Hebert, counsel for Mr. Veasey and his co-plaintiffs in the consolidated action, also represents Mr. Veasey, Ms. Davis, and the other Plaintiffs in this action.

The scheduling order in the consolidated actions set an amended pleading deadline of July 19, 2011, but the Court extended this deadline for Mr. Veasey and his co-plaintiffs through August 2, 2011.  *See* Amended Scheduling Order ¶ 3 Civil Action No. 5:11-cv-00360 (Doc. 51); Order Granting Leave to Amend Civil Action No. 5:11-cv-00360 (Doc. 104).  Mr. Veasey filed an amended complaint on August 2, 2011, but he did not add any claims challenging Plan S148. *See* Complaint, Civil Action No. 5:11-cv-00360 (Doc. 105).  On September 6, 2011, trial on the consolidated actions commenced and continued until September 16, 2011.  Mindful of the time constraints attendant to determining liability and crafting a pre-election remedy, this Court heard and denied numerous pre-trial motions to modify the scheduling order in the consolidated

actions.   *See, e.g.*, Order, Civil Action No. 5:11-cv-00360 (Doc. 385) (discussing time constraints).

On July 21, 2011, around the time that Mr. Veasey filed his complaint challenging the State's congressional plan and before the extended deadline for filing the amended pleadings in the consolidated actions, he and Plaintiffs Wendy Davis and Vicky Bargas, represented by their counsel Mr. Hebert, intervened in the preclearance proceedings before the United States District Court for the District of Columbia.   *See* Motion for Leave to Intervene as Defendants, Civil Action No. 1:11-cv-01303 (Doc. 5).   In their motion for leave to intervene, Mr. Veasey, Ms. Davis, and Ms. Vargas raised objections to Plan S148; objections that are almost identical to those raised in this action.   *See id.* ¶¶ 10-16.   In contrast, the United States Department of Justice lodged no objections to the Plan S148.   *See* United States Identification of Elections Considered, Civil Action No. 1:11-cv-01303 (Doc. 58).   The United States District Court for the District of Columbia should rule on the Section 5 preclearance challenges to Plan S148 by mid-November.

Finally, on September 22, 2011, Plaintiffs Wendy Davis, Marc Veasey, Roy Brooks, Vicky Bargas, Pat Pangburn, Frances Deleon, Dorothy Debose, and Sarah Joyner ("Davis Plaintiffs") filed a complaint initiating this action in which they contest certain districts in Plan S148.   *See* Davis Complaint, Civil Action No. 5:11-cv-00788 (Doc. 1).   Because the United States District Court for the District of Columbia has not precleared Plan S148, the Davis Plaintiffs challenge the benchmark plan as malapportioned.   *See id.* ¶¶ 1, 25, 29.   As to Plan S148, the Davis Plaintiffs assert Fifteenth Amendment claims and claims under the Fourteenth Amendment's Privileges or Immunities Clause.   *See id.* ¶¶ 26-27, 41.   They also assert Section 2 claims on the theory that Section 2 protects multi-ethnic coalitions of minority voters in senate district 10.   *See id.* ¶¶ 3, 35, 42.   The Davis Plaintiffs likewise allege intentional discrimination in

district 10 in violation of the Fourteenth Amendment Equal Protection Clause.  *See id.* ¶¶ 40, 45. Paragraph 40 of the Davis Plaintiffs' Complaint supplies the purported basis of Plaintiffs' intentional discrimination claims:

> State legislative leaders knew Senate District 10 was majority minority in population at the time of redistricting, they acknowledged that Senator Davis was the minority voters' candidate of choice in 2008 when minority voters elected her, and they were warned that dismantling Senate District 10 would harm minority voting rights.  In the face of this evidence, they intentionally eliminated Senate District 10 as a minority opportunity district.

The Davis Plaintiffs' complaint reurges many of the legal theories advanced in Mr. Veasey's consolidated actions challenging the congressional and Texas House plans. Consequently, Mr. Hebert has designated the same expert to testify in both the consolidated action and this proceeding.  *See* Davis Plaintiffs' Witness Designations, Civil Action No. 5:11-cv-00788 (Doc. 26).  Plaintiffs waited four months after they first learned of their objections, two months after urging objections to Plan S148 in the preclearance proceedings, and one week after closing argument in the consolidated actions to file their complaint here.

Four days ago, on October 17, 2011, LULAC and Domingo Garcia ("LULAC Plaintiffs") filed a complaint in which they challenged Plan S148.  *See* LULAC Complaint, Civil Action No. 5:11-cv-00855 (Doc. 1).  Their complaint appears to copy the Davis Plaintiffs' complaint in its entirety except for minor modifications to replace plaintiff names.[2]  They also moved to consolidate their complaint with this action.  *See* Motion to Consolidate, Civil Action No. 5:11-cv-00855 (Doc. 2).  Like Mr. Veasey, LULAC asserted claims challenging the State's new congressional and Texas House plans.  *See* First Amended Complaint, Civil Action No. 5:11-cv-00360 (Doc. 78).  LULAC did not challenge Plan S148 in the consolidated actions even though

---

[2] Due to the almost complete overlap in facts and claims alleged by both the LULAC and Davis Plaintiffs, Defendants' arguments as to claims brought by one plaintiff group apply with equal force to the claims of the other plaintiff group.

LULAC's counsel here, Luis Vera, also represented LULAC in the consolidated cases. Notwithstanding Mr. Vera's familiarity with the consolidated actions, he and his client LULAC waited over one month after the consolidated trial to challenge Plan S148.  Like Plaintiffs Davis, Veasey, and Vargas, LULAC also intervened in the preclearance proceeding to challenge, among other things, Plan S148.  *See* LULAC Motion to Intervene, Civil Action No. 1:11-cv-01303 (Doc. 40).

While Plaintiffs withheld their claims, the State's electoral machinery shifted into gear to draw new precincts and prepare for the upcoming primaries in the spring of 2012.  According to the Texas Election Code, any changes in county election precinct boundaries required "to give effect to a redistricting plan" must be finalized by October 1, 2011.  Tex. Elec. Code Ann. § 42.032 (Vernon 2010).  Likewise, Section 14.001 of the Election Code requires that voter registration certificates be issued to each voter in the county.  The Court has already been forced to suspend these deadlines as to the Texas House and Congressional plans until it and the preclearance court have rendered a decision on those plans.  *See* Order, Civil Action No. 5:11-cv-00360 (Doc. 380).  This suspension relieves state and local election officials of the obligation to meet Election Code deadlines, but it does not preclude these officials from discharging their electoral duties as they deem appropriate.   Moreover, several additional deadlines loom in the near term, at least one of which will predate the scheduled November 14, 2011 trial date in this case.  These deadlines include the following:

- November 12, 2011: Period for filing for a place on the ballot begins.

- December 12, 2011: Last day for filing for a place on the ballot.

- December 16, 2011: Deadline for state chair to deliver certified list of statewide and multi-county district candidates to each county chair.

- December 20, 2011: Ballot drawing at each county seat for primary ballot.

- December 22, 2011: Deadline for county chair to deliver copies of the list of candidates to county election officer, state chair, or secretary of state.

- February 6, 2012: Last day to register to vote.

- March 6, 2012: Primary Election Day.

*See* Texas Secretary of State, Important 2012 Election Dates, http://www.sos.state.tx.us/elections/voter/2012dates.shtml; Texas Secretary of State, Election Advisory 2011-15, http://www.sos.state.tx.us/elections/laws/2012primary.shtml.

While the State and its election officials lay the groundwork for upcoming elections, the preclearance and consolidated proceedings continue. The State is a defendant in the consolidated proceeding and the plaintiff in the preclearance proceeding. The State must continue to advise this Court as to interim maps and is presently taking and defending numerous depositions in the preclearance proceedings. Now the State and other Defendants must divert some of their attention away from these proceedings to defend against Plaintiffs' deliberately delayed challenges to Plan S148. As parties to the consolidated proceedings, the preclearance proceedings, and this proceeding, Plaintiffs understood that this result would inevitably follow from the belated assertion of their Plan S148 claims.

## ARGUMENT

### I.  Legal Standard for Motion to Dismiss and for Judgment on the Pleadings.

Federal Rules 12(b)(6) and 12(c) share the same standard for dismissal. *See Great Plains Trust v. Morgan Stanley Dean Witter*, 313 F.3d 305, 313 n.8 (5th Cir. 2005). Applying this standard to the Davis and LULAC Complaints indicates that several claims should be dismissed.

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "'A motion brought pursuant to [Rule] 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts.'" *Id.* at 12 (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam)). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and brackets omitted). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). This is especially true of redistricting challenges as states "must have discretion to exercise the political judgment necessary to balance competing interests." *Johnson*, 515 U.S. at 915. Thus, it has been the case long before *Twombly* or *Iqbal* that "[u]ntil a claimant makes a sufficient showing to support an allegation [of race-based decision making] the good faith of the legislature must be presumed." *Id.*

## II.    Plaintiffs Cannot Establish Intentional Discrimination.

Plaintiffs have not alleged facts that would give rise to an inference of discriminatory purpose.  To prove discriminatory purpose, Plaintiffs must show that the State Defendants acted with the purpose of discriminating on the basis of race, ethnicity, or national origin.  *See, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) ("[I]n order for the Equal Protection Clause to be violated, 'the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose.'") (quoting *Washington v. Davis*, 426 U.S. 229, 240

(1976)).   Proof that of a law's potentially disparate impact will not establish discriminatory purpose.  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). This is true even if the state was aware that a potentially disparate impact might follow from enactment of the law.  *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (citation omitted) ("'Discriminatory purpose' … implies more than intent as volition or intent as awareness of consequences.").   Discriminatory purpose "implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part '*because of*,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Id.*  (footnote and citation omitted; emphasis added).

The focus on purposeful discrimination, rather than mere disparate impact, means that a law will not violate the Equal Protection clause "simply because it may affect a greater proportion of one race than another."  *Rogers*, 458 U.S. at 618.  Proof that a racial or ethnic minority group cannot elect a number of representatives proportional to its share of the population will therefore fall short of establishing discriminatory purpose.   "The Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization."  *Bolden*, 446 U.S. at 75–76; *see also id.* at 86 (Stevens, J., concurring in the judgment) ("Neither *Gomillion* [*v. Lightfoot*, 364 U.S. 339 (1960)] nor any other case decided by this Court establishes a constitutional right to proportional representation for racial minorities.").

Discriminatory purpose under the Fourteenth Amendment contemplates discrimination on the basis of race—not race neutral criteria such as political affiliation.  *See Hunt v. Cromartie*, 526 U.S. 541, 551 (1999).  Even if race and political affiliation overlap, redistricting on the basis of political affiliation will not equate to discriminatory purpose.  *See id*. ("Our prior decisions

have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact.") (citing *Bush v. Vera*, 517 U.S. 952, 968 (1996)).

The Equal Protection Clause precludes purposeful, invidious discrimination. *See Rogers*, 458 U.S. at 622-23. But it does not require States to abstain completely from racial considerations when enacting redistricting plans. *See Bush v. Vera*, 517 U.S. 952, 958-59 (1996). Indeed, *Thornburg v. Gingles* sometimes compels race-based redistricting when a compact population of potential voters shares certain racial and voting characteristics. 478 U.S. 30, 50-51 (1986). State legislatures therefore have some leeway to account for race, and strict scrutiny "does [not] apply to all cases of intentional creation of majority-minority districts." *Bush v. Vera*, 517 U.S. at 958-59.

Only when state legislatures subordinate traditional redistricting principles to racial considerations do they possess a discriminatory purpose cognizable under the Fourteenth Amendment. *See id*. Discriminatory purpose in the redistricting context means racial considerations must "predominate." *Id*. Thus, "[i]f the State's goal is otherwise constitutional political gerrymandering, it is free to use … political data [such as] precinct general election voting patterns, … precinct primary voting patterns, … and legislators' experience, … to achieve that goal …." *Id*. at 968. This is true "regardless of [the State's] awareness of [the] racial implications and regardless of the fact that it does so in the context of a majority-minority district." *Id*. Indeed "redistricting legislatures will … almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." *Miller v. Johnson*, 515 U.S. at 915. Awareness of racial demographics, like awareness of "age,

economic status, religious and political persuasion, and … other demographic factors," "does not lead inevitably to impermissible race discrimination." *Shaw v. Reno*, 509 U.S. 630, 646 (1993).

The redistricting cases involving single-member districts where the Supreme Court has found discriminatory purpose, and therefore applied strict scrutiny, fall into two categories: (1) irregular boundaries inexplicable on grounds other than race; and (2) direct evidence of intent. *See e.g. Bush v. Vera*, 517 U.S. 952; *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Miller v. Johnston*, 515 U.S. 900, 910 (1995). The common thread in all of these cases is evidence showing more than a mere correlation between racial demographics and district boundaries. *See Bush v. Vera*, 517 U.S. at 968. ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify, just as racial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commission of that crime.").

Two pieces of evidence in *Bush v. Vera* illustrate how Plaintiffs can disentangle the effects of race from the effects of political considerations in the drawing of district boundaries. 517 U.S. at 961-63, 970-71. First, and "most significantly," the evidence in *Bush v. Vera*, showed that the legislature drew district boundaries with such precision that it must have relied on demographic data compiled at the block level. *Id.* Racial data was the only demographic data available at the block level, and Defendants could not offer a non-racial theory to explain the precinct-splitting boundaries. *Id.* Second, the evidence in *Bush v. Vera* showed that the legislature optimized racial demographics at the expense of political performance. *Id.* The Court thus observed that, "the northernmost hook of [District 30], where it ventures into Collin County,

is tailored perfectly to maximize minority population … whereas it is far from the shape that would be necessary to maximize the Democratic vote in that area." *Id.*

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) presented the "rare" case when district boundaries and race correlated so completely, that the correlation established discriminatory purpose. *Arlington Heights*, 429 U.S. at 266. There, "the statute … alter[ed] the shape of Tuskegee from a square to an uncouth twenty-eight-sided figure…. The essential inevitable effect of this redefinition of Tuskegee's boundaries is to remove from the city all save only four or five of its 400 Negro voters …." *Gomillion v. Lightfoot*, 364 U.S. at 340-41.

*Miller v. Johnson* also involved direct evidence of intent. 515 U.S. at 907-08. In *Miller*, the Department of Justice had "twice spurned" the Georgia legislature by refusing to preclear Georgia's congressional redistricting plan. *Id.* On its third attempt to draw districts that would satisfy the Department of Justice, the Georgia legislature took the ACLU's so-called "max-black" plan as its benchmark. *See id.* It then enacted a plan that increased the number of majority-minority districts in Georgia from two to three. *See id.* The *Miller* district court found, and the Supreme Court accepted, that the "evidence of the General Assembly's intent to racially gerrymander the Eleventh District is overwhelming, and practically stipulated by the parties involved …." *Id.* at 910 (internal citations and quotation marks omitted).

The proof in *Miller*, *Vera*, and *Gomillion* would allow no other conclusion: race dictated the irregular district shapes. However, where plausible non-racial reasons justify alleged irregularities, the presumption of legislative good faith holds, and mere irregularity will not support the inference of discriminatory purpose. *See Wright v. Rockefeller*, 376 U.S. 52, 56-58 (1964). For instance, in *Wright*, appellants challenged four New York congressional districts. *Id.* at 53. The Supreme Court found that "[t]he evidence … showed some irregularities in the

boundaries of the districts ….” *Id.* at 54. Nevertheless, the Court concluded that while “there was evidence which could have supported inferences that racial considerations might have moved the state legislature …, we agree that there also was evidence to support [the] finding that the contrary inference was ‘equally, or more, persuasive.’” *Id.* at 56-57.

Although the Supreme Court has identified the *Arlington Heights* factors as pertinent to determining discriminatory purpose,[3] it rarely applies these factors to resolve redistricting cases. *See, e.g., Shaw*, 509 U.S. at 643-44 (citing *Arlington Heights* but not applying the *Arlington Heights* factors); *Bush v. Vera*, 517 U.S. at 1012 n.9 (same). The *Arlington Heights* factors include: “(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body.” *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)). A procedural sequence that impacts all groups equally lies beyond the reach of the Equal Protection Clause. *Cf. Palmer v. Thompson*, 403 U.S. 217, 226 (1971).

Plaintiffs have had months to collect evidence and discover relevant facts that might support their purposeful discrimination claims. This process has culminated in Plaintiffs alleging that Defendants were aware of racial demographics and consequences and that district 10 in Plan S148 disparately impacts minorities. *See* Davis Complaint ¶ 40, Civil Action No. 5:11-cv-00788 (Doc. 1). These allegations are plainly insufficient to show purposeful, invidious discrimination. They bear no resemblance to the allegations in cases like *Vera*, *Miller*, and *Gomillion* in which irregular district boundaries were inexplicable on grounds other than race. Nor do they satisfy

---

[3] *See Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

any of the *Arlington Heights* factors because they identify nothing about "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d at 540.

Alleging awareness of racial demographics, awareness of consequences, and disparate impact, without more, simply recycles allegations that the Supreme Court has repeatedly rejected as insufficient to establish purposeful discrimination. *See Bush v. Vera*, 517 U.S. at 968; *Feeney*, 442 U. S. at 279 (1979); *Arlington Heights*, 429 U.S. at 268.  These allegations therefore cannot state "plausible claims" for intentional discrimination, and the intentional discrimination claims must be dismissed.  *Iqbal*, 129 S.Ct. at 1949 (2009).  Allowing these claims to proceed through discovery here would work a particular hardship in light of the discovery Plaintiffs have already received and continue to receive in two companion cases.

III.    **Section 2 of the Voting Rights Act Does Not Recognize or Protect Coalition Districts.**

A.    **The Plain Language of § 2 Does Not Protect Coalition Districts.**

Nowhere in the plain language of § 2 is there a right, or presumptive right, of a minority-supported political coalition to elect its preferred candidate by combining with voters who happen to align with the same political party.  *See Bartlett v. Strickland,* 129 S. Ct. 1231, 1243 (2009) ("Nothing in section 2 grants special protection to a minority group's right to form political coalitions.").  Under § 2, a plaintiff must demonstrate that a redistricting plan results in minorities suffering a disadvantage, relative to non-minorities, "on account of race or color."  42 U.S.C. § 1973(a).  Thus, "a violation of" § 2 is established if "the political processes leading to nomination or election . . . are not equally open to participation by [minorities]."  *Id*. § 1973(b).

The Act is violated *only* if members of a "protected class" "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. Depriving minorities of the ability to form a winning multi-racial coalition does not "result[]" in vote dilution "on account of race" and does not mean that minorities have "less opportunity than other members of the electorate . . . to elect representatives of their choice." *Id*. § 1973(a) & (b).

Moreover, the argument that coalitions consisting of different minority groups of voters may claim that a redistricting plan dilutes their combined ability to elect candidates confuses the purpose of § 2. Minorities are not provided with "less opportunity than other members of the electorate" if they are unable to form a winning coalition, because racial groups do not have a right to form a winning coalition. *See United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 166-167 (1977) (White, J.) (voters whose "candidate has lost at the polls" have "no constitutional complaint" because "[t]heir position is similar to that of the Democratic and Republican minority that is submerged year after year by the adherents of the majority party who tend to vote a straight party line"); *City of Mobile v. Bolden*, 446 U.S. 55, 109 (1980) (Marshall, J., dissenting) (no Section 2 claim where minorities' "lack of success at the polls was the result of partisan politics, not racial vote dilution"). "Section 2's proviso against finding a right to proportional representation merely confirms what is otherwise clear from the text of the statute, namely, that the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994). A group's inability to form coalitions is based on a failure of persuasion and influence, not voter discrimination. Thus, any special requirement to force the State to create districts to benefit minority-led coalitions would grant minority groups special

immunity from the obligation to "pull, haul, and trade to find common political ground," a result the Supreme Court has specifically rejected. *Id.* at 1020.

> **B.**     **The Supreme Court Has Never Embraced Plaintiffs' Coalition District Theory, And, Indeed, Has Rejected The Logic Of Such A Claim.**

The Supreme Court's reasoning in *Gingles* also confirms that unless minorities have the potential to constitute a majority, then demography, not the redistricting plan, has deprived them of the potential to elect, since majority status is necessary to elect representatives of choice. 478 U.S. at 50 n.17. ("[I]f . . . the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of [the challenged plan]."); *see Growe v. Emison*, 507 U.S. 25, 40 (1993) ("The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.").   The Supreme Court has consistently recognized that "there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority in a single district in order to elect candidates of their choice." *De Grandy*, 512 U.S. at 1020.  *Gingles* deliberately excluded coalition districts in expressly holding that the first "necessary precondition" to mounting a viable vote dilution claim is that the minority group be "sufficiently large and geographically compact to constitute a *majority* in a single member district." 478 U.S. at 50-51 (emphasis added).  As explained in *Gingles*, "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Id.* at 49 n.15.  While Gingles reserved the question of what standards applied to "influence" claims, *id.* at 46, nowhere does the opinion suggest that the word "majority" somehow connotes a district with

a sufficient minority population to ensure that minority voters have the ability to elect their preferred candidates.

Other decisions of the Supreme Court similarly recognize that only in a majority-minority district can the minority group "elect a representative of its own choice" because only then can it "dictate outcomes independently."   *Growe*, 507 U.S. at 40; *Voinovich*, 507 U.S. at 154.   By contrast, a smaller minority group that is part of a winning multi-racial coalition merely "influences" electoral outcomes.   *Gingles*, 478 U.S. at 46 n.12.   This precedent confirms that the relevant focus under § 2 is the power of the individual minority group, not the larger political coalition to which it belongs.

Significantly, Plaintiffs' claim has already been rejected in logic, if not by name, in recent Supreme Court precedent.   For a decade or more the Court avoided the legal question of whether so-called "influence" or "coalition districts"—the latter then defined as districts where a single ethnic group does not constitute a numeric majority but tends to vote cohesively with white voters or another ethnic minority to form a functioning majority having the opportunity, to elect a candidate of choice.   *E.g., Voinovich v. Quilter,* 507 U.S. 146, 154 (1993); *De Grandy*, 512 U.S. at 1009.   In *LULAC v. Perry,* the Court finally addressed the so-called "influence" district, holding "that African-Americans had influence in the district . . . does not suffice to state a section 2 claim. . . .   If section 2 were construed to protect this kind of influence, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions."   548 U.S. 399, 486 (2006) (Kennedy, J.); *see also id.* at 490 n.8 (Souter, J., concurring in part) ("All aspects of our established analysis for majority-minority districts in *Gingles* and its progeny may have to be rethought in analyzing ostensible coalition districts.").

Thereafter, in *Bartlett v. Strickland*, the Court confronted coalition districts, though it narrowed its discussion to so-called crossover coalitions wherein an ethnic minority is said to coalesce with a portion of the white vote to elect a candidate of choice.  Once again, the Court cited constitutional concerns and rejected the claim, focusing on the statutory language in § 2: "the statute requires a showing that minorities have less opportunity than other members of the electorate to . . . elect a candidate of choice."  129 S.Ct. at 1243.  The Court established a bright-line rule that a party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50%.  *Id.* at 1245-46.  While the Court confined its holding to crossover claims, its language and reasoning was clear:

> African American voters in District 18 have the opportunity to join other voters—including other racial minorities, or both—to reach a majority and to elect their preferred candidate.  They cannot, however, elect that candidate based on their own votes and without assistance from others.  Recognizing a section 2 claim in this circumstance would grant minority voters a right to preserve their strength for purposes of forging an advantageous political alliance.  ***Nothing in section 2 grants special protection to a minority group's right to form political coalitions.***

*Id.* at 1243 (emphasis added).  As a result, there can be no question that in light of recent precedent, Plaintiffs' coalition district theory holds little weight.

## C.   Authority Recognizing Coalition Districts is of Questionable Viability.

To the extent Plaintiffs rely on *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir.), *reh'g denied*, 849 F.2d 943 (1988), to support their theory that § 2 requires the creation of coalition districts, they rely on questionable precedent.  In *Campos*, the court in a panel opinion stated:

> There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics. . . .  If, together, they are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the *Gingles* threshold as potentially disadvantaged voters.

*Id.* at 1244.  Notably, the panel opinion cites no authority and offers no reasoning to support its finding.  Although the court tacitly recognized the existence of coalition districts in this simple statement, this finding has not gone unchallenged by the Fifth Circuit and other federal courts.  For instance, in *Campos*, the defendants' petition for rehearing by the Fifth Circuit en banc was denied over the vigorous dissent of Judge Higginbotham, who sought to have the entire court consider the issue.  849 F.2d at 944–45 (Higginbotham, J., dissenting from denial of reh'g en banc).  Judge Higginbotham stated that the panel opinion offered "a disturbing reading of a uniquely important statute" because to assume "that a group composed of both minorities is itself a protected minority is an unwarranted extension of congressional intent.  A group tied by overlapping political agendas but not tied by the same statutory disability is no more than a political alliance or coalition."  *Id.* at 945.  The dissent actually received a majority of the votes of the Fifth Circuit judges who participated, but an insufficient number of active judges for the case to be heard.  *Id.* at 944.

In *League of United Latin American Citizens v. Midland Independent School District*, 812 F.2d 1494, 1503 (5th Cir.), *vacated and rev'd on state law grounds*, 829 F.2d 546 (5th Cir. 1987) (Higginbotham, J., dissenting), which preceded *Campos*, the original panel affirmed the district court's treatment of African-American and Hispanic-American voters as a cohesive voting unit despite Judge Higginbotham's protest.  *See* 812 F.2d at 1503 ("The risks include the reality that diluting the requirement of cohesion expands the mission of the Act beyond the treatment of present-day manifestations of chronic bigotry to a more general device for accommodating majority government and plural constituents—thereby revealing a distrust of the ability of our republican government to do so.").  The entire court for the Fifth Circuit was once again presented with the issue of coalition districts in *League of United Latino American Citizens*

*v. Clements*, 999 F.2d 831, 894 (5th Cir. 1994) (en banc); however, the court resolved the dispute on alternative grounds. *See id*. at 894 & n.2 (Jones, J., concurring) (urging en banc court to "lay to rest minority coalition theory of vote dilution claims" and endorsing Judge Higginbotham's dissents in *Campos* and *LULAC*).

To the extent *Campos* stands for the proposition that coalition districts can satisfy *Gingles* I, several cases have called its continued viability into question. The first and most obvious example is *Bartlett v. Strickland* where the Court rejected the view that "section 2 grants special protection to a minority group's right to form political coalitions." *Bartlett*, 129 S.Ct. at 1243. Since *Campos*, the Supreme Court has also twice summarily affirmed opinions that have rejected the viability of coalition districts under Section 2. *Rodriguez v. Pataki*, 308 F. Supp. 2d 346 (S.D.N.Y.) (three-judge court), *aff'd*, 543 U.S. 997 (2004); *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1104 (S.D. Ohio), *aff'd*, 540 U.S. 1013 (2003).

Several other federal courts, including at least one in this Circuit, have likewise interpreted the first *Gingles* factor to require a majority-minority standard and have refused to find coalition districts cognizable under § 2. *See, e.g., Session v. Perry*, 298 F. Supp. 2d 451, 483 (E.D. Tex. 2004) ("[T]he contention that § 2 protects District 24 from redrawing asks us to extend § 2's protection of Blacks and Latinos from vote dilution to the protection of groups whose cementing force is membership and loyalty to a political party. *Gingles* and the cases that followed it have been keenly aware that the defining concepts of *Gingles*—numbers and cohesion—are critical to its studied effort to confine the limits of the Act to those situations that dilute minorities' opportunity to vote without protecting coalitions that may be helpful or even essential to the leveraging of their strength. Properly confined, the Act implements the fundamentals of factions. Unconfined it reaches into the political market and supports persons

joined, not by race, but by common view.   Serious constitutional questions loom at that juncture.") *rev'd and remanded on other grounds sub nom. LULAC v. Perry*, 548 U.S. 399 (2006); *Hall v. Virginia*, 385 F.3d 421, 427-30 (4th Cir. 2004), *cert. denied*, 544 U.S. 961 (2005); *Nixon v. Kent County,* 76 F.3d 1381, 1387 (6th Cir. 1996).   Additionally, other federal courts have clearly required that a minority group's members constitute a numerical majority. *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852-53 (5th Cir. 1999), *cert. denied*, 528 U.S. 1114 (2000); *Cousin v. Sundquist*, 145 F.3d 818, 828-29 (6th Cir. 1998), *cert. denied*, 525 U.S. 1138 (1999); *Sanchez v. Colorado*, 97 F.3d 1303, 1311-12 (10th Cir. 1996), *cert. denied*, 520 U.S. 1229 (1997); *Romero v. Pomona*, 883 F.2d 1418, 1424, n.7, 1425-26 (9th Cir. 1989), *overruled on other grounds*, 914 F.2d 1136, 1141 (9th Cir. 1990); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 947 (7th Cir. 1988), *cert. denied*, 490 U.S. 1031 (1989); *but cf. Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (expressing unwillingness "at the complaint stage to foreclose the *possibility*" of influence-district claims).   Accordingly, this Court should not depart from the consistent interpretation of Section 2 that has guided federal courts for the last two decades.

###    D.    Coalition Districts Do Not Implicate Rights Protected By the Voting Rights Act.

Plaintiffs' coalition theory would require a gerrymander on behalf of minority-preferred parties in every district containing any minorities.   By definition, coalition districts protect political preference, not the right to vote of a singular racial minority group.   As virtually every lower court has noted, Plaintiffs' theory is contrary to Section 2's purpose because it requires the federal judiciary to create or preserve districts that tend to favor Democrats.   The lower courts have consistently rejected this effort to enlist the federal judiciary into rearranging districts "to make the congressional races more competitive for [D]emocratic candidates" because the

---

"Voting Rights Act does not guarantee that the nominee of the Democratic party will be elected, even if black voters are likely to favor that party's candidates." *Smith v. Clark*, 189 F. Supp. 2d 529, 537 (S.D. Miss. 2002); *Baird v. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992); *see also Hall*, 385 F.3d at 430-32 & n.13; *Nixon*, 76 F.3d at 1392; *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 643-44 (D.S.C. 2002).

To the extent that Plaintiffs could pursue Section 2 claims with as little as 20% of the voting population, it would be difficult to establish an obvious end point and judicially manageable standard for recognizing vote-dilution claims by minority groups with only a small fraction of voters. *Cf. Holder v. Hall*, 512 U.S. 874, 885 (1994) (plurality). The Voting Rights Act was intended "to hasten the waning of racism in American politics," *De Grandy*, 512 U.S. at 1020, not to ensure that "race predominates in the redistricting process," *Miller v. Johnson*, 515 U.S. 900, 916 (1996), a situation that would surely raise constitutional concerns. *See Georgia*, 539 U.S. at 490-91 ("[T]he Voting Rights Act, as properly interpreted, should encourage the transition to a society where race no longer matters: a society where integration and color-blindness are not just qualities to be proud of, but are simple facts of life."). Plaintiffs' theory is contrary to the purposes of the Voting Rights Act and the Fourteenth Amendment because it would require that courts and legislatures become fixated on race in drawing virtually every district. Indeed, if the State is required to draw districts with minority percentages between 15% and 40% to avoid liability, then race will be a "predominant factor" in virtually every redistricting decision. *See Miller*, 515 U.S. at 916.

The Davis and LULAC Plaintiffs concede that their Section 2 claims as to senate district 10 seek relief on behalf of a "coalition" of "Black, Hispanic, and Other" minorities. Davis Complaint ¶¶ 3, 35, 42 Civil Action No. 5:11-cv-00788 (Doc. 1). To the extent Plaintiffs allege

that minorities benefit from an alliance with cross-over Anglo voters and should therefore receive Section 2 protection, *Bartlett v. Strickland* categorically precludes their claim.  129 S. Ct. 1231 (2009).  Even if they allege a true coalition claim, reading Section 2 to protect coalition districts contradicts the overwhelming weight of authority and raises grave constitutional concerns.  *Id*.  Thus, Plaintiffs' reading is untenable.  Further discovery will not make Plaintiffs' Section 2 claims more tenable, and these claims should therefore be dismissed.

## IV.    Plaintiffs' Privileges or Immunities Claims Fail as a Matter of Law.

Because Plaintiffs' Privileges or Immunities claims challenge state senate district 10, which implicates a right arising from *state* citizenship, Plaintiffs fail to state a claim upon which relief can be granted.  The Fourteenth Amendment's Privileges or Immunities Clause does not protect "rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law."  *See, e.g., Snowden v. Hughes*, 321 U.S. 1, 7 (1944). "The  right to vote for state officers or initiatives 'is a right or privilege of state citizenship, not of national citizenship which alone is protected by the Privileges or Immunities clause.'"  *Broyles v. Texas*, 618 F. Supp. 2d 661, 688 (S.D. Tex. 2009) (quoting *Snowden*, 321 U.S. at 7).

## V.    Fifteenth Amendment Vote Dilution Claims are not Cognizable.

Plaintiffs' Fifteenth Amendment claims fail as a matter of law because vote dilution is not cognizable under the Fifteenth Amendment.  *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) ("[T]he Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action.") (citing *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000)).  The Fifteenth Amendment prohibits the states from denying a citizen's right to vote. *City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality) ("That Amendment prohibits only

purposefully discriminatory denial or abridgment by government of the freedom to vote 'on account of race, color, or previous condition of servitude.'")  Plaintiffs have not alleged that the State's redistricting plans will deny or abridge any person's right to cast a ballot, much less that they were passed for the purpose of denying the right to do so on the basis of race.

## VI.   Plaintiffs' Delay Calls for the Doctrine of Laches to Bar Them from Obtaining Relief.

The Davis and LULAC Plaintiffs ask this Court to entertain their late-arriving Plan S148 challenges despite the unavoidable hardship it will cause the State of Texas, its electoral officials, local electoral officials, candidates for office, and voters.  By the time trial concludes in this matter, important election deadlines will have passed, and the Court will no doubt require some time to render a decision as to liability.  This will likely result in the State missing other key, interdependent deadlines that ensure timely and organized primary and general elections and will disturb the reasonable expectations of state and local election officials, potential candidate for office, and voters, all of whom rely upon the orderly chain of deadlines written in the State's Election Code.  It will also disturb the reasonable expectations upon which state and local election officials relied when they made staffing decisions and other preparations necessary to implement new precincts and the upcoming election schedule.

Plaintiffs chose this course of action despite knowing of their claims in May and raising similar objections in July when they intervened in the preclearance proceeding.  Worse, they chose this course even though trial had just ended in the consolidated cases where Mr. Veasey and LULAC asserted challenges similar to the challenges they urge here.  Their challenges to Plan S148 invoke the same legal theories as those advanced in the consolidated proceedings and will rely substantially on the same evidence.  Indeed, Mr. Hebert has already designated the same expert in this proceeding as he did in the consolidated proceeding.  In every material respect,

Plaintiffs' Plan S148 challenges will simply repackage their earlier claims with one variation: Plan S148 replaces the Texas House and congressional plans as the focus of Plaintiffs' attacks.

Against this backdrop, Plaintiffs' decision to withhold their Plan S148 challenges appears to be intentionally calculated to maximize prejudice to Defendants, despite the obvious inconvenience that bifurcating claims will visit on the parties (and third-parties) and this Court. In cases involving inequitable conduct such as this, the doctrine of laches prevents Plaintiffs from obtaining a windfall that might otherwise follow from their deliberate delays. Here, laches should bar Plaintiffs from obtaining the declaratory and injunctive relief they seek, at least with respect to interim relief for the upcoming 2012 primary and general elections.

"Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *See Nat'l Assoc. of Gov't Employees v. City Public Serv. Bd. of San Antonio*, 40 F.3d 698, 708 (5th Cir. 1994). It has three elements. *See id.* These are "(1) a delay on the part of the plaintiff in instituting suit; (2) that is not excused; and (3) that results in undue prejudice to the defendant's ability to present an adequate defense." *Id.* For the third element, undue prejudice can take several forms. *See, e.g.*, *Lopez v. Hale County*, 797 F. Supp. 547, 550 (N.D. Tex. 1992), *aff'd* 506 U.S. 1042 (1993). For instance, disturbing the legitimate "expectation interests" of county officials, voters, and candidates can suffice. *Id.* at 550-51. Prejudice lies at the heart of the laches inquiry. *See, e.g.*, *Bush v. Oceans Int'l*, 621 F.2d 207, 211 n.3 (5th Cir. 1980) ("laches is not, like limitation, a mere matter of time; but principally a question of the (equity or) inequity of permitting the claim to be enforced.") (internal citations omitted). Dismissal or summary judgment is an appropriate remedy when the defense of laches applies. *Lopez*, 797 F. Supp. at 552; *see also Nat'l Assoc. of Gov't Employees*, 40 F.3d at 707.

The timing of the Davis and LULAC Plaintiffs' complaints reveals that they delayed bringing their claims and that this delay is inexcusable. Plaintiffs knew of their claims; they simply withheld them for months. In doing so, they now require the Defendants—and the Court—to replow ground that was thoroughly tilled in preparation for and conduct of a two-week trial. Witnesses must be recontacted and examined; expert reports re-written, and resources needlessly re-allocated. It is difficult to surmise a legitimate reason for the delay, except to garner unreasonable tactical advantage in this Court. This delay undeniably caused Defendants and state and local election officials prejudice.

By waiting, Plaintiffs wasted critical time in an already compressed election and litigation schedule during which the parties could have sought discovery and moved for summary relief as appropriate. Plaintiffs have also diverted scarce resources away from companion cases that address many of the issues that they raise here. Defendants' involvement in those claims necessarily affects their ability to defend Plaintiffs' Plan S148 claims, and Plaintiffs knew this would be the case. Their delay also jeopardizes many upcoming election deadlines and the work performed by state and local election officials to implement the Texas Senate election schedule. In the event that the Court can resolve Plaintiffs' claims by December, Plaintiffs' delays will force state and local election officials to work on a compressed schedule. In the event that it cannot, timely and orderly primary and general elections scheduled for 2012 are threatened. Plaintiffs' dilatory litigation practices should not compel state and local election officials to work under unnecessary duress. Further, Plaintiffs' request for an injunction on section 5 grounds will likely become moot upon resolution of the preclearance proceeding.

The facts here parallel those in *Lopez v. Hale County*, 797 F. Supp. 547 (N.D. Tex. 1992). There, a plaintiff sought to enjoin a November 2, 1992 election for County commissioner

in Hale County.  *See id.* at 548.  On October 23, 1991, Hale County had sought preclearance of its four commissioner precincts, which it redrew in September 1991 following the decennial census.  *See id.* at 547.  Despite Hale County's request for expedited consideration, the Department of Justice did not respond to Hale County's preclearance submission until April 10, 1992.  *Id.* at 548.  By that time, the new reapportionment plan already had been implemented, the candidate filing period had passed in December 1991, voter registration certificates had been issued, the primary filing deadline had passed in January 1992, and primary elections for precincts 1 and 3 had occurred.  *Id.*  The Department of Justice denied preclearance on April 10, 1992 citing the need to avoid fragmenting the Hispanic population between precincts 1 and 2. *Id.*  The *Lopez* plaintiff brought his action on April 13, 1992.

The *Lopez* court dismissed the plaintiff's complaint and denied him equitable relief.  *Id.* at 552.  By waiting until several election deadlines had passed and two primary elections had been held before seeking relief, the *Lopez*  plaintiff was "guilty of laches."  *Id.* at 550. Moreover, the court found no reason to disturb the orderly election processes for any precincts when the Defendants had indicated a willingness to reconfigure precinct 2 to gain preclearance. *Id.*  The Court determined that if "the county fails to make changes that are acceptable to this or any other potential plaintiff, or if such changes are made but not precleared, there will be ample opportunity for such a person to obtain section 5 equitable relief."  *Id.* at 550-51.

Defendants here stand on the eve of several important election deadlines, some of which undoubtedly will pass before this Court can render a decision.  There is no indication that Defendants will not reconfigure Plan S148 if ordered to do so in the preclearance proceeding.  In that proceeding, Plaintiffs have raised challenges nearly identical to the challenges they raise here.  Under these circumstances, and as an alternative to dismissal under Rules 12(b)(6) and

12(c), this Court should dismiss Plaintiffs' complaint without prejudice and allow the preclearance proceeding to run its course. If Plaintiffs' Plan S148 objections prevent preclearance, the State or this Court can then reconfigure S148 and install a remedial plan. If, on the other hand, the State obtains preclearance, Plaintiffs can then reurge their other challenges to Plan S148. Under no circumstances would equity compel the Court to hear Plaintiffs' challenges now and interrupt preparations for the 2012 primary and general elections. To the contrary, equity demands the opposite result: preparations for and litigation involving elections under Plan S148 should continue undisturbed in light of Plaintiffs' inexcusable and prejudicial delays.

**PRAYER**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the LULAC Plaintiffs' Complaint and grant Defendants Judgment on the Pleadings as to the Davis Complaint for the following claims asserted by Plaintiffs:

(1) Plaintiffs' claims of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

(2) Plaintiffs' claims under the Privileges or Immunities Clause of the Fourteenth Amendment;

(3) Plaintiffs' claims alleging violations of Section 2 of the Voting Rights Act.

In the alternative, Defendants request that the Court dismiss the complaints of the Davis Plaintiffs and the LULAC Plaintiffs without prejudice pending a decision by the United States District Court for the District of Columbia on preclearance.

Dated: October 21, 2011                     Respectfully Submitted,

                                            GREG ABBOTT
                                            Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil
Litigation

DAVID C. MATTAX
Director of Defense Litigation

J. REED CLAY, JR.
Special Assistant and Senior Counsel
to the Attorney General

*/s/ David J. Schenck*
DAVID SCHENCK
Deputy Attorney General for Legal Counsel
Texas Bar No. 17736870

ANGELA COLMENERO
Assistant Attorney General
Texas Bar No. 24048399

MATTHEW H. FREDERICK
Special Counsel to the Attorney General
Texas Bar No. 24040931

ANA MARIE JORDAN
Assistant Attorney General
Texas Bar No. 00790748

BRUCE D. COHEN
Special Assistant to the Attorney General
Texas Bar No. 24014866

P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1342
(512) 936-0545 (fax)

**ATTORNEYS FOR THE STATE OF
TEXAS, RICK PERRY, AND HOPE
ANDRADE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this filing was sent via the Court's electronic notification system to the following counsel of record on October 21, 2011:

David Richards
Richards, Rodriguez and Skeith
816 Congress Avenue, Suite 1200
Austin, TX 78701
davidr@rrsfirm.com
*Attorney for Davis Plaintiffs*

J. Gerald Hebert
Attorney at Law
191 Somervelle Street, #405
Alexandria, VA 22304
Hebert@voterlaw.com
*Attorney for Davis Plaintiffs*

Donna García Davidson
Attorney at Law
P.O. Box 12131
Austin, TX 78711
Donna@dgdlawfirm.com
*Attorney for Defendant Steve Munisteri*

Eric Opiela
Attorney at Law
1122 Colorado, Suite 2301
Austin, TX 78701
eopiela@ericopiela.com
*Attorney for Defendant Steve Munisteri*

Chad Dunn
Brazil & Dunn
4201 FM 160 West, Suite 530
Houston, Texas 77068
chad@brazilanddunn.com
*Attorney for Defendant Boyd Richie*

Luis Vera
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205
Lrvlaw@sbcglobal.net
*Attorney for LULAC Plaintiffs*

*/s/ David J. Schenck*
DAVID J. SCHENCK
Deputy Attorney General for Legal Counsel