**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| WENDY DAVIS, *et al.*, | § |
|     *Plaintiffs,* | § |
| | § CIVIL ACTION NO. |
| v. | § SA-11-CA-788-OLG-JES-XR |
| | § [Lead Case] |
| RICK PERRY, *et al.*, | § |
|     *Defendants.* | § |

| | |
|---|---|
| LEAGUE OF UNITED LATIN | § |
| AMERICAN CITIZENS (LULAC), | § |
| DOMINGO GARCIA , | § |
|     *Plaintiffs,* | § |
| | § CIVIL ACTION NO. |
| v. | § SA-11-CA-855-OLG-JES-XR |
| | § [Consolidated Case] |
| RICK PERRY, *et al.*, | § |
|     *Defendants.* | § |

## DAVIS PLAINTIFFS' AND LULAC PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

Plaintiffs Wendy Davis, *et al.* ("Davis Plaintiffs") and LULAC file this response opposing the Motion to Dismiss and for Judgment on the Pleadings filed by Defendants Rick Perry, in his official capacity as Governor, Hope Andrade, in her official capacity as Secretary of State, and the State of Texas (collectively, "Defendants").[1]  In this response, "Plaintiffs" shall refer to both the Davis and LULAC Plaintiffs unless otherwise indicated.

---

[1] Defendants state that they are moving for judgment on the pleadings as to Davis Plaintiffs, Mot. at 1 n.1, but Defendants also have moved to dismiss the complaint of Davis Plaintiffs, *id.* at 30. To the extent that Defendants did not waive a motion to dismiss Davis Plaintiffs' Complaint through its footnote, Davis Plaintiffs also oppose Defendants' motion to dismiss, as does LULAC.  This brief is written so as to incorporate the Davis Plaintiffs' position regarding the Defendants' motion for a judgment on the pleadings into our opposition to Defendants' motion to dismiss.

## INTRODUCTION

Defendants continue to create procedural hurdles in an effort to delay an examination of the purpose behind the State's proposed senate plan (S148) and the subsequent disenfranchisement of minority voters that would occur if the proposed senate map were put in place.  As we will show below, Defendants' motion for judgment on the pleadings is meritless.  First, Plaintiffs have a plausible claim under the Fourteenth and Fifteenth Amendments to the United States Constitution that Defendants *intentionally* discriminated against minority voters by dismantling an effective majority-minority district.   Plaintiffs' claims of intentional discrimination underlying the proposed state senate plan is brought pursuant to the factors identified by the United States Supreme Court to determine racially discriminatory purpose in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977).  Defendants' additional argument that Plaintiffs do not have a cognizable vote dilution claim under the Fifteenth Amendment misunderstands the nature of that claim and is contrary to Supreme Court precedent.  Second, long-established Fifth Circuit precedent holds that combined minority population coalitions (*e.g.*, Hispanics and Blacks) can establish a *prima facie* case of vote dilution under Section 2 of the Voting Rights Act ("Section 2"), and this forecloses Defendants' argument that they are entitled to judgment on the pleadings with respect to the Davis Plaintiffs' Section 2 claim.  Third, Davis Plaintiffs continue to believe that the Privileges or Immunities Clause provides an additional ground for relief.  Fourth, the doctrine of laches has no applicability where, as here, no elections have taken place and Defendants are not harmed because they are in essentially the same position as they would have been in if Plaintiffs had

filed earlier.  Plaintiffs respectfully urge that the Court reject Defendants' baseless motion for judgment on the pleadings.

## BACKGROUND

To the extent that election deadlines in Texas are looming and no legally enforceable redistricting plans yet exist with respect to the state senate, state house and congressional districts, it is a problem that the State itself has created.  The State of Texas waited until the very end of the legislative session to enact its state senate and state house maps, and then waited until a special session in June 2011 to enact a congressional redistricting plan.  The state senate redistricting plan, S148, was finally enacted by the Texas Legislature on May 23, 2011.[2] However, Governor Perry waited nearly a month, until June 17, 2011, to sign the plan into law.[3] And state officials then waited more than a month, until July 19, 2011, to seek preclearance of the state senate plan.[4]  The Texas Attorney General is the chief law enforcement officer in the State and has responsibility, along with the Defendant Secretary of State, to administer and enforce election laws and deadlines.  These State officials were certainly aware of these election deadlines when they made the timing choices referenced above.

When the State of Texas finally got around to filing its preclearance action in the D.C. Court, a number of the plaintiffs in this case immediately sought to intervene as defendants in that suit.  In the case of the Davis Plaintiffs, the filing of their motion to intervene in the DC suit was a mere two days after the complaint was filed.  Plaintiffs intervened in the DC suit because they wanted to protect their rights and interests under Section 5 of the Voting Rights Act.  The

---

[2] http://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=82R&Bill=SB31
[3] *Ibid.*
[4] Even then, the State of Texas chose to file for judicial preclearance in the U.S. District Court for the District of Columbia rather than seeking the "speedy alternative" of administrative preclearance from the United States Attorney General.  See *Morris v. Gressette*, 432 U.S. 491, 503 (1977).

D.C. Court promptly granted intervention to the Davis Intervenors (some of whom are plaintiffs in this case) and LULAC, over the opposition of the State of Texas.  The Davis and LULAC Intervenors in the D.C. case anticipated that the United States Department of Justice would oppose preclearance of the state senate plan, the congressional plan, and the state house plan.  On September 19, 2011, however, the United States Department of Justice filed its answer in the D.C. Court stating that while they would not oppose preclearance of the state senate plan or state board of education plan, they would oppose preclearance of the congressional and state house plans.  Plaintiffs here believe that the Department of Justice made that determination because, within the sixty period they had to review all three plans, they lacked all the information necessary to make an informed decision about the racially discriminatory intent that was behind the state senate plan and retrogressive effects of that plan.  Ultimately, the decision whether to preclear the state senate map will not be made by the Department of Justice, but instead will be made by the D.C. Court.  Plaintiffs in this case continue to oppose preclearance in the DC case and fully expect to prevail.  The Davis Plaintiffs filed this lawsuit on September 22, 2011, just three days after the Department of Justice ("DOJ") filed its Answer in the D.C. Court.

## LEGAL STANDARD

Pursuant to Federal Rule 12(c), Texas has moved for judgment on the pleadings as to the Davis Plaintiffs' complaint.  *See* Fed. R. Civ. P. 12.  To prevail on a motion for judgment on the pleadings, Defendants must demonstrate that "the plaintiff can prove ***no set of facts*** in support of his claim that would entitle him to relief."  *Great Plains Trust v. Morgan Stanley Dean Witter*, 313 F.3d 305, 313 (5th Cir. 2005) (emphasis added).[5]  In reaching its decision on this motion,

---

[5] To the extent that Defendants have not waived a request for a motion to dismiss Davis Plaintiffs' Complaint, the Fifth Circuit has recognized that the same standard applies for dismissal under Federal Rules 12(b)(6) and 12(c).  *See Great Plains Trust*, 313 F.3d at 313 n.8.

this Court may rely on "the substance of the pleadings and any judicially noticed facts." *Id.* at

312; *see also* Fed. R. 201 (describing standard for judicial notice).  The Fifth Circuit has

explained that courts may also look at documents outside of the pleadings in making this

determination where relevant.  *Great Plains Trust*, 313 F.3d at 313-14; *see also* CJS

FEDCIVPROC § 486 ("[N]ot every attachment to a motion for judgment on the pleadings ***or***

***opposition thereto*** requires the conversion of a motion into a motion for summary judgment")

(emphasis added).  Where, as here, the parties do not agree on the underlying material facts, such

a motion is unwarranted and should be denied.  *See Great Plains Trust*, 313 F.3d at 312-13; 5A

Charles A. Wright et al., Federal Practice & Procedure § 1367 (2011) ("The motion for a

judgment on the pleadings only has utility when all material allegations of fact are admitted or

not controverted in the pleadings and only questions of law remain to be decided by the district

court.")

## ARGUMENT

**I.     DEFENDANTS ARE NOT ENTITLED TO A JUDGMENT ON THE PLEADINGS OR DISMISSAL ON CLAIMS OF INTENTIONAL DISCRIMINATION UNDER THE FOURTEENTH AND FIFTEENTH AMENDMENTS**

**A.     Plaintiffs have provided sufficient allegations of intentional discrimination under *Arlington Heights*.**

Contrary to Defendants' attempts to minimize the Supreme Court's decision in *Arlington

Heights*, *supra*, that case still provides the overarching framework for using circumstantial

evidence to demonstrate intentional discrimination under the Fourteenth and Fifteenth

Amendments.  *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 968 (1996) (citing *Arlington Heights* as

providing the standard); *cf. Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (same).

The State of Texas, in its motion for judgment on the pleadings, argues that because the Supreme

---

As such, the analysis provided in opposition to the motion for judgment on the pleadings, *infra*,
also applies to and rebuts the motion to dismiss.

Court of the United States sometimes may have found that one particular factor or circumstance was so overwhelming that it proved intentional discrimination, further use of the decision in *Arlington Heights* factors is unnecessary.  *See* Mot. at 15.  But the fact the Court has done so on some occasions does not undercut in any way the viability or utility of applying the *Arlington Heights* factors to demonstrate racially discriminatory intent.  Indeed, in one case under Section 5 of the Voting Rights Act, the Supreme Court has specifically held that when conducting an inquiry into the purpose prong of Section 5, "courts should look to our decision in *Arlington Heights* for guidance."  *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997).

Under *Arlington Heights*, plaintiffs have multiple ways of showing discriminatory intent, which may be inferred on the basis of all or some combination of the factors.  The illustrative (but not exhaustive) sources of relevant circumstantial evidence identified by the Court in *Arlington Heights* that may be considered in determining racially discriminatory intent include:

1) Whether the impact of the official action bears more heavily on one race than another;

2) The historical background of the decision;

3) The specific sequence of events leading up to the decision;

4) Whether there are departures from the normal procedural sequence;

5) Whether there are substantive departures from the normal factors considered; and

6) The legislative or administrative history, including contemporaneous statements made by the decision makers.

429 U.S. at 266-68.  Indeed, in the Supreme Court's recent decision in *League of United Latin American Citizens v. Perry* ("*LULAC*"), Justice Kennedy made clear that racial intent in drawing a map still may be inferred from the changes in the map coupled with observations of decision makers and the historic and contemporaneous political context surrounding the map.  548 U.S. 399, 439-40 (2006).

Particularly at this stage of the litigation, Davis Plaintiffs have made sufficient allegations of racially discriminatory intent in their complaints to move beyond a motion to dismiss or a motion for judgment on the pleadings under the standards set forth in *Arlington Heights*.  For example, the Plaintiffs' Complaints state that "[t]he State's proposed state senate plan was drawn *with the purpose*, and has the effect, of minimizing and reducing the voting strength of minority populations in the Tarrant and Dallas counties area of North Texas."  *See* Davis and LULAC Compl. ¶3 (emphasis added).  The Complaints also identify the "*intentional* fracturing and dismantling of the coalition of minority voters in Senate District 10." *Id*.(emphasis added), The Complaints include allegations as to the disparate impact of plan on minority voters, *see* Davis Compl. ¶¶ 32-42, which show that the "official action bears more heavily on one race than the other" (the first *Arlington Heights* factor).   The Complaints also include allegations that Defendants previously had held up Senate District 10 as a naturally occurring majority-minority district in 2001 when it drew SD 10, and then chose to dismantle as soon as minority voters had succeeded in electing their preferred candidate, *see* Davis Compl. ¶¶32-40, which provides some of the historical background (the second *Arlington Heights* factor).  The fact that legislators were expressly warned of the harm to minority voters, *see* Davis Compl. ¶40; LULAC Complaint ¶38 , sheds light on the "specific sequence of events" that led up to the decision to destroy the minority voter coalition in SD 10 (the third *Arlington Heights* factor).  And both complaints allege that State officials ignored complaints from minority voters and their elected representatives, much of which were made during legislative debates, which is relevant to whether there were "departures from the normal procedural sequence" (the fourth *Arlington Heights* factor), and relevant to "the legislative and administrative history" that can shed light on whether a redistricting plan is discriminatory (the sixth *Arlington Heights* factor).  *See* Davis

Compl. ¶40; LULAC Complaint ¶38.  Finally, allegations that Defendants "dramatically change[d] the demographic makeup of Senate District 10" by moving voters into and out of the district and by "intentionally cleaving" a block of voters through "fracturing and dismantling" the existing district, especially where the district had more than sufficient voters, *see* Davis Compl. ¶¶ 13, 37, 39-41, supports claims based on "departures from the normal factors considered" (the fifth *Arlington Heights* factor).   Again as demonstrated by the cases on which Defendants rely, Plaintiffs need not prove each and every one (or even a majority) of these factors is present in order to show intentional discrimination, much less do so at this stage of the litigation.  A trial is when Plaintiffs' evidence of intentional discrimination against Hispanic voters and Black voters will be presented.  The allegations of discriminatory intent set forth in Plaintiffs' complaints provide sufficient notice to Defendants as to the basis for the claims and demonstrate why Defendants' motion to dismiss or a motion on the pleadings should be denied with respect to these claims.

At any rate, Defendants cannot credibly claim not to understand the substance of Plaintiffs' claims.  First, Defendants have not moved for clarification or for a more definite statement as the Federal Rules of Civil Procedure authorize.  This failure to seek a more definite statement stands in sharp contrast to the Defendants' position in the D.C. Court, where the State has asked on two separate occasions for the D.C. court to order the United States to supplement its Answer to the Complaint with additional details of the Government's position.  No such action has been taken here.

Moreover, as a party to the preclearance litigation, Defendants are familiar with the facts and additional evidence that provides the basis for Plaintiffs' intentional discrimination claim.  As to the third, fourth, and sixth *Arlington Heights* factors, Texas State Senator Judith Zaffirini's

declaration in the D.C. Court describes the redistricting process as "the least collaborate and most exclusive of any [she] ha[s] experienced during [her] time in the Senate" and explains that she clearly expressed her concerns about the closed "intentionally discriminatory process" and offered fair alternative state senate maps to what the State was proposing. *See* Ex. 10 to Davis Intervenors' Opposition to Plaintiff State of Texas' Motion for Summary Judgment (Sen. Judith Zaffirini Decl. & Attachments), **attached as Exhibit 1**; *see also* Ex. 13 to Davis Intervenors' Opposition to Plaintiff State of Texas' Motion for Summary Judgment (Sen. Rodney Ellis Decl. & Attachments), **attached as Exhibit 2**, (describing the state senate redistricting process as "badly flawed and purposefully discriminatory"). The facts presented to the D.C. Court by the Davis and LULAC Intervenors in the preclearance action also provides additional detail as to how the "adopted map carefully targets and removes African American and Hispanic neighborhoods from District 10," which relates to the sixth *Arlington Heights* factor. See Ex. 2 ¶ 10; *see also* Ex. 4 to Davis Intervenors' Opposition to Plaintiff State of Texas' Motion for Summary Judgment (Sen. Rodney Marc Veasey Decl.), **attached as Exhibit 3**. Indeed, these facts bring the present litigation in line with the facts found to be so troubling in *Vera*, 517 U.S. at 961-63, 970-71. These facts developed in the preclearance litigation, in which Defendants are currently involved, further highlight the grave irregularities in the proceedings that bear the hallmarks of intentional discrimination. Plaintiffs have attached these sworn Declarations from the preclearance litigation to this Opposition so that Court can see some of the specific facts that the State Defendants have already been provided and which we intend to offer in this case at trial to substantiate our claims of intentional discrimination.[6]

---

[6] If this Court chooses to do so, it could convert the State's motion here to one seeking a summary judgment under Rule 56 of the Federal Rules of Civil Procedure, and consider these materials. We recognize that the facts set forth in these sworn Declarations are material facts

B.     **Plaintiffs' vote dilution evidence is cognizable under the Fifteenth Amendment.**

Defendants fundamentally misunderstand the nature of Plaintiffs' vote dilution claim under the Fifteenth Amendment.  Plaintiffs do not, as Defendants contend, raise the vote dilution claim solely as a stand-alone Fifteenth Amendment claim.  *See* Mot. at 25-26.  Rather, the charge that the state senate map dilutes minority voting strength (*see, e.g.*, ¶¶ 3 and 41 of Davis Plaintiffs' Complaint) is relevant to showing the effects of Defendants' intentional discrimination, a fact that is relevant under the first *Arlington Heights* factor.  *See supra*.  Under guiding Supreme Court precedent, evidence of vote dilution is always relevant to a Fifteenth Amendment claim when presented in conjunction with other evidence of intent to discriminate. *See Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 & n.3 (2000) (*Bossier II*) (emphasizing that a dilutive impact on minority voting strength would be relevant to Fifteenth Amendment proceedings, as well as Section 2 proceedings); *see also Johnson v. DeGrandy*, 512 U.S. 997, 1025 (1994) (O'Connor, J., concurring) (explaining that a level of proportionality with regard to the number of effective minority opportunity districts is "always relevant" under Section 2). Thus, one way to show that the map violates the Fifteenth Amendment is to show that it intentionally "results in [an] abridgement of the right to vote' or 'abridge[s] [the right to vote]' relative to what the right to vote ought to be" as demonstrated by alternative maps.  *Reno v. Bossier Parish Sch. Bd.*, 528 U.S.at 334 (quoting U.S. Const., amend. XV § 1; 42 U.S.C. § 2(a)) (alterations in original).   Defendants rely on the decision in *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000), *see* Mot. at 25, to make the argument that claims of racial vote dilution are not cognizable under the Fifteenth Amendment.  But the case before this Court alleges *intentional*

_____

that are in dispute.  Accordingly, if this Court were to convert the State's Motion to Dismiss and For Judgment on the Pleadings to one seeking summary judgment under Rule 56, there are genuine issues of material fact that would warrant a denial of the State's converted motion. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

vote dilution, as Plaintiffs' Complaints make clear. *See* Davis Compl. ¶¶ 3, 41 and LULAC

Compl. ¶¶ 3, 38-39. The decision in *Prejean*, therefore, not only does not foreclose claims of

intentional voting discrimination, it also expressly holds that redistricting "done for

predominately racial reasons violates the Fifteenth Amendment and Section 2(a) [of the Voting

Rights Act]." *Prejean, supra*, at 519.

## II.   DEFENDANTS' SECTION 2 ANALYSIS OF COALITION DISTRICTS IS INCORRECT AS A MATTER OF LAW

Defendants' assertion that coalitions composed solely of minority voters are not protected

under Section 2 of the Voting Rights Act is contrary to long-established Fifth Circuit precedent.

*See, e.g.*, *Campos v. City of Baytown*, 840 F.2d 1240, 1245 (5th Cir. 1988); *Westwego Citizens*

*for Better Government v. City of Westwego*, 906 F.2d 1042, 1046 (5th Cir. 1990) (*per curiam*);

*Brewer v. Ham*, 876 F.2d 448, 452 (5th Cir.1989). *Campos* squarely rejected the claim that

Defendants make here in holding that a coalition of minority voters may establish the first

*Gingles* factor where "the minority group together votes in a cohesive manner for the minority

candidate." *Campos, supra*, at 1245. Defendants' attempt to relitigate this issue to circumvent

this binding precedent is unavailing. First, its reliance on the dissents in various Fifth Circuit

cases, *see* Mot. to Dismiss 21, serves only to highlight that the governing rule recognizes that

Section 2 protects cohesive minority coalitions. Second, Texas's reliance on out-of-circuit cases

and another Texas district court case, *see* Mot. to Dismiss 22-23, cannot overcome binding Fifth

Circuit precedent. Finally, Defendants are unable to point to any superseding Supreme Court

precedent. Despite Defendants attempt to obfuscate the issue, *see* Mot. to Dismiss at 20, nothing

in *Bartlett v. Strickland*,  which involved crossover districts not minority coalition districts,

disturbed this long-standing rule, 129 S.Ct. 1231, 1242-43 (2009) (expressly reserving the issue

of coalition districts).[7]  The Plaintiffs respectfully request that the Court summarily reject Defendants' arguments regarding coalition districts as foreclosed by binding precedent.

Even if the Court addresses the merits of Defendants' argument at this stage of the litigation (rather than after a trial) – which it should not –Defendants' purported plain language reading of Section 2 of the Voting Rights Act and Supreme Court precedent is illogical.   At root, Defendants appear to confuse *crossover* districts – in which minority voters must join with like-minded <u>Anglo</u> voters to be effective – and *coalition* districts – in which minority voters join together with each other to make up a majority in a district and elect their preferred candidate. *See Bartlett*, 129 S.Ct. at 1242.  Defendants assume that individual minority groups cannot share the same interest based on their experience as minorities when voting together.  As soon as two minority groups join together, Defendants contend that they are voting cohesively purely for partisan reasons and not  based on their shared experience and interests as minorities vis-a-vis the Anglo population.  *See* Mot. at 16-20.  But the language that Defendants use undercuts their own argument.  For example, Defendants explain "[u]nder § 2, a plaintiff must demonstrate that a redistricting plan results in minorities suffering a disadvantage, *relative to non-minorities*."  *Id.* at 16 (emphasis added).  Plaintiffs' proposed remedial coalition districts meet this standard (For example, the Davis Plaintiffs' SD 10 in Plan S156 is over 58% combined black and Hispanic citizen voting age population).  Thus, Plaintiffs have presented a Section 2 violation that fits Defendants' description:  racial minorities – Black and Hispanic voters – suffer a disadvantage relative to non-minorities – Anglo voters.

---

[7] Notably, both of the two summary affirmance cases on which Defendants erroneously rely, Mot. at 22, occurred <u>before</u> the decision in *Bartlett*.  If these two cases had somehow decided the issue, the Court would not have needed to reserve the question in *Bartlett*, 129 S.Ct. at 1242-43.

Defendants' explanation of *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1985), displays the same logical flaw. The key distinction in *Gingles* is between minority voters and Anglo voters; nowhere is there any such distinction between minority voters.[8]   Again, the excerpt quoted by Defendants highlights this point: "in the absence of significant white bloc voting it cannot be said that the ability of *minority voters* to elect their chosen representatives is inferior to that of white voters." Mot. at 18 (citing *Gingles*, 478 U.S. at 49 n.15) (emphasis added). Contrary to Defendants' backwards reading of Section 2 law, this language actually provides affirmative support for coalition districts like the one Plaintiffs have proposed here. Texas's sordid and continuing history with respect to Blacks and Hispanics, who in many ways have a shared experience of discrimination, provides a paradigmatic example of why recognizing coalition districts is entirely consistent with the purpose of Section 2.

The distinction between coalition districts and crossover districts also undercuts Defendants' parade of horribles, *see* Mot. 24. The existing *Gingles* standard already provides a clear way to discern whether there is a pattern of racially polarized voting sufficient to show a Section 2 claim. The Defendants make the bizarre claim that recognizing coalition districts such as SD 10 will "require[ states] to draw districts with minority percentages between 15% and 40% to avoid liability," Mot. at 24. That is not the case at all. The Plaintiffs here are not seeking a

---

[8] It is unclear why Defendants' rely on a series of cases for the proposition that minority voters do not have the right to proportional representation or to form a winning coalition. *See* Mot. to Dismiss 17. Plaintiffs nowhere argue for or make the claim that they are entitled to proportional representation per se, although the presence or lack of proportionality is "always relevant" in a Section 2 vote dilution claim. *See Johnson v. DeGrandy, supra*, at 1025 (O'Connor, J., concurring). Rather, Davis Plaintiffs' claim is that the state has engaged in "intentional cleaving of an effective concentration of minority voter neighborhoods into disparate pieces that will now have no political impact on any of the districts they are placed within." Davis Compl. ¶ 40. Such a claim of vote dilution, given the presence of racially polarized voting in Texas, is entirely consistent with the Court's recognition that "vote dilution is distinct from the mere inability to win a particular election." *Gingles*, 478 U.S. at 57.

13

remedy that creates a minority plurality district or a racial crossover district.  To the contrary, **the Plaintiffs have made clear that the coalition of minority voters must cross the fifty-percent threshold consistent with the first *Gingles* factor**, *see Bartlett*, 129 S.Ct. at 1246 (interpreting *Gingles* to require that "the minority population in the potential district is greater than 50 percent").[9]   And Plaintiffs have made that showing:  For example, the Davis Plaintiffs' remedial plan (S156) shows proposed Senate District 10 is over 58% combined black and Hispanic citizen voting age population, and just 37% Anglo CVAP.  Similarly, LULAC's remedial plans also propose a Senate District (SD 9) in this region that is over 70% combined Hispanic and Black VAP, and which are majority minority CVAP districts.  See LULAC Remedial Plans S158 and S159.

The above facts describe precisely what Plaintiffs have claimed here and which make out a *prima facie* case of vote dilution under Section 2.  Together, minorities comprise a coalition group who made up a total population majority of Senate District 10's population under the benchmark plan and who voted cohesively in 2008 to elect their preferred candidate of choice – Wendy Davis – and overcame the opposing bloc vote by Anglos.  *See* Davis Compl. ¶¶ 33-36.  Defendants' destruction of that minority voter coalition district was intentionally discriminatory.  Furthermore, as stated above, the Plaintiffs have demonstrated that District 10 can be redrawn in a manner that not only preserves, but enhances this geographically compact, cohesive minority voter coalition comprised such that they can form a majority minority CVAP district.  *See* Plaintiffs' Submission of Proposed Remedial State Senate Plan, Dkt. # 29.  Those are the

---

[9] Of course, Plaintiffs here, as in any Section case, must show that minority voters vote cohesively and that Anglo voters vote in a bloc that normally will defeat the minority voters' preferred candidate.  *See Gingles*, 478 U.S. at 51.   Plaintiffs have made these allegations in their complaints and intend to prove them at trial.

elements of a Section 2 case.  See *Gingles, supra;  Johnson v. DeGrandy, supra*; and *LULAC v. Perry, supra*.

III.    **ALTHOUGH THE COURT NEED NOT REACH THE PRIVILEGES OR IMMUNITIES GROUND, PLAINTIFFS RESERVE THEIR RIGHT TO RAISE THIS ISSUE ON APPEAL.**

The Plaintiffs' Complaints raise a Privileges or Immunities Clause claim to preserve it for appeal.  Justice Thomas' recent concurrence in *McDonald v. City of Chicago, Ill.*, provides historical and textual support for why the Privileges or Immunities Clause should be revived in enforcing citizens' constitutional rights in the face of contrary state legislation.  *See McDonald v. City of Chicago, Ill.*, 130 S.Ct. 3020, 3059-3088 (2010) (Thomas, J., concurring in part, dissenting in part).  As Justice Thomas explains, "[a]t the time of Reconstruction, the terms 'privileges' and 'immunities' had an established meaning as synonyms for 'rights'" and "were used interchangeably with the words 'rights,' 'liberties,' and 'freedoms.'"  *Id.* at 3063.  Although Justice Thomas' opinion was focused on incorporating the original Bill of Rights against the states, the logic applies equally to the right to vote.  The right to vote is one of the "privileges" and "immunities" of citizenship.  *See id.* at 3067 n.6 (quoting Justice Washington's description of "fundamental rights" as including "the elective franchise" in interpreting Article IV, § 2).

Just as Article IV, § 2 was understood to "prohibit the States from discriminating against sojourning citizens with respect to whatever fundamental rights state law happened to recognize," so the Privileges or Immunities Clause prohibits the state from discriminating against citizens on account of race or color in voting for elected state officials.  *Cf. id.* at 3067-68.  Davis Plaintiffs reserve the right to raise this issue in the event of an appeal in this case.  Even if this Court rejects Plaintiffs' argument pursuant to the Privileges or Immunities Clause, all of the Plaintiffs' other claims are unaffected because they do not depend on the Privileges or Immunities Clause arguments.

## IV.     THE DOCTRINE OF LACHES DOES NOT APPLY

Defendants' reliance on the doctrine of laches, Mot. to Dismiss at 26-30, is unavailing for the reasons in Davis Plaintiffs' Advisory on Laches, Dkt. # 34, and in LULAC Plaintiffs' and Davis Plaintiffs' Response Opposing the Motion for a Stay, Dkt. # 46, and incorporated as if set forth herein.  In particular, Defendants continue to misread *Lopez v. Hale County, Tex.*, 797 F. Supp. 547, 549-50 (N.D. Tex. 1992), *aff'd*, 506 U.S. 1042 (1993).  In *Lopez*, the plaintiff *waited until after the election was held* under the unprecleared plan and then filed suit.  *Lopez*, 797 F. Supp. at 548.  The *Lopez* court noted, "An election has been held; voters have cast their ballots; candidates have been nominated; the county has expended considerable money and effort in that process. It would be particularly onerous to void that process and start over, unless overriding equitable considerations required it." *Id.*, at 551.  There is no such prejudice here.  Davis Plaintiffs – even with their extremely limited resources – promptly filed this suit as soon as DOJ filed an Answer in the D.C. preclearance litigation and before any election deadlines.  Because Davis Plaintiffs have agreed to use the record from the *Perez v. Perry*,  No. 11-360, and LULAC has agreed to follow these procedures and meet all other existing deadlines, any trial of this case likely would be only one to two days.  Moreover, Plan S148 is not legally effective because it has not been precleared as it is subject to Section 5 proceedings in the D.C. court.  As a result, this case is in about the same posture as the pending consolidated congressional and house challenges.  *Perez v. Perry*, No. 11-360.  Thus, any of the complaints that Defendants now raise as to election deadlines were equally relevant to the other litigation and should be rejected for the same reasons.

Respectfully submitted,

DAVID RICHARDS
State Bar No. 16846000
Richards, Rodriquez and Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
Tel (512) 476-0005
Fax (512) 476-1513


/s/ J. Gerald Hebert
J. GERALD HEBERT
191 Somervelle Street, #405
Alexandria, VA 22304
(703) 628-4673
Admitted *pro hac vice*

**Counsel for Davis Plaintiffs**



Respectfully submitted,

LUIS ROBERTO VERA, JR.
LULAC National General Counsel
Law Offices of Luis Roberto Vera, Jr.
        & Associates
1325 Riverview Towers
111 Soledad
San Antonio, TX 78205
(210) 225-3300
 lrvlaw@sbcglobal.net

**Counsel for LULAC Plaintiff**


## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of October, 2011, I served a copy of this Plaintiffs'Opposition to Defendants' Motion to Dismiss and for Judgment on the Pleadings on counsel who are registered to receive NEFs through the CM/ECF system. All attorneys who have not yet registered to receive NEFs have been served via first-class mail, postage prepaid.

/s/ J. Gerald Hebert
J. GERALD HEBERT