IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| WENDY DAVIS, *et al.*, § | | |
|    *Plaintiffs,* § | | |
| § | CIVIL ACTION NO. | |
| v. § | SA-11-CA-788-OLG-JES-XR | |
| § | [Lead Case] | |
| RICK PERRY, *et al.*, § | | |
|    *Defendants.* § | | |
| _____ | | |
| | | |
| LEAGUE OF UNITED LATIN § | | |
| AMERICAN CITIZENS (LULAC), § | | |
| DOMINGO GARCIA, § | | |
|    *Plaintiffs,* § | | |
| § | CIVIL ACTION NO. | |
| v. § | SA-11-CA-855-OLG-JES-XR | |
| § | [Consolidated Case] | |
| RICK PERRY, *et al.*, § | | |
|    *Defendants.* § | | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

Defendants Rick Perry, in his official capacity as Governor, Hope Andrade, in her official capacity as Secretary of State, and the State of Texas (collectively, "Defendants") respectfully file this Reply in Support of their Motion to Dismiss and for Judgment on the Pleadings. Plaintiffs' Response fails to identify any allegations that would suffice to state a claim for intentional discrimination.[1] Their Section 2 theory creates a conflict with the Fourteenth Amendment and therefore should be avoided. Their remaining claims have already been rejected by this Court or exist merely to preserve the record for appeal. And all of Defendants' requests

---

[1] Plaintiffs are two different plaintiff groups. The Davis Plaintiffs are Wendy Davis, Marc Veasey, Roy Brooks, Vicky Bargas, Pat Pangburn, Frances Deleon, Dorothy Debose, and Sarah Joyner. The LULAC Plaintiffs are LULAC and Domingo Garcia.

for relief as to the 2012 elections are barred under the doctrine of laches due to Plaintiffs' unjustified delay. For these reasons, the following claims should be dismissed:

(1) Plaintiffs' claims of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

(2) Plaintiffs' claims under the Privileges or Immunities Clause of the Fourteenth Amendment;

(3) Plaintiffs' claims alleging violations of Section 2 of the Voting Rights Act.

## INTRODUCTION

Plaintiffs' Response underscores that their allegations of intent simply repeat allegations that the Supreme Court has rejected as legally insufficient in *Feeney* and *Arlington Heights*. *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). Indeed, Plaintiffs make no attempt to distinguish these cases. And they fail to direct the Court to any allegations that would suffice to state an intentional discrimination claim or disturb the presumption of the Legislature's good faith in enacting Plan S148. *See Miller v. Johnson*, 515 U.S. 900, 915 (1995). Instead Plaintiffs cite their insufficient allegations of "intentional" legislative conduct, allegedly unheeded warnings of disparate impact, and the disparate impact itself to state their claim. (Response at 7-8). Plaintiffs also improperly reach beyond the pleadings and attach declarations in an attempt to bolster their pleadings. *See Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017 (5th Cir. 1996) ("Normally, in deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint.")

Plaintiffs' declaration evidence and allegations of intent, even if true, cannot cure the legal defects in Plaintiffs' claims. Warnings that could theoretically put the Legislature on notice that its proposed plans will have a disparate impact cannot establish discriminatory purpose. The alleged disparate impact must be the cause, rather than the mere consequence, of the Legislature's decision to enact the plans. *See Feeney*, 442 U.S. at 279.

Plaintiffs' Section 2 claims are viable only if a coalition of voters from different minority racial and ethnic groups can state a claim under Section 2. The Supreme Court has rejected similar "crossover" and "influence" claims in *Bartlett v. Strickland*, 129 S. Ct. 1231, 1243 (2009), and *LULAC v. Perry*, 548 U.S. 399, 486 (2006). A coalition theory under Section 2 cannot survive the Court's *Bartlett v. Strickland* and *LULAC v. Perry* decisions because "crossover," "influence,"[2] and "coalition" claims all share the same constitutional infirmity: race-based decision-making to advance political interests. Applying Section 2 to require race-based decisions presumptively triggers strict scrutiny. *See Miller v. Johnson*, 515 U.S. 900, 920 (1995). If Section 2 merely protects individual minority groups from discrimination, it can theoretically survive strict scrutiny. *Id.* ("There is a significant state interest in eradicating the effects of past racial discrimination.") (internal citations and quotation marks omitted). If it instead protects political alliances or shared policy choices, Section 2 will fail strict scrutiny because the protection of political alliances and shared policy choices is not a compelling state interest, and a race-based remedy is not narrowly tailored to achieve that end even if it were.

Plaintiffs concede that they bring their Privileges and Immunities claims simply to preserve the record for appeal. *See* Response at 15. And they offer no reason for this Court to

---

[2] An influence district is a district in which minorities "can influence, rather than alter, election results." *Bartlett*, 129 S. Ct. at 1242 (internal citations and quotations omitted). A crossover district is a district in which "minority voters make up less than a majority of the voting-age population, [but] at least potentially, [are] large enough to elect the candidate of [their] choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.*

depart from its recent decision that the Fifteenth Amendment does not contemplate vote dilution claims.

Finally, the defense of laches bars Plaintiffs' claims in whole or in part. Plaintiffs' Response offers no justification for their decision to pursue their Senate claims separately from their Texas House and congressional claims. Though they cite limited resources, they fail to explain how bringing separate lawsuits increases efficiency and conserves their resources. They also ask the Court to adopt a per se rule that would suspend application of the doctrine of laches in any redistricting case where elections have not yet occurred. This ignores that prejudice can take many forms, including duplicative trials, missed election deadlines, and compressed election schedules.

## ARGUMENT

### I.  Legal Standard for Motion to Dismiss and for Judgment on the Pleadings.

The parties agree that Federal Rules 12(b)(6) and 12(c) share the same standard for dismissal. *See Great Plains Trust v. Morgan Stanley Dean Witter*, 313 F.3d 305, 313 n.8 (5th Cir. 2002). Thus, whether the Court styles Defendants' motion a "motion to dismiss" or a "motion for judgment on the pleadings," the results here are the same. *Cf.* Response at 1 n.1. Plaintiffs' claims fail as a matter of law and should therefore be dismissed.

As explained in Defendants' Motion to Dismiss and for Judgment on the Pleadings, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and brackets omitted); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).[3] For instance, in *Iqbal*, the plaintiff had alleged that then-Attorney General John Ashcroft and other federal officials had

---
[3] "*Twombly* retired the *Conley* no-set-of-facts test" upon which Plaintiffs rely. *Iqbal*, 129 S. Ct. at 1944.

purposefully and invidiously discriminated against him. *Iqbal*, 129 S. Ct. at 1948. Citing *Feeney*, 442 U.S. at 279, the Supreme Court found that "purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences.'" *Iqbal*, 129 S. Ct. at 1948. Thus "to state a claim . . . , respondent must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 1948-49.

The *Iqbal* Plaintiff pleaded that "petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'" *Id.* at 1951 (internal citations omitted). He also pleaded "that Ashcroft was the 'principal architect' of this invidious policy and that Mueller was 'instrumental' in adopting and executing it." *Id.* (internal citations omitted). The Court determined that the plaintiff's "bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim, namely, that petitioners adopted a policy 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Id.* (internal citations omitted). These allegations therefore failed to "nudge [his] claims of invidious discrimination across the line from conceivable to plausible." *Id.* (internal citations and quotation marks omitted).

For the most part, Plaintiffs' intentional discrimination allegations merely repeat formulaic recitations of alleged legislative "intent" or "purpose." *See* Response at 7 (quoting allegations from the Davis Complaint that "[the] senate plan was drawn *with the purpose*" and

that there was "*intentional* fracturing").  Their remaining claims advance legal theories that are unsupported and should be rejected as a matter of law.

## II.     Plaintiffs Cannot Establish Intentional Discrimination.

Plaintiffs confuse the concepts of notice pleading and evidentiary relevance with legal sufficiency to state a claim.  The mere fact that Plaintiffs' Complaints provides adequate notice of their intentional discrimination claims does not make these claims sufficient to state a claim for relief.  *See Francis v. Giacomelli*, 588 F.3d 186, 192-93 (4th Cir. 2009); *compare* FED. R. CIV. P. 8 *with id.* at 12(b)(6); *see also* Response at 8.  Similarly, alleging facts that, if true, could make the existence of an *Arlington Heights* factor more or less probable does not make these allegations sufficient to state a claim.  *See Arlington Heights*, 429 U.S. at 265 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination."); *compare* FED. R. CIV. P. 12(b)(6) *with* FED. R. EVID. 401; *see also* Response at 7-9.  Here, Plaintiffs have not alleged facts that would make an inference of discriminatory purpose more likely than not and they therefore have not stated a claim.

The Supreme Court rarely applies the *Arlington Heights* factors to Section 2 cases,[4] and Plaintiffs have not directed the Court to any decision that does so.  *See* Response at 6 (citing the Section 5 case of *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997)).  *Arlington Heights* nevertheless provides a useful comparison because the facts that Plaintiffs have pleaded parallel the facts that the Supreme Court found insufficient to prove intentional discrimination in *Arlington Heights*.  *See Arlington Heights*, 429 U.S. at 270-71.  *Arlington Heights* involved a zoning application to convert land zoned for single-family use into multi-family use.  *Id.* at 255-60.  The multi-family project proposed for the land at issue would have introduced multi-family

---

[4] *See, e.g., Bush v. Vera*, 517 U.S. 952, 1012 n.9 (1996); *Shaw v. Reno*, 509 U.S. 630, 643-44 (1993) (citing *Arlington Heights* but not applying the *Arlington Heights* factors).

housing to a predominantly single-family community. *See id.* At three public hearings, members of the public spoke both in favor and against the rezoning application. *See id.* "Some of the comments, both from opponents and supporters, addressed what was referred to as the 'social issue'—the desirability or undesirability of introducing at this location in Arlington Heights low- and moderate-income housing, housing that would probably be racially integrated." *Id.* at 257-58. Other comments addressed the proposal's potential effect on property values and the city's stated policy preference that disfavored multi-family developments surrounded by single family housing. *Id.* at 258. The city ultimately rejected the proposed zoning change. *Id.* at 258-60. The district court found that Plaintiffs had not carried their burden of proving discriminatory intent. *Id.* The court of appeals reversed. *Id.* The Supreme Court reversed the court of appeals and found the *Arlington Heights* record insufficient to establish a claim of purposeful discrimination. *Id.*

In identifying portions of their Complaints that purportedly support their allegations of intent, Plaintiffs repeatedly emphasize the warnings and complaints of minority voters and their representatives. *See* Response at 7-8. According to Plaintiffs, these warnings shed light on three *Arlington Heights* factors: the "specific sequence of events" that led up to the enactment of Plan S148, "departures from the normal procedural sequence," and "the legislative and administrative history." *Id.* This reasoning ignores the factual predicate of *Arlington Heights*. There, the city plan commission likewise knew that denial of the rezoning application could disproportionately affect minorities. *See Arlington Heights*, 429 U.S. at 257-58. This "social issue" was at the forefront of the city plan commission's deliberations. *Id.* The commission nevertheless decided against endorsing the zoning change and the Supreme Court found this denial constitutional. *Id.* at 270-71. *Arlington Heights* establishes that the failure to heed "warnings" of legislators and

voters who will reap a political advantage if the Legislature adopts their policy judgments *cannot* suffice to establish intent. Otherwise, a political party holding a minority of seats in the Legislature could dictate political outcomes by loading the legislative record with "warnings" of a potential disparate impact.

The fact that Senate District 10 recently elected an Anglo Democrat does not show that the "historical background" of the decision supports an inference of intent. *See* Response at 7. Notwithstanding Plaintiffs' contrary assertions in their Response, Defendants never claimed—and Plaintiffs have not alleged—that Senate District 10 was a "naturally occurring majority-minority district in 2001." Response at 7. Rather, Plaintiffs allege that "[w]hen Senate District 10 was drawn in the 2001 redistricting cycle, it was 56.6 percent Anglo, 16.7 percent African American and 22.9 percent Hispanic." Davis Complaint ¶ 32. In other words, Senate District 10 was at most a potential crossover district.

Although Plaintiffs identify District 10 incumbent Wendy Davis as the preferred candidate of minority voters, they fail to allege any facts that would disentangle partisan interests from racial discrimination. Only intentional racial discrimination is prohibited. Partisan measures do not constitute intentional discrimination merely because they have a foreseeable impact on certain racial or ethnic groups. *See Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."); *Bush v. Vera*, 517 U.S. at 968 ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify, just as racial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they

merely reflect racial disproportions in the commission of that crime."). This history of one Democrat's electoral success in Senate District 10, followed by a reconfiguration of the district so that it may no longer be a crossover district, does not show that intentional discrimination on account of race caused the reconfiguration. Without allegations to support the requisite causal showing, Plaintiffs' intentional discrimination claims fail. *See Feeney*, 442 U.S. at 279.

Plaintiffs' allegation that the reconfiguration of Senate District 10 "bears more heavily on" racial minorities than Anglos shows, at most, disparate impact. Response at 6-7. According to *Arlington Heights*, the Supreme Court's decision in *Washington v. Davis* "made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights*, 429 U.S. at 264-65 (citing *Washington v. Davis*, 426 U. S. 229 (1976)). *Arlington Heights* also involved "warnings" of disparate impact, but these warnings could not establish discriminatory purpose even when combined with disparate impact. *Id.* at 270-71.

Finally, Plaintiffs allege that by "fracturing and dismantling" an existing district, Defendants departed from "normal factors considered." Response at 8. However, the Complaints allege no facts show what "normal" factors the Legislature considers. Without a baseline for comparison, Plaintiffs cannot state a plausible claim that a "departure" from the baseline has occurred. Plaintiffs' improper attempt to reach beyond the pleadings and cite legislators' declarations as proof of discriminatory legislative process suffers a similar defect. Neither Plaintiffs' Complaints nor the improperly cited declarations establish the "normal" sequence of events for enacting redistricting legislation. Allegations of a hastened political process do little to inform the intentional discrimination inquiry in any event. *See Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 370 (6th Cir. 2002) ("Allegations that the Legislature

acted with haste and did not engage in extensive fact-finding might be a legitimate and even a valid critique of its behavior, but it does not lead to an inference of racial discrimination.").

If Plaintiffs had a good faith basis for doing so, they could have alleged district boundaries inexplicable on grounds other than race; disparities in the process available to plan opponents based on the race of the opponent; racial performance optimized in Plan S148 at the expense of political performance; or circumstantial evidence of reliance on racial data as opposed to political data. Plaintiffs have alleged none of these facts because they have no good faith basis for doing so. Instead, Plaintiffs have alleged that Defendants knew Plan S148 would have a disparate impact on minorities, Defendants enacted Plan S148 anyway, and then the foreseen disparate impact occurred. Even if proven, these facts do not support the inference that Defendants enacted Plan S148 because of Plan S148's alleged discriminatory effect on minority voters. *See Feeney*, 442 U.S. at 279. Plaintiffs have therefore failed to state "plausible claims" of intentional discrimination, and their claims should be dismissed.[5] *Iqbal*, 129 S.Ct. at 1949.

## III.   Section 2 of the Voting Rights Act Does Not Recognize or Protect Coalition Districts.

Plaintiffs rely exclusively on *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988),[6] to support their theory that § 2 requires the creation of coalition districts. But Plaintiffs have failed to reconcile the viability of their *Campos* reading with the Supreme Court's admonition that "[n]othing in section 2 grants special protection to a minority group's right to form political coalitions." *Bartlett*, 129 S.Ct. at 1243. They conspicuously fail to cite in their Response any authorities for their coalition theory that are less than 21 years old, much less any authorities that

---

[5] Since 1973 no Plaintiff has successfully lodged a claim of invidious, intentional discrimination against the State of Texas. *See White v. Regester*, 412 U.S. 755 (1973). Plaintiffs have offered nothing to suggest that Defendants' distant and unfortunate history of discrimination has recently reemerged after a 38-year hiatus.

[6] Plaintiffs also cite *Westwego Citizens for Better Gov't v. Westwego*, 906 F.2d 1042, 1046 (5th Cir. 1990), and *Brewer v. Ham*, 876 F.2d 448, 452 (5th Cir. 1989), but neither of these cases found that a coalition of minority voters had proved a Section 2 violation.

postdate *Bartlett*. *See* Response at 11-15. They likewise fail to explain how coalition districts can survive the Supreme Court's recent summary affirmance of *Rodriguez v. Pataki*. 308 F. Supp. 2d 346, 374-75 (S.D.N.Y.) (three-judge court), *aff'd*, 543 U.S. 997 (2004) (explaining the pitfalls of a coalition theory). Indeed, the Supreme Court's summary affirmance of an opinion rejecting influence districts caused the district court in *Session v. Perry* to reject coalition districts notwithstanding *Campos*. *See Session v. Perry*, 298 F. Supp. 2d 451, 481 (E.D. Tex. 2004) (citing *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1104 (S.D. Ohio), *aff'd*, 540 U.S. 1013 (2003)).

Most importantly, Plaintiffs' Response fails to explain how their reading of *Campos* can survive strict scrutiny or avoid elevating race to a "predominant" factor in redistricting. *Cf. Bartlett,* 129 S. Ct. at 1247; *LULAC v. Perry*, 548 U.S. at 486; *Miller v. Johnson*, 515 U.S. at 920. A rule that requires patching together coalitions of minorities "would unnecessarily infuse race into virtually every redistricting." *Bartlett,* 129 S. Ct. at 1247 (internal citations and quotations omitted). This is especially true in a state like Texas where no racial group commands a majority. Rather than imperil the constitutionality of section 2, courts should adopt a reading that ensures the statute's continued viability. *See id.* (noting that the "canon of constitutional avoidance is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts") (internal citations and quotation marks omitted). Here, the reading that avoids any conflict between section 2 and the Fourteenth Amendment requires rejecting Plaintiffs' coalition theory. The *Campos* decision never examined this constitutional dimension. *Campos*, 840 F.2d at 1244. It also predates several Supreme Court authorities that clarify the interplay between the Voting Rights Act and the Fourteenth

Amendment. *See, e.g.*, *Bartlett,* 129 S. Ct. at 1247; *LULAC v. Perry*, 548 U.S. at 486; *Miller v. Johnson*, 515 U.S. at 920; *Bush v. Vera*, 517 U.S. 952, 1012 n.9 (1996); *Shaw v. Reno*, 509 U.S. 630, 653-54 (1993). In light of these authorities, Plaintiffs' reliance on *Campos* is constitutionally untenable, and Plaintiffs' claims should therefore be dismissed.[7]

### IV. Plaintiffs' Privileges or Immunities Claims Fail as a Matter of Law.

Plaintiffs admit that their Privileges or Immunities Clause challenge exists merely to preserve the record for appeal. Response at 15. At bottom, their claims rely on reading Justice Thomas's concurrence and dissent in *McDonald v. City of Chicago, Ill.*, 130 S. Ct. 3020, 3059-88 (2010), as a silent reversal of *Snowden v. Hughes*, 321 U.S. 1, 7 (1944). Justice Thomas's opinion obviously had no reversing effect and does not resolve the distinction central to this case: the state-created right to vote as opposed to the federally created right vote. *See Snowden*, 321 U.S. at 7. "The right to vote for state officers or initiatives 'is a right or privilege of state citizenship, not of national citizenship which alone is protected by the Privileges or Immunities clause.'" *Broyles v. Texas*, 618 F. Supp. 2d 661, 688 (S.D. Tex. 2009) (quoting *Snowden*, 321 U.S. at 7). The Privileges or Immunities Clause protects only rights of federal citizenship. *See Snowden*, 321 U.S. at 7. Plaintiffs' Privileges or Immunities claim, which seeks protection of a state right to vote for a state official, therefore fails as a matter of law.

### V. Fifteenth Amendment Vote Dilution Claims are not Cognizable.

Plaintiffs' Fifteenth Amendment claims fail as a matter of law because vote dilution is not cognizable under the Fifteenth Amendment. *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir.

---

[7] Plaintiff's Complaints make plain that Senate District 10 was, at best, a cross-over district and only a "coalition" if measured by total population as opposed to total citizen voting age population. Davis Complaint ¶¶ 32-42 (Doc. 1). Citizen voting age population is the proper measure for a section 2 case. *See Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997). Nevertheless, at the pleading stage, this Court must accept Plaintiffs' factual allegations as true, and Plaintiffs have alleged that two majority-minority citizen voting age population coalition districts could be drawn in Dallas and Tarrant counties. *See* Davis Complaint ¶ 42 (Doc. 1).

2000) ("[T]he Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action.") (citing *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000)). Plaintiffs attempt to escape this result by arguing that they have stated a claim for *intentional* vote dilution. *See* Response at 10. Plaintiffs' Response misses the point: vote dilution is not a cognizable injury under the Fifteenth Amendment, whether or not intentional conduct caused the alleged vote dilution. *See City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality) ("That Amendment prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote 'on account of race, color, or previous condition of servitude.'"). For this reason, allegations of intentional conduct could not salvage the Fifteenth Amendment claims in *Perez*. *See* Order, *Perez, et al. v. Texas, et al.*, Civil Action No. 5:11-cv-00360 (Doc. 275). Plaintiffs have supplied the Court with no reason to change course now.

Plaintiffs have not alleged that the State's redistricting plans will deny or abridge any person's right to cast a ballot, much less that they were passed for the purpose of denying the right to do so on the basis of race. Plaintiffs' Fifteenth Amendment claims should therefore be dismissed.

## VI.  Plaintiffs' Delay Calls for the Doctrine of Laches to Bar Relief.

Plaintiffs' cramped reading of *Lopez v. Hale County*, 797 F. Supp. 547 (N.D. Tex. 1992), ignores that the prejudice in that case took many forms. Plaintiffs' reading also ignores that the prejudice here resembles the *Lopez* prejudice in several respects. Like *Lopez*, Plaintiffs' delays will cause missed election deadlines and unavoidable hardship to the State of Texas, its electoral officials, local electoral officials, candidates for office, and voters. Although Plaintiffs' delay will not require duplicative elections, it will, if Plaintiffs' claims survive this Motion and summary judgment, require a duplicative trial.

Plaintiffs' delays in bringing their Plan S148 claims have already unnecessarily consumed scarce resources that would have been better applied to the preclearance and *Perez* proceedings. Although the preclearance scheduling order shows discovery closing on October 25, 2011, this order predates the late-arriving expert reports of the defendant-intervenors in that case. Scheduling Order, Civil Action No. 1:11-cv-01303 (Doc. 51). The State has not had the opportunity to depose these experts regarding their reports and may very well choose to do so if the preclearance matter proceeds to trial. Parallel discovery in this matter and the preclearance proceeding is therefore a very real possibility. Moreover, preparations for a trial in November will require the State and this Court to divert scarce time away from the *Perez* case.

Defendants are not to blame for Plaintiffs' delays. The Department of Justice did not object to Plan S148. If the United States District Court for the District of Columbia grants the State summary judgment on Plan S148, that map would likely have been settled by mid-November. Now, due to Plaintiffs' delays, that map could remain in flux well into December or January, to the detriment of numerous stakeholders. Plaintiffs' justification for this delay rests on two implausible explanations. Plaintiffs first explain that they needed to act in light of DOJ's refusal to do so, but this explanation ignores that Plaintiffs have intervened in the preclearance proceeding. *See* Response at 16. If they believed that Plan S148 retrogressed, they could have objected in that proceeding with or without DOJ action. Plaintiffs' second explanation, which cites their scarce resources, appears pretextual. Conducting two trials will not conserve resources.

Plaintiffs' explanations reinforce the conclusion that tactical advantage motivated them to withhold their claims. Under these circumstances, and as an alternative to dismissal under Rules 12(b)(6) and 12(c), this Court should dismiss Plaintiffs' complaint without prejudice and allow

the preclearance proceeding to run its course. If Plaintiffs' Plan S148 objections prevent preclearance, the State or this Court can then reconfigure S148 as necessary to address any defects identified in preclearance proceedings and order an interim plan. If, on the other hand, the State obtains preclearance, Plaintiffs can then reurge their other challenges to Plan S148. Equity entitles Plaintiffs to no relief as to the 2012 elections. Rather, preparations for and litigation involving elections under Plan S148 should continue undisturbed in light of Plaintiffs' inexcusable and prejudicial delays.

## PRAYER

For the foregoing reasons, Defendants respectfully request that the Court dismiss the LULAC Plaintiffs' Complaint and grant Defendants Judgment on the Pleadings as to the Davis Complaint for the following claims asserted by Plaintiffs:

(1) Plaintiffs' claims of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

(2) Plaintiffs' claims under the Privileges or Immunities Clause of the Fourteenth Amendment;

(3) Plaintiffs' claims alleging violations of Section 2 of the Voting Rights Act.

In the alternative, Defendants request that the Court dismiss the complaints of the Davis Plaintiffs and the LULAC Plaintiffs without prejudice pending a decision by the United States District Court for the District of Columbia on preclearance.

Dated: November 4, 2011                         Respectfully Submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil
Litigation

DAVID C. MATTAX
Director of Defense Litigation

J. REED CLAY, JR.
Special Assistant and Senior Counsel
to the Attorney General

*/s/ David J. Schenck*
DAVID SCHENCK
Deputy Attorney General for Legal Counsel
Texas Bar No. 17736870

ANGELA COLMENERO
Assistant Attorney General
Texas Bar No. 24048399

MATTHEW H. FREDERICK
Special Counsel to the Attorney General
Texas Bar No. 24040931

ANA MARIE JORDAN
Assistant Attorney General
Texas Bar No. 00790748

BRUCE D. COHEN
Special Assistant to the Attorney General
Texas Bar No. 24014866

P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1342
(512) 936-0545 (fax)

**ATTORNEYS FOR THE STATE OF TEXAS, RICK PERRY, AND HOPE ANDRADE**

## CERTIFICATE OF SERVICE

  I hereby certify that a true and correct copy of this filing was sent via the Court's electronic notification system to the following counsel of record on November 4, 2011:

David Richards
Richards, Rodriguez and Skeith
816 Congress Avenue, Suite 1200
Austin, TX 78701
davidr@rrsfirm.com
*Attorney for Davis Plaintiffs*

J. Gerald Hebert
Attorney at Law
191 Somervelle Street, #405
Alexandria, VA 22304
Hebert@voterlaw.com
*Attorney for Davis Plaintiffs*

Donna García Davidson
Attorney at Law
P.O. Box 12131
Austin, TX 78711
Donna@dgdlawfirm.com
*Attorney for Defendant Steve Munisteri*

Eric Opiela
Attorney at Law
1122 Colorado, Suite 2301
Austin, TX 78701
eopiela@ericopiela.com
*Attorney for Defendant Steve Munisteri*

Chad Dunn
Brazil & Dunn
4201 FM 160 West, Suite 530
Houston, Texas 77068
chad@brazilanddunn.com
*Attorney for Defendant Boyd Richie*

Luis Vera
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205
Lrvlaw@sbcglobal.net
*Attorney for LULAC Plaintiffs*

          */s/ David J. Schenck*
          DAVID J. SCHENCK
          Deputy Attorney General for Legal Counsel