IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| WENDY DAVIS, *et al*., | § | |
|     *Plaintiffs,* | § | |
| | § | CIVIL ACTION NO. |
| v. | § | SA-11-CA-788-OLG-JES-XR |
| | § | |
| RICK PERRY, *et al*., | § | |
|     *Defendants.* | § | |
| | § | |
| AND | § | |
| | § | |
| LEAGUE OF UNITED LATIN | § | |
| AMERICAN CITIZENS (LULAC), *et al.* | § | CIVIL ACTION NO. |
|     *Plaintiffs,* | § | SA-11-CA-0855-OLG-JES-XR |
| | § | |
| v. | § | |
| | § | |
| THE STATE OF TEXAS, *et al*., | § | |
|     *Defendants* | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Procedure 56(a), defendants the State of Texas, Rick Perry, and Hope Andrade (collectively, "defendants") respectfully move for summary judgment on the ground that plaintiffs cannot show the existence of a genuine dispute as to any material fact.

**STATEMENT OF THE CASE**

This is a redistricting case. The *Davis* plaintiffs filed their original Complaint on September 22, 2011. (Davis Compl., Doc. 1.). An order appointing a three-judge panel was entered on September 23, 2011. (Doc. 4.) On September 28, 2011, among other deadlines, an expedited scheduling order set an answer date for October 3, 2011 and a discovery deadline on October 31, 2011. (Doc.7.) The order also set trial for November 14, 2011. *Id.* The State defendants and defendant Munisteri timely filed their answers. (Docs. 10, 14.) On October 3, 2011, the Court entered an order permanently enjoining the implementation of Texas's enacted

1

redistricting plan for the state Senate, (Doc. 8), and the Court scheduled an interim Senate redistricting plan hearing immediately following the interim Congressional and state House redistricting hearings scheduled in *Perez v. Perry*, No. 11-360 (W.D. Tex), which were scheduled to begin on October 31, 2011. (Doc. 12.)

On October 17, 2011 the *LULAC* plaintiffs filed their original Complaint raising virtually the same causes of action as the *Davis* plaintiffs. *LULAC v. Perry*, No. 11-0855 (W.D. Tex), Doc 1. The Court consolidated that case with this one on October 19, 2011 and ordered the *LULAC* plaintiffs to "meet the upcoming deadlines and do whatever is necessary to catch up with deadlines that may have already passed." (*Id*., Doc. 33.) The State defendants and defendant Munisteri have filed motions to dismiss and for judgment on the pleadings, (Docs. 11, 40), to which plaintiffs have filed responses, (Docs. 27, 49). These motions remain pending.

## PLAINTIFFS' CLAIMS

Plaintiffs raise four claims:

(1) they are denied equal protection under the law because the state Senate districts are malapportioned under the benchmark plan (S100) in violation of the one person/one vote provision of the Fourteenth Amendment;

(2) they are denied citizenship rights guaranteed by the Privileges and Immunities Clause of the Fourteenth Amendment because the state Senate districts under the benchmark plan (S100) are malapportioned;

(3) the State's enacted state Senate redistricting plan (S148) cannot be administered because it has not been precleared pursuant to Section 5 of the Voting Rights Act; and

(4) the State's enacted state Senate redistricting plan (S148) violates Section 2 of the Voting Rights Act, as well as the Fourteenth and Fifteenth Amendments because it was allegedly

drawn with discriminatory intent and it allegedly has the effect of diluting the votes of an alleged

coalition of minority voters comprised of Latinos and African-Americans in Senate District 10.

(*See* Davis Compl. 7-12, Doc. 1; *see also* LULAC Compl. 6-10, No. 11-0855, Doc. 1)(raising

virtually exact same claims).

## SUMMARY JUDGMENT EVIDENCE

EXHIBIT 1:   Relevant Portions from the United States Department of Justice's Answer in *State of Texas v. Holder*, No. 11-1303 (USDC-District of Columbia), Doc. 40, September 19, 2011;

EXHIBIT 2:   Plan S100 (Benchmark) Senate Map;

EXHIBIT 3:   Plan S100 Texas Legislative Council Reports;

EXHIBIT 4:   Plan S148 (Enacted) Senate Map;

EXHIBIT 5:   Plan S148 Texas Legislative Council Reports;

EXHIBIT 6:    Expert Report and CV of John Alford, Ph.D.;

EXHIBIT 7:   Declaration by Doug Davis;

EXHIBIT 8:   Deposition Excerpts of Doug Davis taken in *Perez v. Perry*, No. 11-360 (Consolidated)(USDC-W.D.Tex);

EXHIBIT 9:   Deposition Excerpts of Wendy Davis and Exhibits;

EXHIBIT 10: CVAP Reports (Red 106) for S100, S148, S156, S158, S159;

EXHIBIT 11: District 10 Election Analysis for 2004, 2006, 2008, and 2010 Elections;

EXHIBIT 12: Excerpts of Al Green Trial Testimony given in *Perez v. Perry*, No. 11-360 (Consolidated)(USDC-W.D.Tex), September 12, 2011.

EXHIBIT 13: Map—S100 Political Shading of DFW area

EXHIBIT 14:  Map—S148 Political Shading of DFW area

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.     The Election of Wendy of Davis in Senate District 10**

Plaintiff Wendy Davis is an Anglo Democrat, who has lived in or around the city of Fort Worth since she was eleven years old. *See* Ex. 9 (Wendy Davis Dep) at 5:20-25.  When local Democratic leaders urged Plaintiff Davis to run for the Senate seat, she was serving as a Fort Worth City Council member. *Id*. at 9:22-25; 18:20-25.  Because Davis had been a city council member for approximately nine years, her name was well known to Fort Worth voters. Neither the incumbent Republican nor Davis was opposed in the 2008 primary.  *Id.* at 22:19-25.

Davis's 2008 election in an Republican district was the result of multiple political factors. *Id.* at 24:13-22; 25:4-7. In addition to Davis being well known to voters in her district, the incumbent senator was linked to a controversy for which he received negative media attention. *Id.* at 19:17-25; 20-21:1-11.  The incumbent was also criticized for twice attempting to have Davis removed from the ballot. *Id.* at 18:11-25; 19:1-9; 23:3-25; 24:1-6.  In addition, according to a press release drafted by Plaintiff Davis's campaign, polling indicated that the incumbent Senator was not well known in his district and was not responsive to the needs of his district constituents. *Id*. at 21:12-25; 22:1-25.  Moreover, the 2008 general election was the first time in the history of the United States that an African American, Barack Obama, was a major party's nominee for U.S. President. *Id*. at 25: 12-22.  Indeed, in 2008, 304,399 voters turned out to vote in the general election in Senate District 10. *See* Ex. 11, (Dist. 10 Election Analysis).  By contrast, in the 2010 general election, only 172,661 Senate District 10 voters cast ballots. *Id.* Similarly, in general elections predating the 2008 President Obama's election, turnout numbers in Senate District 10 were lower: 163,519 in 2006 and 279,719 in 2004.  *Id.*

When Davis was elected Senator for District 10 in the 2008 general election, she received 49.9 % of the total votes cast, while the incumbent received 47.5% of total votes cast, a difference of 2.4 % votes. *See* Ex. 11, (Dist. 10 Election Analysis). The racial composition of the voters who cast ballots in favor of plaintiff Davis in the 2008 general election were as follows: 25.8 % Anglo; 99.6 % Black and 85.3% Hispanic.  *See* Ex. 6 at 4-5 (Alford Report). In 2008, even though Democratic statewide candidates received similar support from Black and Hispanic voters in Senate District 10, no Democratic statewide candidate received the majority of votes cast in the general election in that district. *Id.*; *see also* Ex. 9 at 28:17-22.  In the 2008 general statewide elections, all of the Republican candidates, including African American and Hispanic Republican candidates, received a majority of votes in Senate District 10.  *See* Ex. 6 at 3 (Alford Report); Ex. 11.

### B.     The 2010-2011 Redistricting Process

In the Fall of 2010, Senator Davis provided a written statement to the Senate Redistricting Committee during a Public Outreach hearing on redistricting in Dallas County describing her thoughts about how Senate District should be drawn.  Ex. 9 at 43:10-25;44:1-16 (Wendy Davis Dep.); Ex. 7 at¶ 2 (Decl. of Doug Davis).  Senator Davis also met personally with Senator Seliger in March 2011, *id.* at 44:17-25;45:1-14,  again on May 6, 2011, along with Doug Davis, Director of the Senate Select Committee on Redistricting, Ex. 9 at 56:5-17; Ex. 7 ¶ 3,  and again on May 10.  Ex. 9 at 60:4-8, 17-25.  She testified personally before the committee on May 12. Ex. 9 at 78:12-25; Ex.7 at ¶ 4.  At least twelve witnesses attending and testifying at the same public hearing were her Tarrant County constituents.  Ex. 9 at 65-67, Ex. 7 ¶ 5.

In addition, amendments to Senate District 10, sponsored by Senator Davis, were carried by Senator Zaffirini and presented to the committee at a May 13, 2011 hearing.  Ex. 9 at 68-70;

Ex. 7 ¶4.   The same amendments were presented and rejected on the floor. Ex. 7. Representatives Veasey and Alonzo carried her amendments in the House. *Id.*   Again, the amendments failed to garner the support of the majority. *Id.* In total, the committee held seven Public Outreach hearings around the State and two public hearings during the regular session. Ex. 7 at ¶ 5.  In the end, Plan S148 passed the Senate 29-2 and the House 96-47.

### C.    Preclearance

Texas submitted its Senate Redistricting Plan (S148) to the District of Columbia for preclearance on July 19, 2011.  *Texas v. Holder*, No. 11-1303 (USDC-District of Columbia), Doc. 1.  In its Answer, the United States Department of Justice did not lodge any objections to the Senate Map, admitting that Texas "is entitled to a declaratory judgment that the proposed Senate plan complies with Section 5 of the Voting Rights Act."  *See* Ex. 1(DOJ Answer).  Plan S148 retains the seven Hispanic opportunity districts (S6, S19, S20, S21, S26, S27, and S29) and the two plurality African-American districts (S13 and S23) in the benchmark plan (S100).  *See* Exs. 2, 3, 4, 5, 7, 10.

Like the benchmark, each of the seven Hispanic districts has a Hispanic Citizen Voting Age Population (HCVAP) and a Hispanic Voting Age Population (HVAP) of greater than 50% in Plan S148, giving Hispanics in those districts the ability to elect the candidate of their choice. Likewise, each of the two plurality African-American districts in Plan S148 maintains Black Voting Age Population (BVAP) at levels approximately equal to those in the benchmark plan. African Americans in those districts therefore have at least the same ability to elect the candidate of their choice as they did in the benchmark.

### D.    Senate District 10 in Benchmark and Enacted Plans

Senate District 10 in the benchmark plan, *see* Ex. 2, Plan S100, is wholly contained within Tarrant County and is comprised of 62.7% Anglo CVAP, 15.1 % Hispanic CVAP, and 18.3% Black CVAP. Ex. 10 (Plan S100, Red 106 Rep). Senate District 10 in the benchmark plan is a Republican majority district. Ex. 9 at 11:13-18 (Wendy Davis Depo);  Ex. 3 at 2-3 (Alford Report); Ex. 13 (political shading map).   Under the benchmark plan, combining the citizen voting age populations of Hispanics and African Americans in Senate District 10 results in a total of 33.4%, which is less than a majority of the citizen voting age population. Ex. 10 (Plan S100, Red 106 Rep).

Senate District 10 in the Legislative enacted plan (S148) is wholly contained within Tarrant and is comprised of 69.5% Anglo CVAP (which is an increase of 6.8 from the benchmark), 13.6 % HCVAP (which is a 1.5 difference from the benchmark), and 12.8 % BCVAP (which is a difference of 6.5 from the benchmark). Ex. 10 (Plan S148, Red 106 Rep) Senate District 10 in the enacted plan is a Republican majority district. Ex. 14 (political shading). Under the enacted plan, combining the citizen voting age populations of Hispanics and African Americans in Senate District 10 results in a total of 26.4% which, like the benchmark, forms less than a majority of the citizen voting age population. *See* Ex. 10 (Plan S148, Red 106 Rep).

**E.     Davis' Proposed Plan S 156**

Senate District 10 in the *Davis* plaintiffs' proposed demonstration plan (S156) combines population in Tarrant and Dallas counties to form a district that is dramatically different from the benchmark district.  Ex. 9 at 37-38.  Davis's configuration of SD 10 would be comprised of 37.6 % Anglo CVAP (which is a 25.1 difference from the benchmark); 32.6% HCVAP (which is an increase of 17.5 from benchmark); and 26.0 % BCVAP (which is a 7.7 increase from the benchmark). *Id.*; *see also*  Ex. 10 (Plan S156, Red 106 Rep).  In addition, it would change the

district from a majority Republican district to a majority Democratic district. *See* Senate Interim D-12. Finally, Davis's proposed plan is similar to one of the amendments that she offered during the legislative session but that was rejected by a majority of the Legislature. Ex. 9 at 83:8-25; 84: 1-14. One difference between the amendment and her current proposal is that her current proposal is more compact. *Id.* at 84: 10-14.

F.     LULAC's Proposed Plans S158 and S159

Senate District 9 in the *LULAC* Plaintiffs' proposed demonstration plan (S158) combines populations between Tarrant and Dallas counties to form what purports to be a coalition district. It is comprised of 41.8 % Anglo CVAP (which is an 18.4 drop from the benchmark), 38.0% HCVAP (which is up 20.2 from benchmark), and 16.2 BCVAP (which 1.5 difference  from the benchmark). Ex. 10 (Plan S156, Red 106 Rep).

Senate District 9 in the *LULAC* plaintiffs' proposed demonstration plan (S159) is wholly contained in Tarrant County and is comprised of 47.2 % Anglo CVAP which is a difference if 13% from the benchmark, 21.1% HCVAP and 26.6 % BCVAP.  Moreover, in each of the LULAC proposals, Senator Davis is drawn *out* of the district in which the alleged minority coalition is placed. Ex. 10 (Plan S156, Red 106 Rep).

G.     Cohesion

According to defendants' expert, John Alford, an ecological inference analysis of statewide elections demonstrates that African Americans and Hispanics do not vote cohesively in primary elections.  Ex. 6 (Alford Report) In addition, African-American Congressman Al Green testified at the Section 2 trial in *Perez v. Perry*, that "tension" districts can form if African Americans and Hispanics are placed together in equal numbers.  Ex. 12.

**MOTION FOR SUMMARY JUDGMENT**

I.      **Plaintiffs' Privileges and Immunities Claim Fail as a Matter of Law.**

Plaintiffs allege that the malapportioned Senate districts under the benchmark plan (S100) constitute an abridgement of the privileges and immunities of citizenship guaranteed by the Fourteenth Amendment. (Davis Compl. 8, Doc. 1; LULAC Compl. 4-5, Doc. 1.)  However, the Fourteenth Amendment's Privileges or Immunities Clause does not protect "rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law." *See, e.g., Snowden v. Hughes*, 321 U.S. 1, 7 (1944).  "The right to vote for state officers or initiatives 'is a right or privilege of state citizenship, not of national citizenship which alone is protected by the Privileges or Immunities Clause.'" *Broyles v. Texas*, 618 F. Supp. 2d 661, 688 (S.D. Tex. 2009) (quoting *Snowden,* 321 U.S. at 7).  Because plaintiffs are challenging the legality of a state map that facilitates election of state senators through state law, their claim is not covered by Privileges or Immunities Clause and should be dismissed as a matter of law.

II.     **Plaintiffs' Section 5 Claim Should Be Dismissed As Moot.**

"The goal of a three-judge district court facing a Section 5 challenge must be to ensure that the covered jurisdiction submits its election plan to the appropriate federal authorities for preclearance as expeditiously as possible." *Lopez v. Monterey County*, 519 U.S. 9, 24 (1996).  Once a jurisdiction has submitted its plan to either the DOJ or the District of Columbia, "Section 5 provides no further remedy." *Id.*  Here, it is undisputed that the State of Texas submitted its Senate redistricting plan to the District of Columbia for preclearance and that the United States Department of Justice did not object to Texas's enacted state Senate plan. *See* Exhibit 4.  Because the State of Texas has in fact submitted the Senate redistricting map to the District of

Columbia for preclearance, Section 5 provides no further remedy in this case, warranting dismissal of this claim.

## III.     Plaintiff Wendy Davis Lacks Standing

As an Anglo, Plaintiff Wendy Davis does not belong to a protected racial group. Accordingly, for purposes of the Voting Rights Act, she is not protected by it. Nor do her allegations support any claim for relief under any provision of the United States Constitution. Her claims therefore should be dismissed as a matter of law.

## IV.     Plaintiffs' Claims of Vote Dilution Lack Merit.

Plaintiffs offer no competent summary judgment evidence establishing that by virtue of their race or ethnicity, rather than their partisan affiliation, they have less opportunity than other members of the electorate to elect their candidate of choice.

### A.     Senate District 10 Was Not an Minority Opportunity District

Plaintiffs' claims of vote dilution are based in part on their incorrect assumption that Senate District 10 was considered an "effective" minority opportunity district by the principle map drawer, Doug Davis.  This contention fails, not just because Doug Davis denies it, see Ex. 7 at ¶7,  but because the objective evidence clearly establishes that under *any* measure, district 10 was not and could not be considered any type of minority opportunity district, much less an "effective" one.  Consequently, there is simply no way for plaintiffs to prove that the changes to District 10 have dilutive impact.

The notion that a district can be defined as a "coalition district" for purpose of the Voting Rights Act because a group consisting of multiple races come together to elect candidates of a certain *political* party is inconsistent with the purpose of the Voting Rights Act. *See  Bartlett v. Strickland,* 129 S.Ct. 1231, 1243 (2009)("[n]othing in Section 2 grants special protection to a

minority group's right to form *political* coalitions."). The undisputed evidence establishes that District 10 is not a coalition district, but rather it is at best a crossover district. A crossover district is "one in which minority voters make up less than a majority of the voting-age population. But . . . the minority population at least potentially, is large enough to elect the candidate of choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.* at 1242.

According to the United States Census American Community Survey Special Tabulation Data for Plan S100, the African American citizen voting age population in District 10 is 18.3 percent, the Hispanic citizen voting age population in District 10 is 15.1 percent, and the combination of these populations is 33.4 percent. Ex. 10 (Plan S100, Red 106 Rep). Consequently, no minority group forms a majority in the district, nor can they form a majority by combining their populations. *Id.* Because of the absence of this numerical majority, it is impossible for Plaintiffs to show that their votes controlled the elections in Senate 10 and that their subsequent vote was diluted by the changes to that district.

In addition, Senator Davis acknowledges that the "coalition" of voters who approached her to run for Senate in 2010 included members of the majority Anglo population. Ex. 9 at 14:1-24 (Wendy Davis Depo). And it cannot be denied, given that Wendy Davis is Anglo Democrat, Ex.9 at 9:14-21, that this "coalition" was formed to elect *Democratic* candidates rather than *minority* candidates. Finally, the State's expert, John Alford explains in his report that due to the absence of a numerical majority of minorities in District 10, Senator Davis's election was not possible without Anglo crossover votes. *See* Ex. 6 at 5 (Alford Rep).

While the "crossover" definition applies to Davis's election in 2008 because an increased number of Anglo Republicans crossed over to assist minority voters in 2008, her election is

easily explained by the unique facts surrounding that election and the unpopularity of her Republican opponent. Notwithstanding that Davis's election was an outlier, even if this Court determines that District 10 can be characterized as a crossover district, the Supreme Court made clear in *Bartlett*, that crossover districts are not protected by the Voting Rights Act. *See Bartlett v. Strickland*, 129 S.Ct. at 1246. Accordingly, plaintiff's dilution claims fail as a matter of law.

**V.      Plaintiffs' Claims of Intentional Discrimination Lack Merit**.

Plaintiffs allege that S148 was motivated by intentional discriminatory intent because a group of democratic voters who happened to be minority were moved to other districts in order to make District 10 more Republican. Plaintiffs' claim fails because it is undisputed that these voters were Democrats. According to Doug Davis, the Legislature's expressed intent was to enhance the Republican character of District 10. Ex. 7 at ¶ 10. The political shading of the voting tabulation districts in Tarrant County clearly establish that the Legislature's political goal was accomplished. Ex. 14. In other words, these voters would have been removed from the district *regardless* of their racial composition and ethnicity because they were Democrats, not because they were minority. The Voting Rights Act does not protect Democrats. To the extent that Plaintiffs are asking the Court to find that being a Democrat and being a minority is the same thing, the Supreme Court has made clear that when the two are indistinguishable, Plaintiffs fail to meet their burden of proof.

**A.      The Legislatively Enacted Map Was Motivated By Politics Not Race.**

The mere fact that Doug Davis was aware the racial demographics of the voters he was removing from district 10 is insufficient alone to show intentional discrimination. Federal law recognizes that "[r]edistricting legislatures will . . . almost always be aware of racial demographics; but, it does not follow that race predominates in the redistricting process." *Miller*

*v. Johnson*, 515 U.S. 900, 916 (1995).  While the distinction between being aware of racial considerations and being motivated by them may be difficult to make, plaintiffs bear the burden of doing so. *Id.*

Plaintiffs bear the burden to show that race, not politics, was the motivating factor behind these changes.  To the extent that Plaintiffs may argue that minorities favor democratic candidates and that there can be no distinction between party affiliation and race or ethnicity, their claim fails.  "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates."  *LULAC v. Clements*, 999 F.2d 831, 854 (1993).

Finally, plaintiffs' allegation that S148 was motivated by intentional discriminatory intent because a coalition district was not drawn in the DFW area is equally unavailing.  At the time that the lines were drawn, federal law regarding whether the Voting Rights Act required redistricting legislatures to draw coalition districts, though not definitively settled, strongly suggested that they were not. *See Voinovich v. Quilter*, 507 U.S. 146, 154-155 (holding that § 2 can require creation of majority-minority district, in which a minority group composes a numerical, working majority of the voting age population); *LULAC v. Perry*, 548 U.S. 399, 412 ( holding that § 2 does not require creation of "influence districts"); *Bartlett v. Strickland*, 129 S.Ct. 1231,1242-1243 (holding that § 2 does not require creation of "crossover districts"); *id.* at 1243 (holding that § 2 does not protect right by minority voters to form political coalitions).

Even if the Legislature was wrong about what the VRA required in this regard, however, a mistake in law does not rise to the level of intentional discriminatory intent. *E & T Realty v. Strickland* , 830 F.2d 1107, 1114 (11th Cir. 1987)( "Mere error or mistake in judgment . . . does not violate the equal protection clause. There must be intentional discrimination."). Especially

13

where the evidence establishes only that the changes to DFW districts were motivated by politics not race. *See* Ex. 7 at ¶7-12. Finally, to the extent that plaintiffs may attempt to create discriminatory animus by characterizing the Legislative redistricting process as unfair, the competent summary judgment evidence simply does not bear that out. *See* Ex. 7 at ¶ 2-6 and Ex. 9. For these reasons, plaintiffs' claims should be summarily dismissed.

**B.    The Competent Summary Judgment Evidence Establishes Only that the State's Senate Plan Was Enacted In Good Faith and Without Discriminatory Intent.**

Plaintiffs contend that Senate District 10 was an effective minority opportunity district and that the failure to ensure the re-electability of Senator Davis was intentionally discriminatory because the principle map drawer purportedly "knew" minorities successfully elected her to office. The competent summary judgment evidence simply does not support their claims. See Ex. 7 (Doug Davis Decl ¶ 7-12). The only evidence plaintiffs point to in support of their claim that Senate District 10 was "effective" is the fact that Senate District 10 elected Senator Davis, the minority's "preferred candidate," in 2008. As explained above, it is clear that Senator Davis was not and could not be elected on the strength of minority votes alone, which is consistent with the election analysis that was available to Doug Davis during the redistricting process. That data conclusively established that District 10 was a majority Republican district by virtue of the fact that 48 out of 48 statewide elections between 2002-2010 resulted in Republican victories. Ex.6.

Moreover, the evidence is clear that Senator Davis's election is likely explained by the historic presidential campaign in 2008 and other factors beyond the control of minority voters. Rather, several other significant factors came together to elect Davis in 2008. For example, polling showed that the incumbent was relatively unknown in his district. In addition, a publicized controversy and two failed attempts to remove his only opponent from the ballot

likely further diminished the incumbent's chances for re-election. Finally, there was an unusually high turnout during a historic election of the Democratic nominee, which likely brought more Democrats than Republicans to the polls. There is simply no reasonable basis to believe that this perfect storm would reoccur if the district remained exactly the same. On its face, no reasonable person can characterize Senate District 10 as an effective minority opportunity district on the basis of this one election. Consequently, the Legislature's failure to recognize it as such is not unreasonable.

Further, that Doug Davis made that district more Republican by removing Democratic voters speaks to political motivations, not race considerations. Indeed, if the mere fact that minorities show a preference for one candidate over another and that candidate happens to win the election is sufficient to establish "effectiveness" for purposes of the Voting Rights Act, then *any D*emocrat elected in *any* district, with *any* minority voting age population, would become a protected "effective" minority district. Because no reasonable person would interpret the VRA in such a way, plaintiffs cannot prove that the Legislature's refusal to do so was discriminatory.

The uncontroverted evidence demonstrates only that when the principal map drawer, Doug Davis, believed that a district was "effective" and thus elected a minority's candidate of choice, the district was given special attention to ensure that minorities could continue to elect their candidate of choice in that district. Ex 7 (Doug Davis Decl ¶8).  He goes on to say that he believes Senate District 10 was *not* an effective minority opportunity district, which is why he believed it was not a protected district. *Id*. at ¶ 7. Even if he was mistaken about the district, a mistake of law does not prove intentional discrimination.

Moreover, the fact that the United States Department of Justice has admitted that the Senate Plan was entitled to a declaratory judgment because it fully complied with Section 5

means that DOJ also tacitly conceded that the map was not enacted with a discriminatory purpose. This point is not a subtle one, given DOJ's insistence that Section 5, notwithstanding well-established constitutional concerns, would bar preclearance of an "incompetent retrogressor's" plan. That is to say, a plan created with specific retrogressive intent, but failing to actually retrogress, would not pass preclearance muster, according to that position. *See Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 332 (2000).

Defendants anticipate that plaintiffs will rely almost exclusively on self-serving statements from members of the Democratic delegation to the Texas Legislature to show discriminatory intent. But these statements, even if accepted for purposes of this motion as true, do not show that Plan S148 was enacted with the specific intent to discriminate against African Americans, Hispanics, or any other minority group because of, rather than in spite of, their race, color, or language. All they establish is that politics, not race, were at play here. Claims that legislators representing minorities did not have access to the map drawing process are simply not supported by competent summary judgment evidence.

In fact, as set out above, Senator Davis's own rendition of what transpired during the legislative session recounts numerous conversations and opportunities where she was afforded the opportunity to provide input into the redistricting process. That the Legislature disagreed with her interpretation of the VRA and did not acquiesce to her demands does not mean she was not given access to the process. Ex. 9; Ex.7 ¶ 6.

In the end, Plan S148 won overwhelming support, passing the Senate 29-2 and the House 96-47, and what was a majority Anglo and Republican district remains a majority Anglo and Republican district. Nothing about the process or the data underlying new Senate District 10 evidences that the legislature passed Plan S148 with the specific intent of discriminating on

16

account of race, color, or language.  Rather, the evidence establishes only that politics, not race, motivated the enactment of the senate redistricting map.

**VI.     Section 2 of the Voting Rights Act Does Not Compel Creation of a Coalition District In DFW Because It Would Not Meet the Gingles Factors.**

Plaintiffs' demonstration plans make clear that a section 2 *majority* Latino or majority African American opportunity district cannot be drawn in the Dallas/ Fort Worth Area. Consequently, Plaintiffs argue that Section 2 compelled that a *coalition* district be drawn instead. Even if this Court determines that a coalition district can be drawn in the Dallas-Fort Worth area without running afoul of traditional redistricting principles, this Court should hold that Section 2 does not compel the drawing of such a district because it fails to meet the *Gingles* factors.

**A.  *Gingles* Factors**

1.     *Gingles I*

The first *Gingles* factor requires that the minority group demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).  Only those districts in which a single minority group forms a majority are contemplated by Section 2.  *See Voinovich v. Quilter*, 507 U.S. 146, 154-155 (holding that § 2 can require creation of majority-minority district, in which a minority group composes a numerical, working majority of the voting age population); *LULAC v. Perry*, 548 U.S. 399, 412 ( holding that § 2 does not require creation of "influence districts"); *Bartlett v. Strickland*, 129 S.Ct. 1231,1242-1243 (holding that § 2 does not require creation of "crossover districts"); *id.* at 1243 (holding that § 2 does not protect right by minority voters to form political coalitions).  Nothing in section 2 compels legislatures to draw districts for purposes of bringing minority groups together.

Here, neither the Hispanic citizen voting age population nor the Black citizen voting age population is sufficiently large or compact for a majority Hispanic or African American district in the Dallas/ Fort Worth area. [1] As the plaintiffs have demonstrated in their demonstration plans, drawing a coalition district that is comprised of over 50% citizen voting age population, would require subordinating Texas's traditional redistricting principles and allowing race to predominate, which cannot be done without triggering strict scrutiny. *See* Ex. 8 (Depo excerpt of Doug Davis); *see Shaw v. Reno*, 509 U.S. 630,651 (1993)(vote dilution can justify race-based districting only if "the State employ[s ] sound districting principles… *and* [the affected racial group's] residential patters afford the opportunity of creating districts in which they will be in the majority." ); *see also e.g. Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997).

    2.    *Gingles* II

    The second *Gingles* factor  requires that the minority group show it is politically cohesive.  *Gingles*, 478 U.S. at 51.   The State's expert explains that in contested Democratic primaries within Senate District 10, Black and Hispanic voters do not vote cohesively:

> Without the cue of shared partisanship, Black and Hispanic voters do not typically support the same candidate cohesively when there is a minority candidate running.  Voters in the 'Other' category (mostly Asians) are not particularly important to the issue of a minority coalition in Senate District 10 as they make up only a small proportion of the district population (less than 4 percent of CVAP).  And in any case they do not vote consistently with any other single group. Two of the thirteen Democratic primary contests feature both a Black and a Hispanic candidate.  In both contests Black voters provide cohesive support for the Black candidate, while Hispanic voters give the majority of their support to the Hispanic candidate.   This is perhaps not surprising, as contests like this provide the harshest test of a potential minority coalition.

> Three of the thirteen Democratic primary contests feature a mix of Anglo and Black candidates.  Hispanic voters in all three contests give two-thirds or more of their votes to Anglo candidates.  In one of the contests, the 2008 Presidential

---

[1]  *See* Red 106 Reports, Ex. 10:  Senate District 10 in Plan S156 is comprised of 32.6% HCVAP; 26.0% BCVAP. Senate District 9 in Plan S158 is comprised of 38.0% HCVAP and 16.2% BCVAP.  Senate District 9 in Plan S159 is comprised of 21.1% HCVAP and 26.6% BCVAP.

primary, Black voters give over two-thirds of their support to the Black candidate (Barack Obama). In the 2006 Agriculture Commissioner contest Blacks split their vote between the Black and Anglo candidates (49 to 51) with a slight majority going to the Anglo candidate. In the third contest, the 2008 Railroad Commissioner place 3, none of the racial or ethnic groups votes cohesively.

Eight of the thirteen contests feature a mix of Anglo and Hispanic candidates. In these eight contests Black and Hispanic voters share the same preferred candidate only once, in the other seven contests Hispanic voters typically give two-thirds or more of their vote to the Hispanic candidates while Black voters typically gave two-thirds or more of their vote to the Anglo candidates. In fact, in each of the seven contests, the estimated Black support for the Anglo candidates is actually higher than the estimated Anglo support for the Anglo candidates. The one contest where Blacks and Hispanics voted together was the 2002 contest for Governor, but there the two major candidates where both Hispanics.

Taken as a whole Table 3 clearly shows that Blacks and Hispanics in Senate District 10 do not vote cohesively in the Democratic primary. In fact, Black and Hispanic voters in the Democratic primary are far closer to being racially polarized in their voting behavior than they are to voting as a single cohesive minority coalition.

Expert Report by Dr. Alford, Ex. 6, p.5-7.

Moreover, during the Section 2 trial in *Perez v. Perry*, Texas Congressman Al Green, who is an African American, testified that in his experience placing Hispanics and African Americas together in a single district in equal numbers could potentially create "tension" districts that would likely diminish minority cohesion. *See* Ex. 12. Congressman Green explained that:

there is a sort of a gentle persons agreement that when plurality exits, you work to further the opportunities for persons who represent your views, that can come from a plurality. When equilibrium exists, then it could easily be the case that each party wants to have the same opportunity. So that's when you have unnecessary tension. . .

Ex. 12, 1366: 20-25; 1367: 1-11. This evidence clearly establishes that the minority group in question is not politically cohesive.

In sum, nothing in the text of Section 2 can be read to compel protection of minority supported coalitions defined solely by a common political party affiliation. *See Bartlett,* 129 S.

Ct. at 1243 (2009) ("Nothing in Section 2 grants special protection to a minority group's right to form political coalitions."). A redistricting plan that fails to account for a common partisan preference, shared by people of two, three or more ethnicities, to vote for candidates of one political party does not deprive anyone of the right to vote "on account of race or color."

**PRAYER**

For the foregoing reasons, defendants respectfully request that the Court grant their motion for summary judgment and dismiss with prejudice all claims alleged by plaintiffs.

Dated: November 5, 2011                                Respectfully Submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil
Litigation

DAVID C. MATTAX
Director of Defense Litigation

DAVID SCHENCK
Deputy Attorney General for Legal Counsel

J. REED CLAY, JR.
Special Assistant and Senior Counsel
to the Attorney General

*/s/ Ana M. Jordan*
ANA MARIE JORDAN
Assistant Attorney General
Texas Bar No. 00790748

ANGELA COLMENERO
Assistant Attorney General
Texas Bar No. 24048399

MATTHEW H. FREDERICK

20

Special Counsel to the Attorney General
Texas Bar No. 24040931

BRUCE D. COHEN
Special Assistant to the Attorney General
Texas Bar No. 24014866

P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1342
(512) 936-0545 (fax)

**ATTORNEYS FOR THE STATE
DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this filing was sent via the Court's electronic notification system to the following counsel of record on November 5, 2011 to:

David Richards
Richards, Rodriguez and Skeith
816 Congress Avenue, Suite 1200
Austin, TX 78701
davidr@rrsfirm.com
*Attorney for Davis Plaintiffs*

Eric Opiela
Attorney at Law
1122 Colorado, Suite 2301
Austin, TX 78701
eopiela@ericopiela.com
*Attorney for Defendant Steve Munisteri*

J. Gerald Hebert
Attorney at Law
191 Somervelle Street, #405
Alexandria, VA 22304
Hebert@voterlaw.com
*Attorney for Davis Plaintiffs*

Chad Dunn
Brazil & Dunn
4201 FM 160 West, Suite 530
Houston, Texas 77068
chad@brazilanddunn.com
*Attorney for Defendant Boyd Richie*

Donna García Davidson
Attorney at Law
P.O. Box 12131
Austin, TX 78711
Donna@dgdlawfirm.com
*Attorney for Defendant Steve Munisteri*

Luis Vera
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205
Lrvlaw@sbcglobal.net
*Attorney for LULAC Plaintiffs*

*s/ Ana M. Jordan*
ANA M. JORDAN
Assistant Attorney General