**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| WENDY DAVIS, *et al.*, | § |
|     *Plaintiffs,* | § |
| | § CIVIL ACTION NO. |
| v. | § SA-11-CA-788-OLG-JES-XR |
| | § [Lead Case] |
| RICK PERRY, *et al.*, | § |
|     *Defendants.* | § |
| _____ | |
| | |
| LEAGUE OF UNITED LATIN | § |
| AMERICAN CITIZENS (LULAC), | § |
| DOMINGO GARCIA , | § |
|     *Plaintiffs,* | § |
| | § CIVIL ACTION NO. |
| v. | § SA-11-CA-855-OLG-JES-XR |
| | § [Consolidated Case] |
| RICK PERRY, *et al.*, | § |
|     *Defendants.* | § |
| _____ | § |

<u>**APPENDIX I**</u>

<u>**DAVIS PLAINTIFFS' AND LULAC PLAINTIFFS' STATEMENT OF
GENUINE ISSUES OF DISPUTED MATERIAL FACTS**</u>

Pursuant to Rule 56 Federal Rules of Civil Procedure, the Davis Plaintiffs and LULAC Plaintiffs hereby submit this statement of issues setting forth all material facts as to which there is a genuine issue necessary to be litigated.

As described in the paragraphs below, the Plaintiffs dispute the State of Texas' claim that the State's proposed state senate redistricting plan was enacted free of a racially discriminatory purpose and will not have a dilutive and discriminatory effect. The material factual issues in dispute center on the racially discriminatory process followed by the State of Texas to enact the senate plan, including the shutting out of

minority legislators, as well as those legislators who represent majority-minority districts, from any meaningful role in the redistricting process.  In addition, as explained below, the Davis and LULAC Plaintiffs also dispute the State's claim that that the State's proposed state senate redistricting plan will not lead to a discriminatory result.  The Plaintiffs also dispute the claim made by the State that Senate District 10 was not a district in which minority voters elected the candidate of their choice to the state senate in 2008 elections under the benchmark plan (S100).

We have included references to the parts of the record relied on to support each factual statement set forth below.

## FACTS

1. **The State Correctly Predicted In 2001 That Senate District 10 In The Fort Worth Region Of Tarrant County Would Develop Into A Minority Opportunity District**

1.  Ten years ago, the State of Texas enacted a state senate redistricting plan and submitted that plan to the United States Department of Justice for preclearance under Section 5 of the Voting Rights Act.  When Senate District 10 (hereafter SD 10) was drawn back in 2001, it was 56.6 percent Anglo, 16.7 percent African American and 22.9 percent Hispanic (over 43% combined minority population).  In urging the Department of Justice to approve its 2001 state senate plan, Texas pointed out that the minority population in District 10 was growing, and the State justified its configuration of the district by stating:

> ..District 10 contain[s] significant minority communities that are essentially kept intact within [the] district.  The voting strength of these minority communities in the future will depend on the cohesion within and between Black and Hispanic voters and the ability of such voters to form coalitions with other racial or ethnic groups in support of their preferred candidates.

Exhibit 1 (State of Texas' August 2001 Section 5 Preclearance Submission).

    2.   DOJ precleared the 2001 state senate map and, just as Texas predicted, the minority population continued to grow significantly in SD 10 throughout the decade.  By the time of the 2010 census, Senate District 10's minority population had increased by 9 percent, the Anglo population percentage had fallen by 9 percent, and minorities comprised a majority of Senate District 10's total population.  Exhibit 2 (Plan Statistics for S100, the Benchmark State Senate Plan).

    3.   Since the early part of the last decade, there had been a strong awareness among African American and Hispanic leaders that the minority population within Senate District 10 (African Americans and Hispanics) was large, growing, and politically cohesive.  As a result of the minority growth in SD 10, local minority elected officials and leaders knew that SD 10 was growing into a district in which the minority voters would soon have a realistic opportunity to elect the candidate of choice in that district. As one local elected Hispanic leader put it:

> "Over the course of the decade, Hispanic and African American leaders in Tarrant County had paid close attention to the rapid growth of the minority population within the boundaries of Senate District 10.  As the 2008 election approached, we understood that the minority community had become sufficiently large and united to form an effective coalition to elect our candidate of choice."

Exhibit 3, Declaration of Sergio DeLeon.[1]

    **2.   By 2006-2008, It Became Clear to Minority Leaders in Tarrant County That SD 10 Was an Effective Opportunity District for Black and Hispanic Voters**

---

[1] See also Exhibit 4, Declaration of African American State Representative Marc Veasey ("The City of Fort Worth and adjacent suburban cities including Forest Hill and Everman contain the third largest concentration of African American voters in the State of Texas.  The Hispanic population in our area is also large and growing"),and Exhibit 5, Declaration of African American Tarrant County Commissioner Roy Brooks ("My Commissioners' Precinct includes almost every predominantly African-American neighborhood in the City of Fort Worth and much of the Hispanic growth neighborhoods in the southern part of our County").

4.  The minority population growth in SD 10 over the course of the last decade (along with the shrinking of the Anglo population in that district) was accompanied by an awareness in the minority community and minority leaders in SD 10 that they stood on the verge of being able to elect their preferred candidate to the state senate.  The State Senator who had held SD 10 for many years was Anglo incumbent, Kim Brimer, a senator who had largely ignored the black and Latino communities.  As one local black leader put it:  "[Senator Brimer] rarely visit[ed] our neighborhoods, and fail[ed] to seek our views or even solicit[  ] our votes."  Exhibit 5, Declaration of Roy Brooks.  Minority leaders knew, given the minority population growth in SD 10 and incumbent Senator Brimer's unresponsiveness, that they had the opportunity to make a change, so they went out and recruited a candidate they thought would be viable and electable.  Minority leaders knew too that the only way minority voters could defeat Brimer and overcome the Anglo bloc vote that would support him was to stick together.  As black county commissioner Roy Brooks stated:

> African American and Hispanic leaders deliberately and aggressively recruited Wendy Davis to run in 2008.  African American and Hispanic leaders pledged to each other and to the community at large to concentrate our efforts and our financial resources in order to inform, unite and mobilize minority voters.  We knew that Wendy Davis would not be the candidate of choice of Anglo voters.  To elect our candidate of choice, African Americans and Hispanics had to come together and vote together, which we did.

Exhibit 5, Roy Brooks Declaration.[2]

---

[2] Minority leaders in Tarrant County had good reason to believe that by 2008 SD 10 had grown into a true minority opportunity district.  In 2006, "a talented but badly underfunded District Attorney candidate [ ] nearly carried Senate District 10 while losing county-wide in Tarrant County by a much wider margin." Exhibit 4, Marc Veasey Declaration.

5.   Those who formed the minority coalition behind Senator Wendy Davis' 2008 election knew that, since 2008 was a Presidential election year, they needed to target their scarce resources in SD 10, even if it meant that they would have to withhold their financial support and other resources from statewide campaigns.

> Organizational and financial support was committed to the election of Wendy Davis to the near exclusion of statewide candidates, including our Presidential candidate, Barack Obama and our US Senate candidate Rick Noriega [an Hispanic].  As minority community leaders, we understood that diverting resources to statewide candidates would harm rather than enhance our opportunity to elect our candidate of choice in Senate District 10.

Exhibit 3, Sergio DeLeon Declaration.[3]  State political party leaders also recognized the wisdom of focusing on the SD 10 election.  State Democratic Party Chair Boyd Richie described the strategy regarding the 2008 election in SD 10 this way:

> A conscious, pragmatic decision was made to devote time, effort and resources to the Senate District 10 race, knowing that it would draw resources away from efforts to elect statewide Democratic candidates or to advance the Obama Presidential campaign.  Though that was a hard choice to make as Party Chair, the Texas Democratic Party recognized the practical wisdom of this decision and focused its efforts in Tarrant County and in senate District 10 in particular.  To do this, there was a concerted effort to build support from and mobilize African American and Hispanic voters and to have them unite in their electoral support for Wendy Davis.  We did this, even to the exclusion of efforts for the Obama campaign or other statewide candidates that were going on at the time.

Exhibit 6, Boyd Richie Declaration.

3.   **The 2008 Election Results: The Strong and Cohesive Minority Voter Coalition Elects Senator Wendy Davis**

6.   Just as Commissioner Brooks predicted (Exhibit 4, Brooks Declaration), the 2008 election in SD 10 was marked by severe racially polarized voting.  Exhibit 7, Dr.

---

[3] The minority coalition in SD 10 was so unified and focused that it insisted that all those groups in the coalition agree to focus their resources on SD 10 as the *sole* priority:  "African American and Hispanic leaders also knew that such a concentrated effort would not allow time or money to be spent on the presidential race or on statewide candidates.  In fact, we insisted that all those in our coalition make the Senate District 10 their first and only political priority in 2008 so we could focus our resources on that election."  Exhibit 5, Roy Brooks' Declaration.

Lichtman Report at 2-3.  "Anglo voters strongly bloc voted against the candidates of choice of Latino and African American voters."  *Ibid.*  Dr. Lichtman found that "Senator Davis was an overwhelming consensus choice of Latino and African American voters in the 2008 SD 10 election, and that Senator Davis was elected by a unified coalition of Latino and African American voters." *Id.*, at 3.  Dr. Lichtman's analysis of the racially polarized voting in the 2008 SD 10 election is reported at Table 1 of his Report (Exhibit 7), and shows the following:

**Table 1**
**Ecological Regression Estimates**
**Mean Vote for Democratic Candidate**
**Latino, African American, Anglo Voters**
**2008 General Election for State Senate District 10**

|  | % of Latino Voters for Candidate | % of African American Voters for Candidate | % of Anglo Voters for Candidate |
|---|---|---|---|
| Davis, Democrat | 99% | 99% | 30% |
| Brimer, Republican | 0% | 0% | 67% |
| Cross, Libertarian | 1% | 1% | 3% |

Exhibit 7, Report of Dr. Allan J. Lichtman at Table 1.

7.  Senator Davis, crediting her election in 2008 to the effectiveness of the minority voter coalition, explained it in these terms:

I sought election to the State Senate in 2008 after intense consultation with, and encouragement from, African American and Hispanic leaders in Tarrant County.  I would not have sought election in 2008 had I not received the strong and active support of local African American and Hispanic leaders.  Moreover, the success of my election would not have been possible had I not received the near unanimous support of African American and Hispanic citizens voting in coalition to overcome opposition from a large majority of Anglo voters.

6

Exhibit 8, Senator Wendy Davis Declaration.

     8.  In electing Wendy Davis to the state senate in 2008, minority voters in Tarrant County were finally able to bring about the effective representation of their needs in the Texas Senate.  State Representative Marc Veasey and County Commissioner Roy Brooks, both of whom are African American leaders and elected officials in the Fort Worth area, have provided sworn statements that make clear that Senator Davis was the preferred candidate of choice of minority voters in Senate District 10 in 2008 and that the minority voter coalition that propelled her to office produced a state senator who fights to represent and protect the particularized needs of the minority community in Tarrant County.  Ex. 4, Veasey Declaration; Ex. 5, Roy Brooks Declaration; Ex. 8, Wendy Davis Declaration.  That minority leaders and minority voters in Tarrant County have someone in the state senate now who is more attuned to the needs of the minority communities is confirming evidence that the minority voter coalition in SD 10 that elected the candidate of choice in 2008 was effective and vital to Davis' election.  *Ibid*.  Senator Davis herself has acknowledged the effectiveness of the minority voter coalition both in terms of her election in 2008 and in terms of the representation she has provided to the minority community in Tarrant County:

> Upon my election, I recognized my responsibility as the representative of a minority opportunity district to defend and protect the interests of the minority coalition in Senate District 10 and further recognized that I would be called upon to continue to earn the support of Hispanic and African American voters through my representation.  During my service in the Senate, I have kept open and clear communication with minority leaders and other voters to insure that the positions I take and the votes I cast meet our community's needs and are responsive to their concerns.

Exhibit 8, Sen. Wendy Davis Declaration at ¶6.

    4. **<u>According to the 2010 Census, Senate District 10 Was A Majority-Minority District In Total Population.</u>**

9.  By the time of the 2010 census, Senate District 10 had become majority-minority district in terms of total population. Ex. 2.[4]  SD 10, according to the 2010 census, was 52.4% combined Hispanic, Black and other minorities.  *Ibid*.  The 2010 census also showed that Texas' population had grown so much over the last decade that in order to comply with the one-person, one-vote requirements of the Constitution, the ideal population in each senate district would be 811, 147.  Ex. 2.  The 2010 census also showed that the population of SD 10 was 834,265, a little more than 23,000 (2.85%) over ideal population.  The State of Texas' principal map drawer, Doug Davis (no relation) has testified that SD 10 was well within the overall population range for one-person, one-vote purposes, meaning that SD 10 did not have to change at all to meet the requirements of one-person, one-vote.  Ex. 9, Doug Davis Deposition at 35-36.

10.  In the current benchmark plan, SD 10 is a geographically compact district located entirely within Tarrant County.  Ex. 2.  SD 10 contains a number of identifiable communities of interest:  "Senate District 10 includes almost every minority neighborhood in the City of Fort Worth as well as close-in predominately minority suburbs such as Forest Hill and Everman and other growing minority neighborhoods in Arlington.  Senate District 10 contains the third largest concentration of African American voters in the state of Texas, and its Hispanic population is large and growing."  Ex. 8, Declaration of Wendy Davis.

---

[4] The current (benchmark) state senate plan currently has 12 districts in which minority voters have an opportunity to elect their candidate of choice and participate effectively in the election of a candidate of choice.  Of these 12 senate districts, only Senate District 10 was destroyed as an effective minority opportunity district.  **See Exhibit 13, Sen Rodney Ellis at ¶3**

11.  Even the state senate's map drawer not only was able to identify minority neighborhoods in SD 10 as communities of interest, he was able to identify their racial/ethnic composition:  "Southeast Fort Worth, Everman and Forest Hills are the three historically predominantly African American neighborhoods in Fort Worth."  Ex. 9 at page 33.  He described the community of interest in SD around the stockyard area of North Forth worth as "highly Latino."  Ex. 9 at 33.

12.  That SD 10 contained these recognizable communities of interest is important for redistricting purposes in Texas because the State's principal map-drawer testified that recognizing communities of interest was one of the goals of the redistricting plan and was among the traditional redistricting principles he claimed to follow in drawing the map. Ex. 9, Doug Davis Deposition at 27.  .

**5.  <u>The 2001 Redistricting Cycle in Texas:  The state's Proposed State Senate Plan (S148) Is Motivated By A Racially Discriminatory Purpose.</u>**

  **A.  <u>Racially Exclusive and Discriminatory Process of Senate Redistricting</u>**

13.  Because the State of Texas' 2011 legislative session included a battle over the state budget, the formal process of redistricting the state senate (and other statewide bodies) was delayed until after the budget issues were resolved toward the end of the legislative session in mid May 2011.  As a result, the formal redistricting process for the state senate plan really began after the budget bill was passed and at the very end of the session.  Ex. 9, Doug Davis Deposition at 49.

14.  As a result, the formal senate redistricting process was rushed, with the entire formal process starting with a redistricting committee public hearing on May 12, 2011, and ending just eleven days later with the enactment of the state senate map on May 23, 2011.  See Ex. 12, Bill History for State Senate Redistricting Bill.   The truncated

redistricting process was harmful to the public, which was not given an adequate

opportunity to be heard.  Senator Judith Zaffirini -- an Hispanic who has served in the

Texas Senate since 1987, was on the Senate Redistricting Committee in 2011, and is a

veteran of past redistricting cycles -- summed it up this way:

> The public at large was not given adequate opportunity to comment on the
> plans being considered by the Texas Legislature.  No public hearings on
> proposed maps were held outside the State Capitol in Austin.  The single
> public hearing conducted was held with minimal public notice.  Citizens
> from around our very large state, particularly those on our southern border
> and in other areas far from Austin, were not given adequate notice to
> arrange travel to Austin, much less time to review adequately and to
> develop comments about the proposed plan.

 Exhibit 10, Senator Zaffirini Declaration.

15.   Though the formal redistricting process did not begin in Texas until mid-May

2011, maps were being drawn and secret, behind the scene maneuvering was taking place

among certain state senators and those responsible for drawing the state senate map.  In

the months both before and during the 2011 legislative session in Texas, and before the

official 2010 census numbers were released, the State of Texas' principal point person

and map-drawer for the senate redistricting plan, Doug Davis, began drawing alternative

state senate maps using population projections.  *Id*., at 38-39.  Before the 2011 session

began, several Anglo senators came to Davis to identify potential redistricting problems

with their districts. Ex. 9, Doug Davis Deposition at 42-44.[5]

16.   Though Anglo senators were able to freely discuss redistricting with the

senate's map drawer and the chairman of the Senate Redistricting Committee before any

---

[5] Davis testified he met with one Anglo senator (Fraser) in the summer of 2010 to discuss redistricting and
the potential redistricting problems with his district. Ex. 9 at 42-43.  Davis also identified several other
senators (all Anglo) that he either met with during the legislative session either to discuss redistricting or
with whom he met and showed them a draft configuration to them of their proposed district before any
redistricting plans were made public. Ex. 9, Davis Deposition at 49-58.  Two Anglo Senators even got to
draw their own districts.  *Id*., at 59.

proposed plans were made public, senators representing majority-minority districts, including Senator Wendy Davis, were denied such access.  Some of these state senators were even on the Senate's redistricting committee but were kept in the dark.  For example, State Senator Judith Zaffirini said that the 2011 redistricting process in Texas was the "least collaborative and most exclusive of any I have experienced in my time in the Senate."  Ex 10, Declaration of Senator Judith Zaffirini.  Senator Zaffirini said that "[e]ven as a member of the Redistricting Committee, I was essentially kept in the dark until the map was drawn and released."  Ex. 10.

17.  Similarly, State Senator Royce West, an African American state senator from Dallas who has served in the Senate since 1993, called the 2011 redistricting process "flawed", noting especially the racially discriminatory treatment of those state senators, like him and Senator Wendy Davis and Senator Judith Zaffirini, who represented majority-minority districts:

> Many Senators who represent Anglo-controlled districts enjoyed ongoing participation in developing the Senate plan.  Other senators – most of whom represent minority opportunity districts – were not allowed to see the final configuration of even their own districts in isolation, much less in the broader context of the map – until less than 2 days before it was presented in committee.

Ex. 11, Senator Royce West Declaration. Senator Zaffirini has characterized the state senate redistricting process as "intentionally discriminatory", noting as Senator West did, that

> many senators who represent majority Anglo districts were given open and continued access to the redistricting process for weeks leading up to the formal consideration of the map.  The Anglo senators were able to offer their views and argue their positions extensively, while those of us who represent minority opportunity districts were not allowed the access needed to advocate effectively in behalf of our constituents.

Ex. 10, Declaration of Senator Judith Zaffirini.  Similarly, State Senator Rodney Ellis, an African American who was first elected to the Texas Senate in 1990 and who has now been through three redistricting cycles, has testified in his sworn Declaration that "the process that produced the currently pending 2011 [state senate] map was badly flawed and purposefully discriminatory."  Ex. 13 at ¶2.

18.  Like other Senators who represent majority-minority districts, Senator Wendy Davis was also denied access to information and maps during the redistricting process, despite making direct and repeated requests for such information.  Ex. 8, Declaration of Senator Wendy Davis.

> I made every possible effort throughout the legislative session to communicate the concerns and needs of my constituents and to gain information regarding the configuration of the Senate redistricting map.  My efforts were aggressively rebuffed at every turn.
>
> On many occasions early and throughout the session, I specifically requested to meet with Redistricting Committee Chairman Kel Seliger to discuss the needs of my constituents and to view and respond to draft configurations of Senate District 10.  Senator Seliger refused to discuss redistricting in any substantive manner and failed to share any draft maps.

Ex 8 at ¶s 8-9.  Senator Davis did have one "perfunctory" meeting with the senate's map drawer in March 2011, at which time she "stressed the importance of keeping the existing minority coalition in place in Senate District 10."  *Id.*, at ¶10.    At the March 2011 meeting, Senator Davis asked to view any draft redistricting plans, but none was shown to her.  Id.  Nor were any maps shown to her after repeated requests subsequent to that meeting, though Senator Davis "was aware that other Senators who represented Anglo majorities were being provided an opportunity to see draft maps and to provide their feedback on those maps."  *Id.*

19.   During late April and throughout May, 2011, draft redistricting maps were available for viewing on an "invitation only" basis in a room adjacent to the senate floor and various members were invited, one by one, to leave the floor with Anglo Republican Senator Seliger to review draft proposals and provide their feedback.  When Senator Davis realized this was occurring, she "asked Senator Seliger to be provided the same privilege but was never granted that opportunity."  Senator Davis "also made this request to Senator Seliger's committee staffer, Doug Davis, but was not granted the opportunity."

State officials in Texas acted intentionally each step along the way to ensure that those senators who represented minority opportunity districts were excluded from meaningful participation in the redistricting process.  Not only were these Senators denied the right to see their districts and provide any feedback to those drawing the maps, (See Exs. 8, 10 and 11), but even worse, Anglo Senators were actually shown the districts of other senators who represented minority opportunity districts.  Thus, Senator Carona, an Anglo Senator (Ex. 9 at 52), approximately two weeks prior to the May 12, 2011 public hearing on the state senate map, offered to show Senator Davis "what the plan was for [her] district."  Ex. 8 at ¶15.  Though he never revealed the map to her, he did reveal to her "that there were several priorities that Governor Rick Perry's office had expressed in re-districting, one of which was to make changes necessary in Senate District 10 ." *Ibid*. Senator Carona also indicated to Senator Davis that he and Senator Shapiro (another North Texas Anglo Senator) "had been involved in drafting the maps for their districts and that there had been some give and take between them regarding what was to be the final proposed plan." *Id*.

20.   Members of the general public, including minority elected officials and senators representing majority-minority districts, voiced their strenuous objections about the racially discriminatory redistricting process at the time redistricting was occurring. For example, all twelve senators representing minority opportunity districts in Texas sent a letter dated May 17, 2011 "detailing our objections to the discriminatory redistricting process."  See Ex. 10 (Zaffirini Declaration) and Ex. 16, May 17, 2011 Statement. Numerous others also complained at the time about the discriminatory redistricting process.  These include: Ex. 14, Letter from Senator Davis to Senator Kel Seliger (May 10, 2011); Ex. 15, Letter from Senator Rodney Ellis to Department of Justice (July 5, 2011); Ex. 17, Letter from Tarrant County Commissioner Roy Brooks to Senator Kel Seliger (May 11, 2011); Ex. 18, Letter from Tarrant County Constable Sergio L. De Leon to Senator Kel Seliger (May 12, 2011) ; Ex. 19,  Letter from Senators Judith Zaffirini, Mario Gallegos, Juan Hinojosa, Eddie Lucio, Jr. and Carlos Uresti to Senator Kel Seliger" (May 13, 2011); Ex. 20, Letter from Fort Worth City Council members to Department of Justice (May 10, 2011).

21.   It cannot be denied that the State of Texas was fully aware that the racially discriminatory process of drawing a new senate map was intentional.  After all, every single senator representing a minority opportunity district in the senate (there are twelve) voted for an alternative senate redistricting plan that preserved and protected these twelve senatorial districts, but that amendment was rejected.  See Ex. 10.  Moreover, these same twelve senators issued a statement on May 17, 2011, protesting the attempted destruction of SD 10 as a minority coalition district.  See Ex. 16.  State officials who drew the state senate map ignored the concerns of these twelve senators, the only senators in the State of

Texas who represent minority opportunity districts.  In doing so, state officials trampled on the rights of minority voters throughout Texas.   By pursuing a racially exclusionary and discriminatory redistricting process, rejecting a proposed plan that preserved all twelve minority opportunity district, and by enacting a racially discriminatory state senate plan, Texas officials "knowingly and deliberately undermined the voting rights of minorities in [the] state."  Ex. 14, May 10, 2011 Letter from Senator Wendy Davis to Senator Kel Seliger, Redistricting Committee Chairman.

22.   All twelve Senators who represent minority opportunity districts in the State of Texas favored an alternative map to the one being proposed by the Texas Senate leadership.  They unanimously supported the alternative plan when it came to the floor. All twelve of these senators supported a plan that retained SD 10 as a majority minority opportunity district.  Ex. 10 at ¶9.  All twelve senators objected to the State's redrawn SD 10 (Ex. 11 at ¶2) because it would "[eliminate] the ability of African American and Hispanic voters in the district to elect the candidate of their choice."  *Ibid*.

23.   State officials have attempted to suggest that the state senate map was supported by a number of minority senators because they voted in favor of the map on final passage.  See Ex. 9, Deposition of Doug Davis at pp.  135  .  This is misleading at best.  All twelve state senators who represent minority opportunity districts signed and publicly issued a statement on May 17, 2011, stating that their vote on final passage "should not be interpreted as endorsement of the process used to develop the plan or the configuration of the plan in all parts of our state."  Ex. 16.  As Senators Ellis, Zaffirini and West have explained (Ex. 13, 10 and 11, respectively), a number of senators representing minority districts voted in favor of the state senate map on final passage to

ensure that the state senate would not deadlock over redistricting, which would have resulted in the all Anglo and highly partisan Legislative Redistricting Board drawing the map. Ex. 13 at ¶s 4-5.[6] As Senator Ellis explained, "[m]any Senators feared, with justification, that this harshly partisan body of statewide elected officials would dismantle not only District 10, but other minority opportunity districts as well." *Id.*, at ¶5. Senator Zaffirini explained her vote on final passage, making this same point. (Ex. 10 at ¶8).

24. State officials did not view SD 10 as a minority opportunity district deserving of protection under the Voting Rights Act because blacks did not constitute over 50% of the voting age population and Hispanics did not constitute over 50% of the citizen voting age population in the district. Ex. 9, Deposition of Doug Davis at pp. 9, 13-14. Using only that figure, the State's chief architect of the plan, Doug Davis, testified that he and the Texas Legislature made a "policy choice" not to include SD 10 on their list of districts that should be protected against retrogression. Yet the plan drawer (Doug Davis) admitted that he included two other districts (Districts 13 and 23) on the list of districts to be protected against retrogression as black opportunity districts, even though neither district was over 50% black in voting age population nor over 50% Hispanic in citizen voting age population. Ex. 9 at p. 10. When asked why these two districts would be protected against retrogression under section 5 of the Voting Rights Act but SD 10 would not be protected, Doug Davis testified that it was "a policy choice" made by the Legislature. He admitted that despite being the principal architect of the senate redistricting plan (Ex. 9 at p. 6), he personally never conducted any analysis of SD 10 to

---

[6] Under Texas law, if the legislature deadlocks over senate redistricting, redistricting responsibility shifts to a five-member board comprised of the Lieutenant Governor, Attorney General, Speaker of the House, State Comptroller and State Land Commissioner. Ex. 13 at ¶5.

determine if minority voters had been "effective" in the district in terms of electing the

candidate of their choice:

> Q. Did you conduct any analysis yourself in
> deciding which districts to focus on in the benchmark
> map; did you conduct any analysis yourself to see
> whether Districts 10, 14 and 15 were effective for
> minority voters within those districts?
> A. No, sir.

Ex. 9 at p. 13.[7]

24.  Reconstituted election returns from statewide candidates, even those who

received strong support from minority voters over the last decade, "are not an accurate

measure of minority voting strength" in SD 10. Ex. 11 at ¶6.   African American State

Representative Marc Veasey made this precise point in his sworn Declaration (Ex. 4)

when he explained:

> The fact that we were able to direct and focus resources on the Senate
> District 10 contest and discourage the expenditure of substantive resources
> in Tarrant County on statewide campaigns is why reconstituted statewide
> election results from 2008 should not be used to assess whether minority
> voters have the ability to elect their preferred candidate to office in Senate
> District 10.  **Rather, the best evidence regarding the ability to elect a
> candidate of choice in Senate District 10 is the actual Senate District
> 10 results themselves.**  What the 2008 Senate District 10 results show is
> that minority voters were able to elect their candidate of choice in District
> 10.  The 2008 reconstituted statewide election results, or any other
> statewide results for that matter, are simply not a reliable or accurate
> measure of minority voting opportunity in Senate District 10

Exhibit 4 at ¶9 (emphasis added).  Other local elected officials have made this same

point. See Ex. 4, Roy Brooks Declaration.

---

[7] In fact, Davis also admitted that although he used only the percentage of minorities (voting age population or Spanish Surname Voter registration data) in a district to decide which districts were worthy of protection against retrogression (Ex. 9 at pp. 18), he did not know what the percentage needed to be in a district to avoid retrogression.  Ex. 9 at p. 17.

25.  In the end, even though SD 10 was majority-minority in total population under the benchmark map, and even though the senate had been provided ample evidence by elected officials and numerous members of the public that SD 10 had been effective for minority voters in the 2008 election and was continuing to grow in minority population, the State of Texas dismantled the district anyway.   Perhaps no one summed up the situation any better than African American Commissioner Roy Brooks, who wrote to the Senate Redistricting Committee and the Senate's outside legal counsel on May 11, 2011, and predicted SD 10's demise:

> Over the last decade, the minority population in the 10th District grew to the point that Anglos now make up less than half the population of the district. African American and Hispanic citizens form an effective coalition and have demonstrated their ability to elect their candidate of choice. Now there is a clear possibility, and perhaps even likelihood, that the Texas Legislature will break apart the 10th District in order to crack the effective block of minority voters and eliminate their ability to elect their candidate of choice. I believe that any effort to dilute the voting strength of minority citizens in the 10th Senate District of Texas would be a disservice to many of the people I represent and would constitute illegal retrogression.

Exhibit 17, May 11, 2011 Letter from Roy Brooks to Senator Kel Seliger, *et al*.

**B.  The State Of Texas' Proposed Senate Plan (S148) Carves Up The Minority Population In SD 10, Cleaving Minority Voter Neighborhoods Into Disparate Pieces That Will Have No Political Impact On Any Of The Districts They Are Placed Within.**

26.  As noted above, SD 10 as it existed in the benchmark map was comprised of almost all of the traditional and growing minority neighborhoods of Tarrant County within its borders:  the historic Northside Hispanic neighborhoods, the growing Southside Hispanic neighborhoods, the growing Hispanic neighborhoods of east Fort Worth, the traditional African American southeast Fort Worth and Forest Hill neighborhoods, the

growing African American neighborhoods in Everman, the growing African American

neighborhoods in southwest Fort Worth, and the growing African American

neighborhoods in Meadowbrook.  See Exhibits 4, 5, 8 and 11.  As Dr. Lichtman's expert

report observes, minority voters in these neighborhoods voted cohesively in the 2008 SD

10 election.  Ex. 7 at 2-3.   Senator Davis was an overwhelming consensus choice of

Latino and African American voters in that election.  *Ibid*.

27.  A map depicting current SD 10 and other Tarrant County and Dallas County

Senate Districts in the benchmark map, with shading that shows the predominantly

African American and Hispanic population concentrations, is attached as Ex. 21.  To see

how the State fractured these minority communities that were all previously within SD

10, the Davis and LULAC Plaintiffs have attached as Exhibit 22 a map showing the

demographic shading of minority population with the new proposed senate lines in the

State's plan (S148).  State Senator Rodney Ellis accurately explained what happens to the

minority communities in SD 10 under the State's proposed plan:

> The demolition of District 10 was achieved by cracking the African
> American and Hispanic voters into three other districts that share few, if
> any, common interests with the existing District's minority coalition.  The
> African American community in Fort Worth is "exported" into rural
> District 22 – an Anglo-controlled district that stretches over 120 miles
> south to Falls [County].  The Hispanic Ft. Worth North Side community is
> placed in Anglo suburban District 12, based in Denton County, while the
> growing South side Hispanic population remains in the reconfigured
> majority Anglo District 10.

Ex. 15, July 5, 2011 Letter of Senator Rodney Ellis.

28.  According to the State of Texas, 104,703 Tarrant County residents formerly

in SD 10 have now been placed in SD 22, which runs south over 120 miles from Fort

Worth to south of Waco.  See Ex. 28, Statistical Package for Plan S148.  See also Ex. 4.

Of these, over 80% are minorities (84,093).  Ex. 28.  The current state senator from

District 22 is Senator Birdwell, whose district under the benchmark plan contains no part

of Tarrant County.  Despite the fact that Senator Birdwell's new district now includes

over 104,703 new people from Tarrant County (Ex. 28), he was unable to estimate the

racial composition of the new territory; nor could Birdwell identify a single neighborhood

from Tarrant County that has been assigned to his district under the State's plan.  Ex. 29,

Deposition of Brian Birdwell at pp 17-18.

      29.  The placement of minority voters into Senate District 22 (a new district that

runs south over 120 miles from Fort Worth to south of Waco) will be especially harmful

to the representational interests of minority voters.  Senator Birdwell has been named by

a number of conservative organizations as the most conservative member of the Texas

Senate (Ex. 29 at p.21), and in the last legislative session co-sponsored a number of bills

that minority voters and minority elected officials fought hard to defeat, including a

controversial voter ID bill, and a controversial bill to end in-state tuition for

undocumented Texas students (persons Senator Birdwell referred to in his deposition at

"illegal aliens").  Ex. 29 at pp.19-20.   See also Ex. 7, Report of Allan Lichtman at ¶18

(describing an atmosphere of racial animosity and tensions over such legislation in the

2011 legislative session).

      30.  That the fracturing of minority voters in current SD 10 among several

districts will retrogress or diminish their ability to participate effectively in the political

process is free from doubt.  See Ex. 5 at ¶10, Declaration of Roy Brooks (minority voters

from SD 10 "have been fractured into other districts where we no longer will have an

opportunity to effectively participate in the political process or to elect our preferred

candidate to the state senate"). This fracturing of the minority communities in SD 10 has

a serious detrimental impact on their ability to participate effectively in the political

process. As Dr. Lichtman, who has studied the political behavior of voters in SD 10 has

observed, "The state legislature, in dismantling benchmark SD 10 cracked politically

cohesive and geographically concentrated Latino and African American communities and

placed members of those communities in districts in which they have no opportunity to

elect candidates of their choice or participate effectively in the political process." Ex. 7

at ¶12.

     31. Although the destruction of SD 10 was neither "subtle" nor "particularly

clever" Ex. 5, Roy Brooks Declaration at ¶10), it was effective. See Ex. 7, Dr. Lichtman

Report at ¶11 has stated, "the substantial reduction of the African American and Latino

population in SD 10 under the state's adopted senate plan clearly deprives these minority

groups, that are overwhelmingly cohesive in their voting behavior in general elections,

any realistic chance to once again elect their candidate of choice to State Senate from this

district, or any other senate district in Tarrant County." State officials accomplished this

by removing the core of the district and dramatically reconfiguring it, more than any

other senate district in the entire state. See Ex. 30. Under the State's proposed senate

plan, SD 10 retains just 43% of its current district—while the other 30 senate districts in

Texas retained on average over 75% of their current district's population. See Ex, 30,

Red Appl Report 340. State data also show that of the 53,451 people removed from SD

10 and moved into SD 12 under the State's proposed plan, 89.5% are black or Hispanic;

and of the 104,703 people moved from SD 10 to SD 22, 78.2% are black or Hispanic

(and over 80% are minorities). *Id*. The mostly minority voters removed from SD 10

have been replaced by nearly half a million new persons from districts 9 and 12, of whom more than two-thirds are reliable Anglo voters, who generally vote as a bloc against minority preferred candidates.  *Id*.  See Ex. 7 at p. 2.

32.  Finally, it is worth noting that those in the Legislature who were responsible for drawing the state senate plan apparently recognized that the plan was likely violative of the Voting Rights Act.  Indeed, one Anglo state senator revealed that Republican members had been told that the map would likely not survive a voting rights challenge, and the estate senator expressed his concern that this would mean that the Court would be put in charge of redrawing the North Texas districts, which includes the district he represents.  See Exhibit 8 at ¶15.

Respectfully submitted,

DAVID RICHARDS
State Bar No. 16846000
Richards, Rodriquez and Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
Tel (512) 476-0005
Fax (512) 476-1513

/s/ J. Gerald Hebert
J. GERALD HEBERT
191 Somervelle Street, #405
Alexandria, VA 22304
(703) 628-4673
Admitted *pro hac vice*

**Counsel for Davis Plaintiffs**

Respectfully submitted,

LUIS ROBERTO VERA, JR.
LULAC National General Counsel
Law Offices of Luis Roberto Vera, Jr.
      & Associates
1325 Riverview Towers
111 Soledad
San Antonio, TX 78205
(210) 225-3300
lrvlaw@sbcglobal.net

**Counsel for LULAC Plaintiffs**


## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2011, I filed the foregoing

Appendix I (Statement of Genuine Issues of Disputed Material Facts) and the

accompanying Exhibits 1-33 in this Court's ECF system, which caused copies of this

document to be sent to counsel of record in this litigation. All attorneys who have not yet

registered to receive NEFs have been served via first-class mail, postage prepaid.


/s/ J. Gerald Hebert
J. GERALD HEBERT

List of Exhibits

Ex.
No.        Description of Exhibit

1.    2001 State of Texas Submission for State Senate Preclearance (Excerpts) (August 15, 2001)
2.    Maps and Statistics for S100 (Benchmark Plan)
3.    Sworn Declaration of Constable Sergio De Leon
4.    Sworn Declaration of. Marc Veasey
5.    Sworn Declaration of Commissioner Roy Brooks
6.    Sworn Declaration of Boyd Richie
7.    Expert Witness Report of Dr. Allan J. Lichtman
8.    Sworn Declaration of Sen. Wendy Davis
9.    Doug Davis Deposition (October 18, 2011)
10.   Sworn Declaration of Sen. Judith Zaffirini
11.   Sworn Declaration of Sen. Royce West
12.   SB 31 Bill History
13.   Sworn Declaration of Sen. Rodney Ellis
14.   Letter from Senator Davis to Senator Kel Seliger (May 10, 2011)
15.   Letter from Senator Rodney Ellis to Department of Justice (July 5, 2011)
16.   Official Statement from Democratic Senators regarding SB 31 (May 17, 2011)
17.   Letter from Tarrant County Commissioner Roy Brooks to Senator Kel Seliger (May 11, 2011)
18.   Letter from Tarrant County Constable Sergio L. De Leon to Senator Kel Seliger (May 12, 2011)
19.   "Letter from Senators Judith Zaffirini, Mario Gallegos, Juan Hinojosa, Eddie Lucio, Jr. and Carlos Uresti to Senator Kel Seliger" (May 13, 2011)
20.   Letter from Fort Worth City Council members to Department of Justice (May 10, 2011)
21.   Demographic Shade Maps for S100
22.   Demographic Shade Maps for S148
23.   Senate Journal (Excerpts)-May 17, 2011
24.   Senate Journal – Printed Remarks  on CSSB-31 (May 17, 2011)
25.   Senate Hearing Regarding Senate Redistricting
       May 13, 2011  -
       http://www.senate.state.tx.us/avarchives/ramav.php?ram=00005314
       May 12, 2011 - Part I,
       http://www.senate.state.tx.us/avarchive/ramav.php?ram=00005305
       May 12, 2011 - Part II -
       http://www.senate.state.tx.us/avarchive/ramav.php?ram=00005306
26.   House Journal (Excerpts)- May 20, 2011
27.   House Journal (Excerpts)- May 21, 2011
28.   Maps and Statistics for S148

29.   Senator Brian Birdwell Deposition
30.   Plan Overlap Analysis: Plan S148 Compared with Plan S100 (Red-340)
31.   Marc Veasey Deposition (Excerpts) (*Perez, et al. v. Perry, et al.,* August 19, 2011)
32.   Sworn Declarations of Davis Plaintiffs Regarding Residency and Voter Status
33.   Order of DC Court in *State of Texas v. United States*, November 8, 2011