# In the United States District Court
# for the
# Western District of Texas

| | | |
|---|---|---|
| SHANNON PEREZ, ET AL. | § | |
| | § | |
| v. | § | SA-11-CV-788 |
| | § | |
| RICK PERRY, ET AL. | § | |

## ORDER

Defendants' motion to stay implementation of the court-drawn interim house redistricting plan pending appeal (Dkt. No. 90) is DENIED for the reasons given in this Court's Order dated November 23, 2011. As stated in that Order, when there is no other legally enforceable plan in effect, this Court is required to craft an independent court-drawn interim map. The State has misinterpreted the applicable case since the inception of the interim court plan process. The State insists that the Court must simply adopt its enacted uncleared plan, making only minimal changes, if any, to "remedy" any constitutional or statutory violations. The State continues to rely on *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518 (1982), which is clearly inapposite to the situation that the Court faces herein. In *Upham*, the district court was faced with drawing a remedial

1

plan after preclearance of the State's enacted plan had been denied. In the remedial phase, under *Upham*, the district court's task would be limited to remedying the portions of the map known to be retrogressive or otherwise violating the Voting Rights Act or the U.S. Constitution. Had the State chosen the path of administrative preclearance through the Department of Justice, we would perhaps be in the remedial phase right now. However, the State chose to file a lawsuit in the United States District Court in the District of Columbia, which is still pending, and we are not in the remedial phase. Instead, we are in an interim phase where the Court has been placed in the position of crafting an independent court drawn plan that complies with the U.S. Constitution and Sections 2 and 5 of the Voting Rights Act. In doing so, the Court is precluded from simply adopting the State's enacted plan or deferring to the challenged plan, as doing so would make the preclearance process meaningless and constitute a de facto ruling on the merits of the various legal challenges to the State's plan. *See Lopez v. Monterey County*, 519 U.S. 9, 117 S.Ct. 340 (1996)(district court erred when it failed to independently craft an electoral plan and instead adopted the County's proposal, which required preclearance); *see also McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224 (1981)(district court erred in adopting the County's plan, which required preclearance). It is undisputed that the "failure to obtain either judicial or administrative

2

preclearance renders the [voting] change unenforceable," *Clark v. Roemer*, 500 U.S. 653, 111 S.Ct. 2096, 2101 (1991), and the Court cannot simply adopt an uncleared redistricting plan, in whole or in part, with the signatures of a few judges sitting in Texas.

Further, the Court's order is not akin to a preliminary injunction as the State suggests. The only request for injunctive relief that has been raised in this lawsuit is the plaintiffs' request that the State's enacted plan be enjoined from implementation because it has not been precleared. *See Clark*, 111 S.Ct. at 2101 (if there has been no preclearance, plaintiffs are entitled to an injunction prohibiting the State from implementing the changes). However, since the inception of this lawsuit, the State has admitted that its enacted plan must be precleared prior to implementation. Yet it has persisted in trying to avoid preclearance altogether by demanding that its uncleared plan be adopted by the Court as an interim court drawn plan. Again, the dictates of the U.S. Supreme Court preclude this Court from doing so.

The dissent has somewhat embraced the State's arguments, and also relies on *Upham*, even though this Court has not arrived at the remedial stage of these proceedings. Likewise, the dissent tries to distinguish *Lopez* based on the procedural posture of the preclearance proceedings in this matter. However, there was no preclearance in *Lopez* and there is no preclearance in this case. At

3

the end of the day, no preclearance means no preclearance, and no enforceable plan. The dissent also fails to appreciate that the Court has drawn an independent redistricting plan without ruling on any of the various legal challenges, and it has considered the parties' legal challenges only for the purpose of avoiding the same legal challenges to the court drawn map. *See Conner v. Waller*, 421 U.S. 657, 95 S.Ct. 2003 (1975)(the district court cannot decide the constitutional challenges to the challenged, unprecleared plan). The Court's Senate plan clearly rises above the myriad of challenges to the State's enacted plan and allows a free and fair election in 2012.

In conclusion, the State claims that it will be irreparably injured if a stay is not granted. However, the individuals who would suffer irreparable injury if the stay were granted are the citizens of Texas, by being deprived of the opportunity to vote in the upcoming election under the schedule currently in place.

SIGNED this 25th day of November, 2011.

_____/s/_____
ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE

```
_____/s/_____
```
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE


JERRY E. SMITH, Circuit Judge, dissenting:

Because a stay of the orders implementing interim plans for the 2012 elections is needed to allow orderly review and clarification of critical legal issues, and because a stay will not harm any party, I respectfully dissent from the denial of a stay. In its order announcing an interim redistricting plan for the Texas House of Representatives, the majority acknowledged that "these are difficult issues and reasonable minds can disagree." It is therefore puzzling that the majority is unwilling to stay its order so that those difficult issues can be addressed on appeal before the announced interim plans are implemented.

There are myriad issues to be decided regarding interim, court-ordered redistricting plans. Because these matters are usually raised only in the wake of the decennial census, the caselaw is somewhat sparse and often murky. Questions that are not addressed now, before any part of these interim plans are implemented, might not be answered for yet another ten years or more. That is why the more orderly course is for this court to stay its proceedings, before filing

for office begins in Texas on November 28, so that the Supreme Court will have sufficient time to address the complex legal issues that apply to interim plans.

Here are the issues most begging for resolution or explication:

1. In fashioning a temporary interim redistricting plan, how much deference should a court give to state-enacted legislative plans where a determination for preclearance has been submitted but is pending in: (1) districts that have not been specifically challenged; (2) districts that have been challenged under novel legal theories; (3) districts that have been challenged but as to which the challenges are unlikely to succeed on the merits; and (4) districts that have been challenged where the claims have a likelihood of success on the merits?  In *Upham v. Seamon*, 456 U.S. 37 (1982), the Court directed lower courts to modify a state's legislative plans only where absolutely required by law in a situation in which a determination on preclearance had been made and two of the districts in the State's plan had failed preclearance. *See also White v. Weiser*, 412 U.S. 783, 794-95 (1973).  In contrast, the Court in *Lopez v. Monterey County*, 519 U.S. 9 (1996), rejected a lower court's wholesale implementation of a county's plan as an interim plan where the county had failed even to submit the plan for preclearance, defying a court order and despite being on notice for five years.

The instant case falls somewhere in between the situations in *Seamon* and

*Lopez*: The State of Texas here has not attempted to frustrate or obviate the preclearance process but instead has timely submitted its maps to the D.C. District Court (unlike the county in *Lopez*), but the D.C. court has not yet ruled on preclearance (unlike the Department of Justice in *Seamon*, which had ruled on preclearance). Although the majority, as to the Texas House of Representatives, contends that the many challenges to the State's plan makes it "impossible to give substantial deference to the State's plan," the very existence of my proffered alternative plan, H299, shows that it is possible to give more deference than the majority did while still taking the plaintiffs' challenges seriously. It would be of greater assistance for the Supreme Court to provide guidance on this issue.

2. In a court-ordered interim plan, how much population deviation is permissible in districts unchallenged by the plaintiffs or districts without meaningful one-person one-vote issues? The majority, relying on *Connor v. Finch*, 431 U.S. 407, 414 (1977), modified the State's enacted districts to bring them into *de minimis* deviation, even in districts unchallenged by the plaintiffs.

In contrast, my map left the unchallenged districts, which had population deviations within the legally permissible range for legislatures (but were not *de minimis*), intact, in accordance with the guidance given in *Seamon*, which held that the stricter *Connor* standard cannot be the sole basis for modifying a state's

7

redistricting, but instead is applicable only where a specific violation was found and a remedial district was being drawn. *Seamon*, 465 U.S. at 43.

    3. For purposes of section 2 and section 5 of the Voting Rights Act, is election "performance" relevant or, or instead is the relevant measure the percentage of citizen voting age population? The majority redrew Districts 77 (in El Paso County) and 117 (in Bexar County) because, under, the State's plan, the district does not "perform" often enough (*i.e.,* it was likely to elect a Republican) despite Hispanics' comprising an overwhelming majority of the citizen voting age population in those districts (73% and 63%, respectively). In contrast, I read the section 2 caselaw to say that performance is not a relevant measure, *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994), but rather the relevant measure is the majority-minority requirement, *Barlett v. Strickland*, 556 U.S. 1, __, 129 S. Ct. 1231, 1244-45 (2009).

I have not found, nor has the majority cited, any caselaw to the contrary. That said, there is little to no guidance about whether a court should consider performance in a section 5 retrogression or discriminatory intent analysis, so it would be helpful for the Supreme Court to provide clarity on this question.

    4. May a court order the creation of minority "coalition" districts in an interim plan, and, if so, under what circumstances? Though the Court in *Bartlett* rejected the contention that "cross-over" districts are covered by

section 2, some of its language calls into question whether "coalition" districts are similarly covered (although the Court did expressly reserve the question). The majority created such coalition districts in Dallas County (HD 107), Fort Bend County (HD 26), and Bell County (HD 54). Districts 26 and 54 relied on Asian votes to form a "coalition," despite the lack of evidence showing cohesion between Asians and Blacks or Hispanics in voting.

Though the majority contends these new coalition districts arose "naturally" from a restoration to the *status quo*, it is hard to see how that could be the case: For example, HD 107 was substantially reconfigured from the *status quo* (composed of less than 40% of HD 107 in the benchmark plan) to exclude Anglo voters and include minority voters, reducing the Anglo citizen proportion by 33%. Similarly, Districts 26 and 54 were altered from the *status quo* by removing almost exclusively white populations instead of reducing the population in a race-neutral manner. Although my proposed alternate plan creates a new coalition district in Tarrant County, it is the identical new district created by the State (and dismantled by the majority), and the State has unquestionable latitude to create such districts so long as it does not subordinate traditional redistricting principles to race.

The lack of clarity regarding coalition districts is evidenced by a circuit split on whether they may ever be required. The Fifth Circuit has treated the

9

question as one of fact, holding that it is not clearly erroneous for a district court to find the first Gingles requirement satisfied by aggregating minority groups to reach the 50% threshold. *See Campos v. City of Baytown, Tex.*, 840 F.2d 1240 (5th Cir. 1988). The Sixth Circuit, however, has held that the text of the VRA does not allow its application to coalitions of minority groups. *See Nixon v. Kent Cnty.*, 76 F.3d 1381 (6th Cir. 1996). This issue cries out for clarification.

In its motion for stay, the State concedes that it may become necessary to delay the primary elections pending appellate review of issues regarding the interim plans. Indeed, Texas has some of the earliest primaries––perhaps the very earliest––in the United States. A delay of even a few weeks would still provide ample time for orderly primaries and runoffs well in advance of the November elections. But long before any such adjustment might become necessary, the first step should be for entry of a stay of this court's orders imposing interim redistricting plans for the Texas House of Representatives and the Texas Senate and, once this court imposes an interim Congressional plan, a stay of that order as well. Likewise, a temporary stay should be entered of candidate filing and qualifications deadlines for all elective offices so that filing does not begin on November 28.

The majority's refusal to enter a stay under these compelling circumstances is error. I therefore respectfully dissent.