# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **WENDY DAVIS, MARC VEASEY, et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **VS.** | ) | **Civil No.  SA-11-CA-788-OLG-JES-XR** |
| | ) | [LEAD CASE] |
| **RICK PERRY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **LEAGUE OF UNITED LATIN** | ) | |
| **AMERICAN CITIZENS (LULAC), et al.** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **VS.** | ) | **Civil No. SA-11-CA-855-OLG-JES-XR** |
| | ) | [CONSOLIDATED CASE] |
| **RICK PERRY, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

## ORDER

On this date, the Court considered Plaintiffs' Motions for Attorneys' Fees, Expenses, and Costs (docket nos. 193 & 194), and the responses and replies thereto.

### I. Background

On September 22, 2011, Plaintiffs Wendy Davis, Marc Veasey, Roy Brooks, Vicky Bargas, Pat Pangburn, Frances DeLeon, Dorothy DeBose, and Sarah Joyner filed case no. SA:11-CV-788, challenging the redistricting plan for the Texas Senate (Plan S148) adopted by the Texas Legislature in 2011.  On October 17, 2011, LULAC and Domingo Garcia filed case number SA:11-CV-855. The claims in 11-CV-855 are substantially similar to the claims in 11-CV-788. Case 11-CV-855 was consolidated with 11-CV-788 as a member case on October 19, 2011.

Plaintiffs sought to protect their "right to vote for their preferred candidate to the Texas State Senate from Senate Districts 8, 10, 12, and 25." SA:11-CV-788, docket no. 1 ¶ 1; SA:11-CV-855, docket no. 1 ¶ 1. Plaintiffs brought claims under the Voting Rights Act ("VRA") and § 1983. They asserted that Plan S148 had not and likely would not receive preclearance under § 5 of the VRA and that, even if it were precleared, it could not be administered because it diluted the voting strength of minority voters in the Dallas and Tarrant Counties area of North Texas in violation of § 2 of the VRA. *Id.* ¶ 2. Plaintiffs further alleged that the intentional fracturing and dismantling of the coalition of minority voters in Senate District 10 constituted unlawful vote dilution and discrimination in violation of § 2 and the Fourteenth and Fifteenth Amendments. Plaintiffs asserted the following specific claims: (1) violation of the Equal Protection Clause of the Fourteenth Amendment; (2) abridgement of the privileges and immunities of citizenship guaranteed by the Fourteenth Amendment; (3) Plan S148 could not be administered because it had not been precleared under § 5 of the VRA; and (4) violation of § 2 of the VRA with regard to Senate District 10.

Plaintiffs prayed that the Court enjoin the use of Plan S148 because it had not been precleared, issue a declaratory judgment that the existing benchmark plan violated Plaintiffs' rights under the Constitution and federal law and was malapportioned, and issue a declaratory judgment finding that Plan S148 illegally dilutes the voting rights of minority voters (African Americans and Latinos) in the Dallas and Tarrant Counties region of North Texas in violation of § 2 of the VRA and was enacted with a racially discriminatory purpose in violation of § 2 of the VRA and the Fourteenth and Fifteenth Amendments. Plaintiffs also prayed that the Court permanently enjoin the use of the existing state senate districting plan or any other plan that violates the Constitution and federal law and order into effect a new plan that complies with federal law. Plaintiffs further sought fees and costs.

On September 29, 2011, this Court enjoined implementation of Plan S148 because it had not been precleared under § 5 of the VRA, as was required by then-existing law. Docket no. 8. The order stated that it would "be effective as a permanent injunction, subject to being lifted by order of the Court as appropriate." *Id.*

The fact that S148 had not been precleared, coupled with the fact that the existing plan could not be used because it was malapportioned and election deadlines were looming, required the Court

to create an interim plan for use in the 2012 elections. *See Perry v. Perez*, 132 S. Ct. 934, 940 (2012) (noting that the Court was required to fashion an interim plan because the population changes reflected by the census rendered the benchmark plan unusable). The Court originally fashioned and adopted Plan S164 as the interim plan. However, Defendants contended that Plan S148 should be used for the 2012 election, and appealed this Court's implementation of Plan S164.

In *Perry v. Perez*, 132 S. Ct. 934 (2012), the Supreme Court vacated this Court's order implementing Plan S164 and remanded for further proceedings consistent with its opinion. The Supreme Court held that this Court must give deference to the State's newly enacted plan in fashioning an interim plan, but should take care not to incorporate into the interim plan any legal defects in the State's plan. Thus, the Supreme Court held, this Court should be guided by the State's plan except to the extent the § 2 or constitutional claims were shown to have a likelihood of success on the merits or the Court found that aspects of the plan stood a reasonable probability of failing to gain § 5 preclearance in the District Court for the District of Columbia ("the D.C. Court").[1] With regard to the § 5 claims, because only the D.C. Court had jurisdiction over the claims, this Court could not apply the traditional preliminary injunction standard to those claims. The Supreme Court held that this Court could not prejudge the merits of the claims, neither presuming that the State's effort to preclear its plan would succeed nor that it would fail. *Id.* at 942. Rather, this Court had to take "guidance from [Texas's] policy judgments unless they reflect[ed] aspects of the state plan that [stood] a reasonable probability of failing to gain § 5 preclearance." *Id.* Under this standard, this Court was to determine whether the Plaintiffs' § 5 challenges in the D.C. Court were "not insubstantial." *Id.*

After the Supreme Court's remand, this Court issued an Order on January 30 stating that, if the parties wanted to preserve the April 3 primary date, they would need to submit an agreed plan

---

[1] This Court was precluded from reaching a final determination on the merits of the § 2 and constitutional claims until a decision on preclearance was rendered by the D.C. Court. However, the Supreme Court directed this Court to apply the preliminary injunction standard in fashioning interim relief to ensure that the interim plan did not incorporate legal defects. *Perry*, 132 S. Ct. at 941-42.

for the Court's consideration.  Docket no. 111.  Plaintiffs and Plaintiff-Intervenor Craig Estes[2] developed a proposed interim plan, Plan S171, which was a partial plan addressing Plaintiffs' claims regarding Senate District 10.  Docket no. 147.  Plan S172 incorporated Plan S171 into the entire legislatively enacted Senate map.  *Id.*  Defendants stated that they had no objection to the Court's entry of an order directing that Plan S172 be used on an interim basis for the 2012 elections, but Defendants preserved all defenses for the final judgment stage of the case and did not admit that any of Plaintiffs' claims against Plan S148 had merit.  *Id.* at 2.

On February 28, 2012, this Court adopted Plan S172 as the interim plan for the districts used to elect senators in 2012 to the Texas Senate.  Docket no. 141.  The Court rejected Defendants' argument that the Legislature's enacted plan must be used without change and expressly agreed with Plaintiffs' argument "that this Court should impose an interim remedial map that differs from the plan enacted by the Texas Legislature."  Docket no. 147 at 1.  To comply with the obligation to ensure that no legal defects were incorporated into the interim plan, the Court reviewed the plan under the standards required by *Perry v. Perez* before approving the plan.  Docket nos. 141, 147.  Specifically, the Court "limited our changes in the State's enacted plan to those aspects of the plan 'that [stood] a reasonable probability of failing to gain §5 preclearance.'"  *Id.* at 3.  The Court found that Plan S172 reflected changes to Plan S148 that were appropriately designed to address Plaintiffs' not insubstantial claim that District 10 "reflects a prohibited purpose under Section 5 of the Voting Rights Act" and remedied the unconstitutional malapportionment of the state senate districts existing in the benchmark plan.  *Id.* at 2.  Plan S172 essentially restored Senate District 10 to its benchmark configuration.  Given the Court's conclusion under the § 5 standard, the Court did not need to consider whether Plaintiffs had demonstrated a substantial likelihood of success on the § 2 and Fourteenth Amendment claims because those claims were also remedied through implementation of the § 5 interim remedy.  The Court expressly ruled that nothing in the order represented a final judgment on the merits as to any claim or defense in the case, "nor does it affect any future claim for attorney's fees."  Docket no. 147 at 3.  As a result of the Court's order, Plan S172 was used for the

---

[2] Senator Estes intervened in the suit on February 7, 2012 for the limited purpose of proposing an interim map (initially, Plan S167), and he voluntarily dismissed his intervention on May 9, 2012.  Docket no. 151.

2012 elections.

In August 2012, the D.C. Court issued a decision denying preclearance of Plan S148. *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012). The D.C. Court concluded "that Texas has not shown that the Senate Plan was enacted without discriminatory intent" and found "that the Senate Plan was enacted with discriminatory purpose as to SD 10." *Id.* at 165-66. Texas appealed to the Supreme Court.

On June 24, 2013, the Texas Legislature passed a new redistricting plan for the Texas Senate, adopting the Court's interim plan (Plan S172) without change. On June 25, while the State's appeal of the D.C. Court's decision was pending, the Supreme Court decided *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), holding that §4(b), the formula that determines which jurisdictions are automatically subject to § 5, is unconstitutional. The next day, on June 26, 2013, Governor Rick Perry signed the bill adopting the new Senate plan, and the plan was immediately effective. On June 27, 2013, the Supreme Court vacated the D.C. Court's judgment denying preclearance of the enacted plan and remanded the case for further consideration in light of *Shelby County* and the suggestion of mootness of appellees Wendy Davis, et al. *See Texas v. United States*, 133 S. Ct. 2885 (June 27, 2013). On July 1, 2013, this Court denied as moot Defendants' pending motions.

On September 4, this Court issued a final judgment reflecting the judicial relief that Plaintiffs had obtained, including that: (1) Plaintiffs' request for declaratory relief was granted to the extent that Senate plan S100, the benchmark plan, violates the one-person, one-vote requirement of the Equal Protection Clause and will not be used for any further elections; (2) Plaintiffs' request for injunctive relief was granted such that Plan S148, the 2011 enacted plan, has been permanently enjoined and no elections have been or will be held thereunder; and (3) Plan S172, which was reviewed under the standard set forth in *Perry v. Perez* and restored Senate District 10 to near benchmark configuration and remedied the constitutional infirmities being asserted by Plaintiffs, was to be used for the 2012 elections. The Court also dismissed Plaintiffs' remaining § 2 and Fourteenth Amendment claims as moot and awarded Plaintiffs their reasonable attorneys' fees and costs as prevailing parties.

In accordance with the Court's order, Plaintiffs filed their applications for attorneys' fees and costs. Defendants have responded in opposition, asking the Court to reconsider its determination

that Plaintiffs are prevailing parties and raising numerous other objections to Plaintiffs' applications. The Court thus first considers whether Plaintiffs are prevailing parties and then turns to the other challenges raised by Defendants.

## II. Analysis – Whether Plaintiffs are prevailing parties?

In the United States, parties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Servs.*, 532 U.S. 598, 602 (2001).  Congress, however, has authorized the award of attorney's fees to the "prevailing party" in numerous statutes, including the Voting Rights Act Amendments of 1975, 89 Stat. 402, 42 U.S.C. § 1973*l*(e), and the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, 42 U.S.C. § 1988.[3]  Section 1973*l*(e) provides, "In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." Section 1988(b) provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

A prevailing plaintiff in a VRA or civil rights case is presumptively entitled to an award of fees, unless special circumstances would render such an award unjust.  *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968).  "Congress considered vigorous enforcement to vindicate civil rights a high priority and entrusted plaintiffs to effectuate this policy."  *Dean v. Riser*, 240 F.3d 505, 507 (5th Cir. 2001).  The policy in favor of awarding fees to civil rights plaintiffs is necessary to carry out Congress's intention that individuals injured by discrimination act as "private attorneys general," vindicating a policy that Congress considered of the highest priority.  *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 759 (1989).

"A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation."  *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989).  The Supreme Court has

---

[3] Because of their similar language and purpose, § 1988 and § 1973*l*(e) are construed similarly, and cases construing one may be applied to the other.  *Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 543 (5th Cir. 1980).

interpreted the term "prevailing party" generously, so that plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation that achieves some of the benefit the parties sought in bringing suit. *Id*. at 791-92; *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). A plaintiff prevails when he obtains an enforceable judgment against the defendant from whom fees are sought or comparable relief through a consent decree or settlement. *Farrar v. Hobby*, 506 U.S. 103, 111 (1992); *see also Buckhannon*, 532 U.S. at 603-04 ("enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees"). A judicially sanctioned settlement, such as through the entry of a consent decree, may confer prevailing party status even without a judicial determination that the plaintiffs' rights have been violated. *Maher v. Gagne*, 448 U.S. 122, 126 n.8, 129 (1980); *see also Buckhannon*, 532 U.S. at 604 (noting that a consent decree is a court-ordered change in the legal relationship between the parties even though it "does not always include an admission of liability by the defendant"). However, private settlements and a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lack[] the necessary judicial imprimatur on the change." *Buckhannon*, 532 U.S. at 605.[4] "The touchstone of the prevailing party inquiry . . . is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Sole v. Wyner*, 551 U.S. 74, 82 (2007).

Based on these principles, the Fifth Circuit holds that, for prevailing-party status: (1) a plaintiff must obtain judicially sanctioned relief, such as a judgment on the merits or a consent decree (judicial imprimatur); (2) the relief must materially alter the legal relationship between the parties; and (3) the relief must modify the defendant's behavior in a way directly benefiting the plaintiff at the time the relief is granted. *Petteway v. Henry*, __ F.3d __, No. 12-40856, 2013 WL

---

[4] Prior to *Buckhannon*, the Fifth Circuit applied the catalyst theory to determine prevailing-party status. Under that theory, "plaintiffs were considered prevailing parties even if their cases settled or became moot, so long as the lawsuit itself was a substantial factor or significant catalyst that caused the defendants to voluntarily change their behavior to the result plaintiffs desired." *LULAC v. Tex. Democratic Party*, 428 F. App'x 460, 463 (5th Cir. 2011) (per curiam). *Buckhannon* rejected the catalyst theory by requiring a judicial imprimatur on a material alteration of the legal relationship of the parties for prevailing party status.

6634558, at *3 (5th Cir. Dec. 17, 2013); *Dearmore v. City of Garland*, 519 F.3d 517, 521 (5th Cir. 2008). Although an enforceable judgment on the merits and a court-ordered consent decree have sufficient judicial imprimatur, these examples are not exclusive. *Dearmore*, 519 F.3d at 521.

Defendants contend that Plaintiffs are not prevailing parties because they "never received a judgment on the merits of any of their claims." Defendants cite *Buckhannon* and the Fifth Circuit's opinion in *LULAC v. Texas Democratic Party*, 428 F. App'x 460, 463-64 (5th Cir. 2011) (per curiam). Docket no. 208 at 2; docket no. 209 at 2. In *LULAC v. Texas Democratic Party*, LULAC filed suit under § 2 and § 5 of the VRA. The district judge denied a preliminary injunction and granted the defendant's motion to dismiss. LULAC appealed regarding the § 5 claim, and the Court of Appeals remanded for a three-judge court to consider the § 5 claim. The parties disputed whether the Texas Democratic Party was subject to § 5. After being denied summary judgment on remand, the defendant voluntarily obtained § 5 preclearance and the case was dismissed as moot. The Fifth Circuit held that LULAC was not a prevailing party because it was not awarded judicially sanctioned relief on any of its claims and the defendant's voluntary submission of its method for preclearance lacked the requisite judicial imprimatur. Neither *Buckhannon* nor *LULAC v. Texas Democratic Party* provides specific guidance on the issue presented here – whether the interim relief obtained by Plaintiffs before Defendants mooted the case created a judicially sanctioned, material alteration of the legal relationship of the parties necessary to permit an award of attorney's fees.

The Supreme Court has held that attorney's fees may be awarded to a party in some circumstances without the party's having obtained a favorable final judgment following a full trial on the merits. *Hanrahan v. Hampton*, 446 U.S. 754 (1980). However, an award of fees *pendente lite* is appropriate only when the party has prevailed on the merits of at least some of his claims. *Id.* at 758. The Supreme Court has not expressed a view on "whether, in the absence of a final decision on the merits of a claim for permanent injunctive relief, success in gaining a preliminary injunction may . . . warrant an award of counsel fees." *Sole*, 551 U.S. at 86. In the absence of such Supreme Court guidance, "lower courts have had difficulties in ascertaining what other forms of judicial action" may create prevailing party status, and "circuit courts considering this issue [with regard to preliminary injunctions] have announced fact-specific standards that are anything but uniform." *Dearmore*, 519 F.3d at 521.

-8-

In addition to the lack of clear guidance in the case law, resolution of the prevailing party question is further complicated by the unique fact pattern of this case, given the impact of § 5 and the D.C. Court litigation.  Although Plaintiffs did not assert claims in this Court for violations of § 5, since those claims were within the exclusive jurisdiction of the D.C. Court, Plaintiffs did bring valid claims (under then-existing law) for injunctive relief against the enacted plan based on the lack of preclearance.  Further, in fashioning interim relief, this Court was to ensure that the interim plan did not violate § 5, but in doing so could only determine whether the Plaintiffs' § 5 claims in the D.C. Court were "not insubstantial."  In addition, because this Court determined that Plaintiffs' § 5 claims were not insubstantial, and because the remedy for that finding also remedied Plaintiffs' § 2 and Fourteenth Amendment claims, the Court did not reach the merits of those claims.  *See Maher*, 448 U.S. at 133 (noting the longstanding judicial policy of avoiding unnecessary decision of important constitutional issues).  Thus, unlike most cases considering whether preliminary injunctions may render a plaintiff prevailing, this Court could not reach the merits of the claims pending before it.  Nevertheless, the Court did give Plaintiffs substantial relief consistent with then-existing law.  The Court enjoined implementation of Plan S148 and issued an interim plan that gave Plaintiffs all of their requested relief with regard to the 2012 election.

Plaintiffs then obtained a judgment on the merits of their § 5 claims in the D.C. Court. Thereafter, however, the Supreme Court's decision in *Shelby County* invalidated the application of § 5 to Texas, and that decision applied to this case.  *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97 (1993) (holding that Supreme Court's application of a rule of federal law to the parties before it requires that rule be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate announcement of the rule). However, instead of returning to this Court to seek an order dissolving the injunction against Plan S148, Defendants adopted the Court's interim plan and mooted Plaintiffs' remaining claims.  In doing so, Defendants have ensured that the interim relief will not be reversed, dissolved, or otherwise undone,[5] but have also precluded Plaintiffs from obtaining a decision on the merits of their

---

[5] In *Sole v. Wyner*, the Supreme Court held that a plaintiff who obtains a preliminary injunction that is reversed, dissolved, or otherwise undone by the final decision in the same case is not a prevailing party.  551 U.S. at 83.

§ 2 and Fourteenth Amendment claims from this Court.

As noted, Defendants argue that Plaintiffs cannot be prevailing parties because they did not obtain a judgment on the merits of their claims. Defendants argue that Plaintiffs' "purported success on their Section 5 claims cannot support an award of attorney's fees because the imposition of Section 5 preclearance requirements on the State violated the Constitution." Docket no. 209 at 19. In the redistricting litigation concerning the Texas and U.S. House maps, Defendants have also argued that Plaintiffs cannot be prevailing parties on their § 2 and Fourteenth Amendment claims because those claims were not ripe. Defendants do not expressly raise these argument in their briefs in this case with regard to whether Plaintiffs are prevailing parties, but the arguments do apply, and Plaintiffs have addressed them in their reply briefs.

Plaintiffs argue that *Shelby County* is irrelevant to Plaintiffs' prevailing party status because this case did not adjudicate the merits of Plaintiffs' § 5 claims, which were before the D.C. Court, and Plaintiffs are not seeking fees related to those claims. Instead, Plaintiffs argue, § 5 was only relevant to the extent that the Court concluded that a court-ordered interim plan was appropriate. Plaintiffs also cite to *Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center*, 765 F.2d 1278 (5th Cir. 1985), in which the Fifth Circuit held that a change in law following the trial court's decision to grant a preliminary injunction does not convert an otherwise prevailing civil rights plaintiff into a non-prevailing party. In *Frazier*, the district court originally granted a preliminary injunction on the plaintiff's § 1983 claim, which reinstated her at work. But after the Supreme Court handed down decisions that altered the concept of state action as applied to the conduct of private parties, the district court vacated the preliminary injunction and granted the remaining defendants' motion for summary judgment. *Id.* at 1282. On appeal, the Fifth Circuit affirmed the dismissal of the § 1983 claims, but held that the district court abused its discretion by not awarding interim fees under § 1988 based on the preliminary injunction. The Fifth Circuit stated, "That a plaintiff eventually loses on the merits of a section 1983 claim does not automatically undermine the validity of an interim attorney's fee award based on substantial relief that is granted in light of the then-current universe of legal principles." *Id.* at 1293-94. The Court reasoned that the district court had not abused its discretion in enjoining the defendants under the law as it then existed, and the change in law did not convert the plaintiff into a non-prevailing party. The validity

of *Frazier* after *Sole v. Wyner*, however, is uncertain.

After considering all the arguments, the Court concludes that, under these facts, Plaintiffs meet the requirements for prevailing party status. As noted, under Fifth Circuit precedent, a prevailing party: (1) must obtain judicially sanctioned relief, such as a judgment on the merits or a consent decree (judicial imprimatur); (2) the relief must materially alter the legal relationship between the parties; and (3) it must modify the defendant's behavior in a way directly benefiting the plaintiff at the time the relief is granted. *Dearmore*, 519 F.3d at 521. It is undisputed that Plaintiffs obtained significant, affirmative interim relief. This relief was judicially sanctioned, materially changed the legal relationship between the parties, and gave Plaintiffs all the relief they sought with regard to the 2012 elections. In addition, that relief was not and cannot now be reversed, dissolved, or otherwise undone.

With regard to the first requirement – that Plaintiff obtain judicially sanctioned relief – Plaintiffs have done so. Plaintiffs sought injunctive and declaratory relief against the use of Plan S148 because it had not been precleared and because it violated the Constitution and federal law. Plaintiffs also asked the Court to order into effect a new senate plan that met the requirements of the Constitution and federal and state law. Although the State had argued that Plan S148 must be used for the 2012 elections, the Supreme Court made clear that Plan S148 was to be used only to the extent that it contained no legal defects, as determined by the "not insubstantial" standard for Plaintiffs' § 5 claims and by the preliminary injunction standard for the other claims. After the Supreme Court's ruling, Defendants consented to the use of Plan S172. Defendants did not object to implementation of the proposed interim plan, agreeing that it "respond[ed] to all claims that are fairly at issue in this case or the Section 5 case" and was within the Court's remedial authority. Docket no. 119 at 4. Defendants acknowledged that the proposed plan "address[ed] Davis's Fourteenth Amendment and discriminatory purpose claims." *Id.* at 19. The interim relief was therefore essentially a judicially approved settlement or consent decree.[6] As the Supreme Court

---

[6] Plaintiffs cite *Hutchinson v. Patrick*, 636 F.3d 1 (1st Cir. 2011), though they mistakenly cite it as a Fifth Circuit case. In *Hutchinson*, the court held that a court-approved settlement that falls short of a formal consent decree bears a sufficient judicial imprimatur to support prevailing-party status if the change in the legal relationship between the parties was court-ordered, there has been judicial approval of the relief vis-à-vis the merits of the case, and there exists an obligation to comply

made clear in *Maher v. Gagne*, 448 U.S. at 129, the fact that a plaintiff prevailed through a settlement rather than through litigation does not weaken the claim to fees. "Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated." *Id.* Plaintiffs were awarded relief by the Court on their claims – an injunction preventing use of the enacted plan and an interim plan to govern the upcoming election that protected Plaintiffs' rights and did not violate the VRA or the Constitution.[7] Thus, Plaintiffs obtained judicially sanctioned relief in the form of a judicially approved settlement or consent decree, satisfying the first element of the prevailing party test. *See Medders v. Autauga Cnty. Bd. of Educ.*, 858 F. Supp. 1118, 1124 (M.D. Ala. 1994) (holding that plaintiffs who obtained court's adoption of consent decree incorporating single-member-district plan as its own interim plan pending preclearance obtained significant relief and were prevailing parties).[8]

_____

and the provision of judicial oversight to enforce that obligation. *Id.* at 9-10.

   [7] The interim relief here is distinguishable from that obtained in *Yousuf v. Motiva Enterprises*, 246 F. App'x 891 (5th Cir. 2007), in which the preliminary injunction and court-ordered standstill agreement "did nothing more than temporarily preserve the status quo, maintaining the parties' previous . . . relationship until the legal issues" could be addressed on the merits. In *Yousuf*, the controversy was later mooted by Hurricane Katrina, and the Fifth Circuit held that the plaintiff was not a prevailing party. Similarly, this case is distinguishable from *Petteway v. Henry*, __ F.3d __ (5th Cir. 2013), in which the Fifth Circuit held that obtaining an injunction against an unprecleared plan did not render the plaintiffs prevailing because there was no evidence that the injunction materially affected the conduct of the County or that it directly benefited the plaintiffs because the County had voluntarily, on the record, committed to forbear making any permanent changes in the electoral maps until they were precleared. Unlike *Yousuf* and *Petteway*, Plaintiffs in this case obtained not only an injunction against the unprecleared plan, but also an interim plan that altered the Defendants' conduct and gave them their desired relief.

   [8] In *Dearmore*, the Fifth Circuit considered whether a plaintiff qualifies as a prevailing party under 42 U.S.C. § 1988(b) when he obtains a preliminary injunction enjoining enforcement of a city ordinance and the city later moots the case before trial in direct response to the court's preliminary injunction. The Fifth Circuit noted that it had "not yet created or endorsed a particular test" for determining prevailing party status based on a preliminary injunction, but instead had held "that a party who obtains a preliminary injunction is not a prevailing party if he fails to qualify under any of the other circuits' tests." 519 F.3d at 522. The Court held that, under the facts presented in *Dearmore*, to qualify as a prevailing party under § 1988(b), a plaintiff (1) must win a preliminary injunction, (2) based upon an unambiguous indication of probable success on the merits of the plaintiff's claims as opposed to a mere balancing of the equities in favor of the plaintiff; (3) that

Whether characterized as a consent decree or a preliminary injunction, the judicially sanctioned interim relief cannot now be "reversed, dissolved, or otherwise undone by the final decision in the same case" because Defendants have mooted the case. Therefore, the Supreme Court's decision in *Sole v. Wyner* does not preclude prevailing party status. Following *Shelby County*, Defendants could have returned to this Court to allow Plaintiffs an opportunity to pursue their § 2 and Fourteenth Amendment claims to a final resolution. Instead, Defendants chose to moot the case before Plaintiffs could do so, by adopting the interim plan. *Cf. Dearmore*, 519 F.3d at 524 n.3 (noting that a lack of appeal and acquiescence to a court order has been noted "by this Court and others to be a factor favoring a finding of prevailing party status"). The Court therefore concludes that Plaintiffs obtained sufficient judicial relief for prevailing party status.

Turning to the second requirement for prevailing party status, the interim relief materially

_____

causes the defendant to moot the action, which prevents the plaintiff from obtaining final relief on the merits. *Id.* at 524. The Court found a material alteration in the legal relationship between the parties because the preliminary injunction blocked the City from enforcing the portion of the Ordinance that violated the Fourth Amendment and the City could not conduct warrantless searches or impose criminal penalties for noncompliance under the offending provision of the Ordinances, and the City then mooted the case, preventing the plaintiff from obtaining final relief on the merits. The Court expressly limited its holding to the "limited factual circumstances." *Id.* at 526 n.4. *Dearmore* represents a situation in which the plaintiff obtains a typical preliminary injunction preventing enforcement of a statute (in other words, maintaining the status quo), but the preliminary injunction is issued "on the merits" and causes the defendant to alter its conduct in the way sought by the plaintiffs, thereby mooting the case. *Dearmore*'s "limited factual circumstances" are not controlling in this case in which, as noted, Plaintiffs obtained not only an injunction against use of the enacted plan, but also affirmative interim relief in the form of a judicially sanctioned plan that protected their rights for the 2012 election.

Even if *Dearmore* is controlling in this case, however, this Court reached the merits to the extent it was able given the unique circumstances of the case. This Court's findings and its implementation of the interim plan arguably satisfies *Dearmore*'s requirements.

In addition, *Shelby County* does not automatically establish that the interim relief in this case was incorrectly granted or could not support an award of fees because Plaintiffs also asserted § 2 and constitutional claims. *Cf. Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 480 F.3d 734, 739 (5th Cir. 2007) ("Recognizing that courts will often justifiably refrain from addressing a constitutional question where it can be avoided, we have held that such a plaintiff may obtain attorney's fees even though the § 1983 claim was not decided 'provided that 1) the § 1983 claim of constitutional deprivation was substantial; and 2) the successful pendant claims arose out of a common nucleus of operative facts.'").

-13-

altered the legal relationship between the parties. Texas's argument that the enacted plan had to be used was rejected; Texas was not permitted to use Plan S148 for the 2012 elections; Plaintiffs were granted relief on their claims and were able to vote in the districts that they sought; and Plaintiffs' rights under the VRA and the Constitution were protected. The Court's orders providing interim relief were and still are judicially enforceable orders.

Third, the interim relief directly benefited Plaintiffs because the Court's order implementing the interim plans gave Plaintiffs the relief they sought with regard to the upcoming election. Further, the State ultimately adopted the Court's plan, providing Plaintiffs with their desired result such that Plaintiffs were never subject to Plan S148.

The Court therefore declines to reverse its prior decision finding that Plaintiffs in this case are prevailing parties. Plaintiffs pursued their relief, and the Court granted them relief, to the extent possible under the circumstances. To the extent Defendants' arguments regarding the effect of *Shelby County* are equally relevant to a determination of whether special circumstances would render an award of fees unjust, the Court concludes, for the reasons stated above, that the fact that some relief was obtained under § 5, which was, in retrospect, unconstitutionally applied to Texas, does not render an award of fees unjust. Given Plaintiffs' assertion of other claims under § 2 and the Fourteenth Amendment, which could have supported the interim relief,[9] the Court finds that an award of fees is not unjust.

In sum, Plaintiffs obtained judicially sanctioned interim relief that materially altered the legal relationship between the parties. As a result of the Court's orders, Plaintiffs obtained their desired relief and were able to vote in the 2012 elections under a plan that did not violate the VRA or the Constitution. Because Plan S148 was repealed, the State has adopted the Court's interim plan, and the claims are now moot, there is no possibility that the interim relief will be reversed, dissolved, or

---

[9] As noted, Defendants assert in the related cases that the § 2 and Fourteenth Amendment claims could not support prevailing party status because they were not ripe at the time the Court granted the interim relief. However, the Supreme Court expressly directed that this Court could grant relief on these claims under the familiar preliminary injunction standard. In addition, once the § 5 claims were removed from the case by the retroactive application of *Shelby County*, the § 2 and Fourteenth Amendment claims were ripe for full consideration, but Defendants voluntarily mooted the case before the Court could reach a final determination on the merits.

otherwise undone by a final decision in this case.  Under these circumstances, the Court finds that Plaintiffs are prevailing parties entitled to an award of attorney's fees and costs.  *Sole*, 551 U.S. at 82 ("The touchstone of the prevailing party inquiry . . . is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.").

### III.  Reasonableness/Amount of Fee Award

Having determined that Plaintiffs are prevailing parties in this litigation, the Court must determine what amount of fees is reasonable.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Id.*  "This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services."  *Id.*  The Court should exclude from this initial fee calculation hours that were not reasonably expended, and counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.  *Id.* at 434.  The lodestar calculation does not end the inquiry, however, and the Court should consider other factors that would warrant an upward or downward adjustment of the fee.  *Id.* at 434 & n.9.

### A. Davis Plaintiffs

The Davis Plaintiffs' original motion sought a total sum of $616,813.45 ($591,560.50 in fees and $25,252.95 in expenses).  In its reply, Jenner & Block voluntarily reduced its requested attorneys' fees by $101,945.00 and legal assistant fees by $11,133.50.  Jenner & Block also removed its requested expenses and costs.  Plaintiffs' revised request includes: (1) attorney's fees for Gerald Hebert (441 hours at $650 per hour = $286,650.00); (2) attorney's fees for David Richards (10 hours at $550 per hour = $5500.00); (3) attorneys' fees for three Jenner & Block attorneys (236.5 hours at various hourly rates between $435 and $985 = $138,671.25); (4) legal assistant/paralegal fees for AngleStrategies (220.3 hours at $175.00 per hour = $38,552.50); (5) paralegal fees for Karina Esparza (1.9 hours at $95 per hour = $180.50); and (6) paralegal fees for Cheryl Olson (31.75 hours at rates between $280 and $295 = $8,927.50).  Therefore, the Davis Plaintiffs' revised requested lodestar amount for all attorneys and paralegals is $478,481.75.

The first step in determining reasonable attorneys' fees is an evaluation of the number of hours reasonably expended.  *La. Power & Light v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995).  The

-15-

Court must determine whether the hours claimed were "reasonably expended on the litigation." *Id.* "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates. The applicant . . . should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Id.* (quoting *Hensley*, 461 U.S. at 437).

Defendants argue that the Davis Plaintiffs' request should be denied or reduced. Defendants argue: (1) Plaintiffs did not succeed on their § 5 claims because § 5 was unconstitutionally applied to Texas; (2) Plaintiffs pursued a failed legal theory during the first phase of interim map proceedings; (3) the fee request is unreasonable because it reflects inadequate billing judgment; (4) the fee request is unreasonable because the hourly rates are excessive; and (5) Plaintiffs cannot recover fees for consulting and clerical work. The Court thus determines whether Plaintiffs' requested lodestar must be adjusted in light of Defendants' arguments and in light of the Court's independent review of the submitted time records.

## 1. Hours Reasonably Expended

### a. § 5 claims

Defendants argue that Plaintiffs did not succeed on their § 5 claims because any claim or remedy based on § 5 is illegitimate, and Texas "cannot be compelled to pay attorneys' fees incurred in pursuit of an unconstitutional claim that should not have existed in the first place." Docket no. 208 at 9-10. Defendants assert that the Court should "reduce any fee award to reflect the fact that the Davis Plaintiffs did not succeed on all of their claims." *Id.*

Plaintiffs may receive fees even if they are not victorious on every claim. *Fox v. Vice*, 131 S. Ct. 2205, 2214 (2011). A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes; the "result is what matters." *Id.* The Supreme Court explained in *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983), that a court should compensate the plaintiff for the time his attorney reasonably spent in achieving the favorable outcome, even if "the plaintiff failed to prevail on every contention." However, "the fee award should not reimburse the plaintiff for work performed on claims that bore no relation to the grant of relief: Such work 'cannot be deemed to have been expended in pursuit of the ultimate result achieved.' But the presence of these unsuccessful claims does not immunize a

defendant against paying for the attorney's fees that the plaintiff reasonably incurred in remedying a breach of his civil rights." *Fox*, 131 S. Ct. at 2214 (citations omitted).

Thus, when there are both successful and unsuccessful claims, "the judge should consider whether or not the plaintiff's unsuccessful claims were related to the claims on which he succeeded, and whether the plaintiff achieved a level of success that makes it appropriate to award attorney's fees for hours reasonably expended on unsuccessful claims." *City of Riverside v. Rivera*, 477 U.S. 561, 568-69 (1986). A plaintiff might bring distinctly different claims that are based on different facts and legal theories, and in such an instance "work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'" *United States ex rel. Longhi v. United States*, 575 F.3d 458, 476 (5th Cir. 2009) (quoting *Hensley*, 461 U.S. at 435). But "[i]n [some] cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435. Accordingly, "*Hensley* emphasized that '[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," and that "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Rivera*, 477 U.S. at 569 (quoting *Hensley*, 461 U.S. at 435). In other words, in determining an appropriate fee award in a situation where only some claims were successful, a district court can consider the overall result obtained if the claims involve a common core of facts or related legal theories. *Arnold v. U.S. Dep't of Interior*, 252 F.3d 435, at *1 (5th Cir. 2001)(per curiam) (unpublished); *see also Coleman v. Houston Indep. Sch. Dist.*, 202 F.3d 264, at *5 (5th Cir. 1999) (unpublished) ("[T]here is ample authority for the proposition that a partially prevailing party may recover all reasonably incurred attorney fees, even though the party did not prevail on all claims, as to all defendants, or as to all issues in a matter.").

This case does not involve discrete, unrelated claims. Plaintiffs' claims for relief under § 2

and § 5 of the VRA and under the Fourteenth and Fifteenth Amendments[10] involved a common core of facts and were based on related legal theories.  Plaintiffs obtained excellent results such that they are entitled to recover a fully compensatory fee encompassing all hours reasonably expended in the litigation.  Therefore, the Court will not reduce the award for time spent on pursuing relief under § 5.

### b. pursuit of "failed legal theory" between October 2011 and January 2012

Defendants contend that Plaintiffs should not recover fees for work between October 3, 2011 and January 20, 2012, because they "pursued a failed legal theory during the first phase of interim map proceedings."  Docket no. 208 at 10.  Specifically, Defendants assert that during this phase Plaintiffs argued that this Court could not give any weight to the legislatively enacted Senate plan because it had not been precleared, while Texas refuted these argument by relying on precedent and arguments that were adopted by the Supreme Court.  The Supreme Court held that the State's enacted plan must be the starting point for an interim plan, even if it has not been precleared.  Therefore, Defendants argue, hours spent on Plaintiffs' contrary unsuccessful "claim" should be excluded from the fee. Defendants cite *Henlsey*, 461 U.S. at 440, for the proposition that "[w]here the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee."  Because Plaintiffs' legal argument was rejected, Defendants contend, the Davis Plaintiffs are not entitled to recover any attorneys' fees for work related to interim redistricting plans before January 20, 2012 and for any work on the Supreme Court appeal.

Plaintiffs contend that because they prevailed in the litigation, an award of fees and costs for all stages of the litigation is appropriate.  Although Defendants succeeded in having the interim maps vacated, Plaintiffs correctly point out that Defendants' argument that this Court must use the enacted maps while preclearance was pending was also rejected by the Supreme Court.  The Supreme Court did not grant Defendants' request to remand to this Court with instructions to impose Texas's legislatively enacted plan as the interim plan while preclearance was pending.  Instead, the Court

---

[10]Plaintiffs' Fifteenth Amendment claim was premised on intentional discrimination. Further, Plaintiffs raised the privileges and immunities claim solely to preserve the issue for appeal. *See* docket no. 49 at 15.

instructed that while the enacted plan should be the starting point, the Court should not incorporate any aspects of the plan that violated the VRA or the Constitution. In this regard, the Supreme Court did not adopt the standard urged by either Plaintiffs or Defendants. Further, although this Court's interim order was vacated and Defendants were therefore automatically awarded costs,[11] neither party prevailed on the merits of any claim (*i.e.*, § 2, § 5, or Fourteenth Amendment) at that time.

Plaintiffs also contend that "the Fifth Circuit has rejected any contention that courts should look at each stage of the litigation piecemeal in determining prevailing party status," and the Court should instead "consider the claims and litigation as a whole." Docket no. 211 at 7. Plaintiffs argue that they did not pursue separate and distinct claims before the Supreme Court in *Perry*; rather, the same claims have been at issue throughout the entire litigation. Plaintiffs assert that because (1) they prevented Defendants from obtaining their preferred relief at the Supreme Court, (2) the appeal was an integral step in the litigation, and (3) Plaintiffs ultimately prevailed, the Court should not exclude fees for any aspect of the litigation.

As noted above, in *Hensley*, the Supreme Court instructed that a fee award "should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing the fee. The result is what matters." *Hensley*, 461 U.S. at 435. Thus, *Hensley* supports Plaintiffs' position rather than Defendants'.

Further, Plaintiffs appropriately cite to *Alizadeh v. Safeway Stores, Inc.*, 910 F.2d 234 (5th Cir. 1990), in which the plaintiff appealed the award of attorney's fees to a prevailing defendant who had lost on an intermediate appeal. After the district court granted summary judgment, the plaintiff appealed and the Fifth Circuit reversed and remanded. The defendant then prevailed after a jury trial, and the district court awarded $6,500 in attorney's fees that the defendant spent on the appeal. The plaintiff argued that the trial was a separate proceeding from the earlier appeal in which the summary judgment in the defendant's favor was partially reversed and remanded for trial. The Fifth Circuit rejected this argument, noting that the case involved two claims, and the defendant was ultimately

_____

[11] Supreme Court Rule 43 provides, "If the Court reverses or vacates a judgment, the respondent or appellee shall pay costs unless the Court otherwise orders."

the prevailing party on these claims in all respects.  The Court held that it was not an abuse of discretion for the district court to award fees for the appeal because "[e]ven though [the defendant] did not prevail on the initial appeal itself, it did ultimately prevail on the merits in the litigation, an integral stage of which was the initial appeal," and "the district court's determination that the prevailing party should receive an award that includes attorneys' fees for the entire course of the litigation of the section 1981 claim was not unreasonable."  *Id.* at 237-38; *see also Romaguera v. Gegenheimer*, 162 F.3d 893, 896 (5th Cir. 1998) (approving without analysis district court's award of fees to prevailing plaintiff that included fees for unsuccessful defense of the district court's judgment during the interim appeal).[12]

Similarly, the Ninth Circuit reasoned in *Cabrales v. County of Los Angeles*, 935 F.2d 1050 (9th Cir. 1991), that *Hensley* supports an award of fees to a prevailing plaintiff that includes fees for unsuccessfully defending an appeal to the Supreme Court:

> We read *Hensley* as establishing the general rule that plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit. Thus, even if a specific claim fails, the time spent on that claim may be compensable, in full or in part, if it contributes to the success of other claims. We analogize from *Hensley*'s discussion of different claims to the different stages of litigation at issue here. Just as time spent on losing claims can contribute to the success of other claims, time spent on a losing stage of litigation contributes to success because it constitutes a step toward victory.
>
> . . . The rationale is clear: If a plaintiff ultimately wins on a particular claim, she is entitled to all attorney's fees reasonably expended in pursuing that claim-even though she may have suffered some adverse rulings.  Here, although the Supreme Court vacated our judgment, the Court's order was simply a temporary setback on the way to a complete victory for plaintiff.
>
> Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to

---

[12] A similar principle was applied in *Abner v. Kansas City S. Ry. Co.*, 541 F.3d 372 (5th Cir. 2008), where the first trial resulted in a hung jury and the plaintiffs prevailed at a second trial.  The defendant argued that "it was an abuse of discretion to award Plaintiffs the attorneys' fees and costs that the first trial generated" because the Plaintiffs were not the "prevailing parties" at the first trial and the first trial was a "wholly unsuccessful effort." *Id.* at 378.  The Fifth Circuit held that, rather than looking at each trial in isolation, it is appropriate for a district court under *Hensley* to focus on the ultimate result of the case, and concluded that the district court appropriately awarded fees reasonably expended in first trial.  *Id.* at 383.

winning the war.  Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning.  The County would have us scalpel out attorney's fees for every setback, no matter how temporary, regardless of its relationship to the ultimate disposition of the case. This makes little sense.  We hold, instead, that a plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage.

*Id.* at 1052-53 (citations omitted).

As in *Alizadeh*, the prevalent approach is to inquire whether the plaintiffs have prevailed in the litigation as a whole. *Schneider v. Colegio de Abogados de Puerto Rico*, 187 F.3d 30, 48 (1st Cir. 1999) (Lipez, J., concurring); *see also Retained Realty, Inc. v. Spitzer*, 643 F. Supp. 2d 228, 239 (D.D.C. 2009) ("Caselaw construing other statutes that provide for attorneys fees, however, suggests that in such circumstances, the prevailing party's entitlement to attorneys' fees includes fees for the unsuccessful stage.").  The Court will follow this approach and will not exclude fees expended in defending the appeal in the Supreme Court because Plaintiffs did not lose on the merits of any claim during the appeal and it was a necessary step to Plaintiffs' ultimate success.

### c. billing judgment

"[P]laintiffs seeking attorney's fees are charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving that they exercised billing judgment." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006). "Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Id.* Plaintiffs contend that they have exercised billing judgment, and that they leanly staffed this case, avoiding any duplication of tasks and using attorneys with appropriate levels of experience to handle various litigation tasks.  Mr. Hebert took the lead in drafting all pleadings and other filings, handling the trial, drafting proposed interim remedial plans, and managing certain logistical matters, such as client communications. Jenner & Block attorneys, who have extensive and specialized experience in handling Supreme Court cases, performed virtually all of the appellate work in the Supreme Court.  Mr. Richards served as local counsel and performed limited tasks.  Plaintiffs contend that the allocation and distribution of work avoided duplication and best utilized the expertise of the attorneys.  Plaintiffs state that some time has been excluded,

including numerous telephone calls with clients to discuss the status of the case and time spent traveling to and from San Antonio. However, Defendants argue that Plaintiffs failed to exercise billing judgment, and that disallowing certain requested fees is warranted.

### Mr. Hebert's attorney's fees

Gerald Hebert's Declaration states that he excluded from his fee request "many hours of time for which [he] could be compensated," thereby demonstrating billing judgment. Hebert states that there were "no excessive, redundant, or unnecessary hours included in the time sheets" and he avoided duplication by agreeing on a division of labor with the Jenner & Block attorneys and by coordinating with LULAC's counsel. Hebert states that AngleStrategies served as case/client coordinator to "undertake all logistics and facilitate communications to the client group," and in exercising billing judgment, he excluded nearly all of his own communications with the client group, except those when time was of the essence and involved possible settlement of the lawsuit. Mr. Hebert states that he also did not include time spent traveling back and forth from Washington, D.C. to Texas. The Declaration of Bruce Spiva attests to the exercise of sound billing judgment, noting that certain hours have been excluded and that the number of hours is "quite reasonable." Spiva Decl. ¶¶ 17-18. Similarly, the Declaration of Steve Pershing states that he has reviewed the timesheets in light of his own experience litigating voting rights cases and submitting fee applications, and that the hours set forth are reasonable and display sound billing judgment, "indeed significantly understat[ing] the number of hours his fee petition could properly claim." Pershing Decl. ¶ 17.

Defendants argue that Mr. Hebert should not be awarded fees for pre-filing work, for client communications, and for entries that are potentially duplicative of his time spent on the *Perez* case.

### pre-litigation work

Mr. Hebert stated in his original declaration that he had not billed for any of the work he performed (pre-complaint) in preparing the case. Hebert Decl. ¶ 14. Defendants argue that pre-litigation fees billed by Mr. Hebert should not be allowed because he stated that he did not bill for this work, but his time sheets include them (and therefore, all time billed before September 22, 2011 should be excluded). In response, Mr. Hebert states that the statement in his original Declaration that he excluded such work was inadvertently included, and he executed a sworn supplemental

Declaration substantiating the error.  Therefore, Plaintiffs contend that this time (43.8 hours) is reasonable and should be included.

In *Webb v. Board of Education*, 471 U.S. 234 (1985), the Supreme Court held that fees may be awarded under 42 U.S.C. § 1988 for pre-filing work performed on the litigation. *Id.* at 243. Thus, "it is settled that a prevailing party may recover fees for time spent before the formal commencement of the litigation on such matters as attorney-client interviews, investigation of the facts of the case, research on the viability of potential legal claims, drafting of the complaint and accompanying documents, and preparation for dealing with expected preliminary motions and discovery requests." *Id.* at 250.  The Court has reviewed Mr. Hebert's submitted hours, which include discussions with clients, legal research, preparation of strategy, communications with experts, and drafting the complaint, and finds that the hours were useful, of a type ordinarily necessary to advance the litigation, and reasonably expended on the litigation.  Therefore, hours billed for pre-litigation work will not be excluded.

*client communications*

With regard to client communications, Defendants state that Mr. Hebert billed for approximately 33 hours of client communication and excluded only 8.4 hours of that time. Defendants argue that because Mr. Hebert has not demonstrated that these communications were made when time was of the essence or for possible settlement, he has not shown that these hours are reasonable and they should not be allowed.  Plaintiffs respond that a 25% discount is "no small amount" and there is no requirement that fee awards be limited to matters requiring an immediate response or involving settlement.  Mr. Hebert states that he merely included these two categories of communications as examples of where he was claiming time for keeping his clients informed or when the State proposed a settlement plan.  The Court finds that Mr. Hebert's requested hours for client communication are reasonable and were expended on the litigation and should not be excluded.

*duplicative hours with the Perez litigation*

Defendants also argue that Mr. Hebert fails to indicate what efforts were made to segregate his time on this case from the time claimed for work on the *Perez* case, in which he represents the Quesada Plaintiffs.  Defendants assert that the Davis Plaintiffs' billing records include entries for

-23-

briefing and attendance at joint hearings, and these entries are also included in the fee motion in the *Perez* case.  Defendants also note that the Davis Plaintiffs and the Quesada Plaintiffs filed similar briefs in response to Defendants' remedial plans, but Mr. Hebert assessed 5.4 hours of time to this case and .8 hours to *Perez*, "despite the fact that the brief in the *Perez* case included additional argument."  Defendants contend that no work in *Perez* should be compensated in this case and, to the extent the time entries reflect work that may be attributed equally to both cases, any fee award should be reduced by half.

Plaintiffs respond that the duplication claimed by Defendants is speculative, that Mr. Hebert has not billed for any of the time in this case that he listed in the motion for the Quesada Plaintiffs in *Perez* and "there has been absolutely no duplication."  Docket no. 212 at 10; Hebert Supp. Decl. ¶ 2.  Plaintiffs argue that "Defendants cite several examples of where [Mr. Hebert] spent more time preparing for hearings in this case than he did in *Perez*, when hearings were jointly held," but that is "hardly surprising" and in fact the time differences show there is no duplication.  Plaintiffs state that Mr. Hebert prepared for hearings in *Perez* to address certain non-duplicative, limited issues in the *Perez* litigation, such as North Texas claims.

The Court has reviewed the time records noted by Defendants to be potentially duplicative. For the hearing on February 14, 2012, Mr. Hebert submits separate records for preparation (8.5 hours) and attendance (9 hours).  For the hearing on February 15, 2012, he likewise submits separate records for preparation (3.3 hours) and attendance (6.5 hours).  The time entries for attendance include the entire length of the hearings.  In the *Perez* litigation, Mr. Hebert submits a 4-hour entry for February 14 to "prepare for[,] attend, participate in hearing before three-judge court," and an identical 4-hour entry for February 15.  Similarly, for the May 29, 2013 hearing, Mr. Hebert billed 3.4 hours in this case preparing for the hearing and 3 hours attending the hearing, which lasted from 9:00 a.m. to 11:35 a.m.  Mr. Hebert also billed 3 hours in *Perez* to "prepare for, attend and participate in" the hearing.  Last, for the status conference on July 1, 2013, Mr. Hebert billed 2.5 hours in this case to prepare for and 2.2 hours to attend the hearing, which lasted from 9:00 a.m. to 11:14 a.m.  Mr. Hebert also billed 3 hours in *Perez* to "prepare for, attend, and participate in proceedings" before the Court.

Thus, these entries suggest that attendance at and participation in the hearings was billed in

both cases.  However, Mr. Hebert's supplemental affidavit suggests that the time billed in *Perez* is simply preparation for the hearing for issues specific to *Perez*, though that is not entirely consistent with the time records.  Nevertheless, based on the evidence submitted, the Court finds that none of the time records in this case include work on the *Perez* litigation.  Even though Mr. Hebert attended some hearings as an attorney in both cases, the Court disagrees with Defendants' argument that, even if all attendance was billed only to this case, to the extent Mr. Hebert attended hearings for both cases, the time should be split equally between the two cases rather than allocated entirely to this case.  Mr. Hebert would have attended the hearings in their entirety for this case, whether or not he represented additional parties in the *Perez* litigation.  As a prevailing party, the Davis Plaintiffs are entitled to recover all fees reasonably spent on this litigation.

However, the time will be reduced by one hour on February 14 and 15 for lunch because the time records do not indicate whether the lunch breaks were spent working.  The Court will further reduce the time billed for attending the May 29 hearing from 3 hours to 2.5 hours.[13]  This results in a total reduction of  2.5 hours.

Defendants also point to the brief in response to the Defendants' remedial plans, for which Mr. Hebert billed 5.4 hours[14] of time to this case and .8 hours[15] of time to *Perez*, "despite the fact that

---

[13]  The Court's minutes indicate that the February 14 hearing lasted approximately 8 hours, not including approximately one hour for lunch, and the February 15 hearing began at 8:03 a.m. and lasted until 2:16 p.m., including a lunch break between 11:29 a.m. and 12:52 p.m.   Attendance at the February 14 hearing is reduced from 9 hours to 8.  Attendance at the February 15 hearing is reduced from 6.5 hours to 5.5.  Attendance at the May 29 hearing is reduced by from 3.0 to 2.5 hours to reflect actual time. Mr. Hebert also attended a joint hearing on January 27, 2012.  This was apparently incorrectly billed as occurring on February 1, 2012.  The January 27 hearing lasted 5.3 hours.  Mr. Hebert's billing records reflect 3 hours for attending the hearing.  Mr. Hebert billed 2.2 hours in this case to attend the July 1, 2013 status conference and 3 hours to prepare for, participate in, and attend the hearing in *Perez*.  The Court's records indicate that the hearing was approximately 2.2 hours.

[14] This includes a 10/23/2011 entry of 4.1 hours for "draft response to State of Texas Interim Plan" and a 10/24/2011 entry of 1.3 hours for "Final draft of response to State of Texas Proposed Interim Plan."

[15] This includes a 10/22/2011 entry of .4 hours to "Draft Response/Advisory of Quesada Plaintiffs to State of Texas' Proposed Interim Plan" and a 10/24/2011 entry of .4 hours to "Final Edits and file Response/Advisory of Quesada Plaintiffs to State of Texas' Proposed Interim Plan."

the brief in the *Perez* case included additional argument." Docket no. 208 at 13. The response briefs filed in the two cases are largely identical for the first few pages, and then vary regarding the position of the Department of Justice on preclearance, and the *Perez* brief contains an additional discussion of the various Plaintiffs' proposed remedial plans. The time records therefore indicate that Mr. Hebert billed the time spent on the duplicative brief for both cases to this case, and billed an additional .8 hours of time to *Perez* for time spent exclusively on *Perez*. The Court finds that no time has been billed for work exclusively on the *Perez* litigation, and because Mr. Hebert would have expended the 5.4 hours for work on this case regardless of whether he represented clients in the *Perez* litigation, he may recover for the work as reasonably expended on this litigation. Therefore, no reduction is warranted.

### *Jenner & Block attorneys' fees*

The total amount of attorneys' fees sought for Jenner & Block attorneys is $138,671.25, as revised. Jenner & Block submits the affidavit of Paul Smith, who states that the hours of attorney time submitted were actually expended, that he excluded time for certain attorneys who provided periodic assistance in the case but were not principally involved in the litigation, and that the remaining time was reasonably and necessarily expended in prosecution of the action.

Defendants contend that entries for appellate work related to the Davis Plaintiffs' unsuccessful pursuit of the legal theory that was rejected in *Perry v. Perez* must be excluded. This argument was rejected as explained *supra*. However, Defendants argue that even if fees may be awarded for this work, reduction is required because Plaintiffs' records include vague, duplicative, and block-billed entries, and because they billed in quarter-hour increments.

### *duplicative work*

Defendants correctly note that the Court must eliminate any duplicative or redundant time entries. Defendants assert in a conclusory manner that Jenner & Block's records "include duplicative entries" and have noted numerous specific entries that they conclude are duplicative, but Defendants do not explain why they contend that they are duplicative. Plaintiffs state, "It appears that Defendants assert that any time a task appears more than once (*e.g.*, 'prepared reply brief') that it is

---

5:11-CV-360 docket no. 851-4.

duplicative," but Plaintiffs contend that these entries "simply reflect the fact that most litigation tasks are not completed in one sitting, nor necessarily completed by one person."  Docket no. 212 at 12. Plaintiffs note that preparing a brief may span several days, with different attorneys drafting or editing different sections, and this is not duplication but "work-flow management."  *Id*.  Plaintiffs note that the bulk of the work was performed by attorneys who bill at lower rates (Amunson and Lopez), demonstrating an effort to minimize fees, and further note that "Defendants do not suggest that the total amount of time expended by multiple attorneys or a single attorney over the course of multiple days on any given task is unreasonable."  *Id.*

However, rather than complaining about repeat entries by a single attorney, it appears that Defendants complain primarily of the fact that three different Jenner & Block attorneys worked on the same tasks of preparing the motion for divided argument in the Supreme Court and the Supreme Court briefs.  Thus, for example, the billing records indicate that Paul Smith spent approximately 16 hours on the motion for divided argument and the opening merits brief; Amunson spent 44 hours on these tasks; and Lopez spent approximately 35 hours.  On the response brief, Smith billed approximately 20 hours; Amunson billed approximately 36 hours; and Lopez billed approximately 21 hours.  Mr. Hebert also billed 1.2 hours to review and edit the merits brief and 1 hour to review the response brief.

Duplication of effort is not per se unreasonable.  *Base Metal Trading, Ltd. v. OJSC Novokuzketsky Aluminum Factory*, 31 F. App'x 159, *3 (5th Cir. 2001).  However, "[i]f more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized."  *Walker v. United States HUD*, 99 F.3d 761, 768 (5th Cir. 2001). Plaintiffs have asserted that, even though multiple attorneys worked on the briefs and the motion for divided argument, they implemented a division of labor, with attorneys working on different tasks. There is no indication that Plaintiffs engaged in unnecessarily duplicative work, or that the overall time billed to these tasks was unreasonable.  Therefore, the Court finds no basis for discounting work as duplicative.

*vagueness/block billing*

A district court may reduce the number of hours awarded if the documentation is vague or incomplete.  *Kellstrom*, 50 F.3d at 324; *see also Leroy v. City of Houston (Leroy II)*, 906 F.2d 1068,

1080 (5th Cir.1990) (striking hours as "not illuminating as to the subject matter" or "vague as to precisely what was done"). Defendants contend that a December 20, 2011 entry from Paul Smith for 3.5 hours described as "worked on brief" is vague. The Fifth Circuit frowns on vague notations such as "work on brief" or "review for oral argument." *Edmond v. Oxlite, Inc.*, No. 01-2594, 2005 WL 2458235, at *4 (W.D. La. Oct. 5, 2005). In *Leroy*, the Fifth Circuit described entries such as "work on brief," "continue to work on brief," and "review for oral argument" as "vague as to precisely what was done." *Id.* at 1080. The *Leroy* Court was concerned that "huge blocks of time" were listed for these activities, "[n]early all of the entries showed only one undivided total amount of time on any one date," and the district court did not address the defendant's claim that the hours were excessive. *Leroy*, 906 F.2d at 1080.

Although parties take a risk when submitting vague time records, the Court concludes that the vague entries here do not require a reduction. *See Kellstrom*, 50 F.3d at 325 (failing to provide contemporaneous billing statements does not preclude an award of fees per se, as long as the evidence produced is adequate to determine reasonable hours); *Tyler v. Cedar Hill Indep. Sch. Dist.*, 433 F. App'x 265, *1 (5th Cir. 2011) ("[T]his court has, in the past, concluded that 'sparse' documentation (such as that describing the hours expended and the rates charged) will suffice to allow the court to review a request for attorney's fees."); *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 823 (5th Cir. 1997) (nondescriptive billing sufficient to support fee award when total number of hours claimed was reasonable). The Jenner & Block attorneys engaged in only a few discrete tasks, which allows the Court to determine whether the overall time spent was reasonable. Although the Court is not informed regarding the precise nature of the work performed in entries such as "work of brief," Defendants have not argued that the hours claimed for preparing the briefs are excessive. Nor have Defendants claimed that the time billed overall by Jenner & Block is excessive. The Court finds that the overall time expended by Jenner & Block attorneys on this litigation – approximately 221 hours (not including the fee application) – is reasonable.

Defendants further complain that a number of Jenner & Block's time entries are block billed. The term "block billing" refers to the "time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1554 n.15 (10th Cir.

1996); *see also Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Housing & Cmty. Affairs*, No. 3:08-CV-0546-D, 2013 WL 598390 (N.D. Tex. Feb. 15, 2013) (quoting *Fralick v. Plumbers & Pipefitters Nat'l Pension Fund*, Civ. A. No. 3:09-CV-0752-D, 2011 WL 487754, at *4 (N.D. Tex. Feb. 11, 2011)). "[A] person engaging in block billing would record the total amount of time spent on a case that day, and then group several tasks under that single entry, leaving the court unable to determine how much time was devoted to a given task." *Inclusive Cmtys.*, 2013 WL 598390, at *4; *see also Edmond*, 2005 WL 2458235, at *4 (recognizing that block billing often results from law firms billing their clients on a daily basis). Block billing makes it more difficult to determine whether the amount of time spent on various tasks was reasonable. *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007). Courts have approved across-the-board reductions in block-billed hours to offset the effects of block billing. *Ceres Envtl. Servs. v. Colonel McCrary Trucking, LLC*, 476 F. App'x 198, 203 (11th Cir. 2012); *Welch*, 480 F.3d at 948 (approving a 20% reduction to block-billed hours).

However, "[a] reduction for block billing is not automatic." *Fralick*, 2011 WL 487754, at *5; *see also C&D Prod. Servs. v. Dir., Office of Worker's Comp. Programs*, 376 F. App'x 392, at *1 (5th Cir. 2010) (finding that Board did not abuse its discretion in finding block-billed entries to be sufficiently specific to satisfy regulations); *BP Pipelines Inc. v. C.D. Brown Constr., Inc.*, 473 F. App'x 818, 835 (10th Cir. 2012) ("[W]e have never mandated a reduction or a denial of a fee request based on block billing."). As noted, "even a failure to provide contemporaneous billing statements does not preclude an award of fees per se, as long as the evidence produced is adequate to determine reasonable hours." *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 392 n.18 (5th Cir. 2000). "Therefore, before reducing the fee request based on block billing, the Court must evaluate whether the applicant's evidence is adequate to enable it to determine the reasonableness of the hours expended." *Fralick*, 2011 WL 487754, at *5; *Holowell*, 217 F.3d at 392 n.18 (affirming award of fees despite block billing where district court had sufficient evidence to determine that the hours claimed were reasonable for the work performed); *see also Flying J. Inc. v. Comdata Network, Inc.*, 322 F. App'x 610, 617 (10th Cir. 2009) ("[T]he decision whether block billing indicates an unreasonable claim should remain with the district court who should be allowed to exercise its discretion accordingly.").

Many Jenner & Block time entries reflect block billing. Time entries reflect the total time

spent by an attorney on the case on a given day; the tasks are itemized, but the time per task is not identified.  For example, Jessica Amunson billed 11.5 hours on December 29, 2011 for "researched and drafted reply brief; conferred with C Lopez re same; emailed with P. Smith and G. Hebert re same; sent draft to team for review."  On December 15, 2011, Amunson billed 9.5 hours for "researched and drafted merits brief in State Senate case; emailed with team re same; implemented edits to motion for divided argument."

However, Plaintiffs contend that the block-billed entries are reasonable and are sufficiently specific insofar as the entries "describe with specificity the multiple tasks, the tasks relate to the case, and the total represents a reasonable amount of time expended."  Docket no. 212 at 12.  The Court agrees that the entries are sufficiently specific and allow the Court to determine whether the total represents a reasonable amount of time.  In fact, the vast majority of the block-billed entries reflect a number of specific entries for related work, such as Lopez's October 28, 2011 entry of four hours for "drafted opposition to motion to dismiss or judgment on the pleadings in Senate Map litigation; phone call with G. Hebert re the same," Amunson's December 19, 2011 entry of 5.5 hours for "drafted and edited opening brief; discussed same with C. Lopez and E. Goldenberg; sent new draft to team," and Amunson's November 29, 2011 entry of .5 hours for "reviewed and made notes re G. Hebert draft response to stay motion and emailed with P. Smith re same."  The Court has reviewed the entries and finds that the overall time spent on the related tasks is reasonable.  Where the entries reflect unrelated work, they generally still reflect a total reasonable amount for the listed tasks. Therefore, the Court will not discount across-the-board for block billing.

Although the Court will not apply across-the-board deductions, the Court has reviewed all of the entries for Jenner & Block attorneys for reasonableness and finds that the following reductions are required:[16]

• Amunsun entry for 3 hours on 12/1/2011 for "edited response to stay petition and oversaw filing process" – This entry will be reduced by .5 hours to eliminate any time spent overseeing filing,

---

[16] Defendants also contend that Smith's attendance at moot court on January 5 and 6 was for other litigation.  Both the Senate case and the *Perez* litigation were on appeal and were being argued to the Supreme Court.  Smith's attendance at the moot court to provide his commentary was time reasonably spent on this litigation.

which is clerical.

     • Amunsun entry for 2.5 hours on 12/16/2011 for "conference call re appendix issues; worked on brief" – This entry will be reduced by .5 hours because "conference call re appendix issues" is vague and does not allow the Court to determine whether the time spent was reasonable, and the task is potentially clerical.

     • Amunson entry for 5.5 hours on 12/18/2011 for "calls and emails with C. Lopez re brief and appendix materials; incorporated all edits to same and sent to team for review" – This entry will be reduced by .5 hours because "calls and emails re appendix materials" is vague and does not allow the Court to determine whether the time spent was reasonable, and the task is potentially clerical.

     • Amunson entry for 6.5 hours on 1/2/2012 for "reviewed and revised brief and prepared for filing" – This entry will be reduced by .5 hours because "prepared for filing" is vague and the Court is unable to determine whether a reasonable amount of time was spent on this task, and the task is potentially clerical.

     • Amunson entry for 1.25 hours on 1/3/2012 for "reviewed final brief and briefs of other parties; filed and served brief" – This entry will be reduced by .25 hours because "filed and served brief" is clerical.

     • Lopez entry for .5 hours on 1/3/2012 for "prepared Supreme Court reply brief filing" – This entry will be disallowed because it is vague and the Court is unable to determine whether a reasonable amount of time was spent on this task, and the task is potentially clerical.

     *billing in quarter-hour increments*

Defendants contend that Jenner & Block's fee award must be reduced because the attorneys billed in quarter-hour increments. Plaintiffs argue that the Fifth Circuit has never held that quarter-hour increment billing is impermissible, and that requested hours should be rejected only where there is a showing that the billed time was not an accurate reflection of the time actually expended.

In *Cambridge Toxicology Group, Inc. v. Exnicios*, 495 F.3d 169, 182 (5th Cir. 2007), the Magistrate Judge concluded that the defendants rounded up because they billed in quarter-hour increments and reduced the award by 12.5%. The Fifth Circuit noted that "defendants cite no cases in which a reduction in fees for quarter-hour billing was deemed improper" and affirmed the reduction based on lack of billing judgment.

-31-

In *Brown v. Astrue*, No. 09-487, 2011 WL 612730, at *3 (M.D. La. 2011), the court recently noted,

> Other courts in this Circuit and in other jurisdictions have reduced fee awards where time entries were rounded to the nearest fifteen minutes, although the Fifth Circuit Court of Appeals has not yet ruled on the issue. *Hawkins v. Astrue*, No. Civ. A. 09–7460, 2010 WL 5375948 at *2–3 (E.D. La. Nov. 24, 2010) (finding that billing in .25 increments for a review of what are at most one-page documents is unreasonable and reducing charges to one-tenth of an hour); *Hagen v. MRS Associates, Inc.*, No. Civ. A. 99–3749, 2001 WL 531119, at *4–5 (E.D. La. May 15, 2001) (reducing the fee award by 10% to account for the inadequacy of quarter-hour billing increments); *Dzwonkowski v. Dzwonkowski*, No. 05–0544–KD–C, 2008 WL 2163916, at *26 (S.D. Ala. May 16, 2008) (reducing each time entry recorded as .25 to .1); *Sandoval v. Apfel*, 86 F. Supp. 2d 601, 615 (N.D. Tex. 2000) (billing one quarter-hour to review simple notices, motions and court orders that were less than one page long is excessive); *Bowman v. Sec'y of H.H.S.*, 744 F. Supp. 898, 899–901 (E.D. Ark. 1989) (reducing or disallowing billing entries of .25/hour for the receipt and review of short and simple motions and orders).

The court continued, "quarter-hour billing does not accurately reflect the number of hours spent on each task and is very likely to inflate the time Plaintiff's attorney devoted to this case." *Id.*

In *Welch v. Metropolitan Life Insurance Co.*, 480 F.3d 942, 948-49 (9th Cir. 2007), the court affirmed a twenty-percent across-the-board reduction where the attorneys billed in quarter-hour increments and the billing records were "replete with quarter-hour or half-hour charges for the drafting of letters, telephone calls and intra-office conferences" that likely took a fraction of the time.

Jenner & Block's time entries are not replete with quarter-hour or half-hour charges for small tasks. Therefore, the risk that quarter-hour billing overstates the actual time expended is much less significant. As noted previously, the Court has reviewed the time entries and determined that the time spent on the various discrete tasks performed by Jenner attorneys is reasonable. Accordingly, no reduction for quarter-hour billing is necessary.

### d. AngleStrategies and Cheryl Olson (paralegal) work

The term "attorney's fee" has historically included fees for paralegal services. *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 582 (2008). However, "[p]aralegal work can only be recovered as attorney's fees if the work is legal rather than clerical." *Vela v. City of Houston*, 276 F.3d 659, 681 (5th Cir. 2001); *Allen v. U.S. Steel Corp.*, 665 F.2d 689, 697 (5th Cir. 1982) (paralegal expenses

are separately recoverable only as part of a prevailing party's award for attorney's fees and expenses, and even then only to the extent that the paralegal performs work traditionally done by an attorney; otherwise, paralegal expenses are separately unrecoverable overhead expenses).  Defendants argue that the Court should deny or reduce any award for work performed by AngleStrategies and Cheryl Olson because "the evidence does not establish that these non-attorney staffers qualify as senior legal assistants" and because their work was clerical in nature and was block billed.[17]

### *AngleStrategies*

Mr. Hebert states that he is a solo practitioner without litigation support staff, and therefore he retained AngleStrategies to provide litigation support throughout the case.  Hebert Decl. ¶ 15. Hebert states that, to maximize efficiency and reduce the number of attorney hours on the case, he "delegated to them numerous litigation tasks, including preparation of exhibits and exhibit books, deposition summaries, conducting research, data gathering, map analysis and preparation, and initial analysis of proposed or alternative redistricting plans."  *Id.*  Hebert states that he reviewed the time sheets prepared by Angle Strategies and attests to their accuracy and reasonableness.  He asserts that "[t]he paralegal support and mapping services rendered to my law firm by Angle Strategies were absolutely essential to my ability to maintain this action, and all work performed by them was undertaken at my direction and under my constant supervision and control."

Defendants contend that no evidence is provided to establish that the employees of AngleStrategies are trained or certified paralegals who perform legal work or work similar to that provided by attorneys.  Defendants assert that AngleStrategies is a political consulting firm and the VRA does not require Texas to compensate a political consulting firm for services provided on behalf of a candidate.  In response, Mr. Hebert has attested that the work performed was legal support performed under his supervision, not political consulting.  *See also* Matt Angle Decl. ¶ 1 ("None of the work for which we have listed in our time records was for political consulting . . . ."). Nevertheless, Defendants are correct that there is no evidence to establish that AngleStrategies personnel have any training or experience as paralegals.  *See Jones v. Armstrong Cork Co.*, 630 F.2d 324, 325-26 (5th Cir. 1980) (affirming exclusion of compensation for work performed by person

---

[17] Defendants also contend that certain attorney work was clerical and should be discounted. The Court has already reviewed attorney hours and reduced the hours for clerical tasks.

called a paralegal because no evidence was introduced of any paralegal training and most of the activities were clerical); *Stagner v. W. Ky. Navigation, Inc.*, No. 02-1418, 2004 WL 253453, at *5 n.10 (E.D. La. Feb. 10, 2004) (the cost of paralegal services are to be included in the fee award if the services performed are legal in nature and are supervised by an attorney, and the paralegal is qualified by virtue of education, training, or work experience to perform substantive legal work). Mr. Hebert was put on notice by Defendants' briefing that they were challenging whether AngleStrategies' personnel possessed the necessary qualifications for their time to be billed as legal work performed by paralegals, yet no evidence was presented in response to this challenge. Nor did Mr. Hebert seek to have these expenses awarded under some other provision for costs or expenses as opposed to attorneys' fees. Accordingly, the Court will disallow the hours submitted by AngleStrategies.

### Cheryl Olson

Plaintiffs seek recovery of fees for work performed by a Jenner & Block paralegal, Cheryl Olson. In their briefing, Defendants assert that much of the work performed by Cheryl Olson was block-billed or that it was clerical and therefore not recoverable. In Brister's expert report, he also raises the issue of whether Olson is qualified by training or experience as a paralegal. *See* docket no. 208-2 at 15 ("[T]he evidence does not establish that these non-attorney staffers qualify as senior legal assistants."). Because this was raised only in the expert report and not in the briefing, the Court finds that Plaintiffs were not put on notice of the need to come forward with such evidence, and thus Plaintiffs will be given an opportunity to supplement their motion. Until such time as Olson's qualifications are established, the Court will not award fees for her work. Accordingly, the Court will also disallow the hours submitted by Olson at this time.

**e. further reductions based on the Court's independent review**

The Court has also conducted an independent review of the submitted hours to ensure that they were reasonably expended on the litigation.

### attendance at hearings and bench trial in this case

The Court reduces the time billed by Mr. Hebert for the November 4, 2011 hearing from 6.5 to 5 hours to reflect the actual time of the hearing. This is a reduction of 1.5 hours.

The Court reduces the time billed by Mr. Hebert for the February 8, 2012 bench trial from

8.9 to 7.0 to reflect the actual time of the hearing, not including the lunch break.  This is a reduction of 1.9 hours.

### pro hac vice fees

Mr. Hebert's submitted hours includes .5 hours[18] for his work related to admission *pro hac vice* in this Court and Mr. Richards' submitted hours include an entry for .6 hours by his paralegal for "communication exchange with Gerry Hebert; revise, finalize and file Motion for Pro Hac Vice for J. Gerald Hebert; correspondence to process server regarding service of summons on defendants." Although there is no consensus among the federal courts concerning whether *pro hac vice* fees may be recovered as costs by a prevailing party, this Court concludes that such fees and time spent in seeking admission *pro hac vice* should not be recoverable as costs because they are an expense that an attorney pays for the privilege of practicing law in this Court and are not normally charged to a fee-paying client.  Moreover, the opposing side should not be responsible for paying such costs and fees simply because Plaintiffs chose to be represented by counsel who are not admitted to practice in this district.  *See Lofton v. McNeil Consumer & Specialty Pharms.*, No. 3:05-CV-1531-L, 2011 WL 206165 (N.D. Tex. Jan. 4, 2011) (disallowing *pro hac vice* fees as costs); *Knauff v. Dorel Juvenile Group, Inc.*, No. SA-08-CV-336-XR, 2010 WL 2545424, at *1-2 (W.D. Tex. June 21, 2010) (same).  Therefore, the *pro hac vice* fee ($25), and attorney and paralegal fees incurred related to Mr. Hebert's admission *pro hac vice* are not allowed.

### Karina Esparza (paralegal) work

In addition to the *pro hac vice* hours, other work billed by Esparza includes "prepare civil cover sheet and requests for summons; finalize and efile complaint and request for summons"; "correspondence to process server regarding service of summons on defendants"; and "review order regarding briefing deadlines; file returns of service on all defendants."  The Court concludes that these are clerical tasks, and thus these fees are not allowed.  Accordingly, the Court reduces the award of fees to Richards by $180.50 (1.9 hours x $95/hour).

---

[18] This includes .1 hours to review the letter from the Court regarding admission on 9/23/2011; .3 hours to prepare *pro hac vice* motion on 9/27/2011; and .1 hours to review order re *pro hac vice* on 10/3/2011.

**2. Reasonable Hourly Rates**

Defendants contend that the hourly rates requested by Plaintiffs are excessive and that Plaintiffs have not carried their burden of demonstrating the reasonableness of the proposed hourly rates for counsel and support staff. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) (the party seeking an attorney's fee award bears the burden of justifying the reasonableness of its requested hourly rate). Defendants contend that the D.C.-area hourly rates are inapplicable and too high.

Plaintiffs contend that voting rights and redistricting cases are among the most complex and difficult to litigate of all federal civil actions. Pershing Decl. ¶ 12.[19] They argue that Texas voting rights cases "in particular have historically been some of the most complex and difficult of all such cases, and the litigation now before this Court has been among the more difficult and intricate of those, both procedurally and substantively." *Id.* Plaintiffs assert that they appropriately hired attorneys with substantial experience in redistricting and voting rights. Given their experience, Plaintiffs contend that their hourly rates are reasonable.

**a. Washington, D.C. versus San Antonio/Western District of Texas rates**

The parties first dispute whether San Antonio or Washington, D.C. rates should serve as the baseline for the fee analysis. Other than David Richards, Plaintiffs' attorneys are based in the Washington, D.C. area, and their rates reflect the rates normally charged to their clients in D.C. Defendants contend that it is well established that the forum market rates apply when determining the fee award. *Hopwood v. Texas*, 236 F.3d 256, 281 (5th Cir. 2000). In contrast, Plaintiffs argue that Mr. Hebert's and Jenner & Block's work is properly based on the prevailing market rates in D.C., citing *McClain v. Lufkin Industries, Inc.*, 649 F.3d 374, 383 (5th Cir. 2011). Defendants argue that *McClain* is inapplicable because Plaintiffs have retained local counsel (David Richards) who claims to be an expert on voting rights and there are dozens of Texas attorneys involved in the redistricting cases.

In *McClain*, the Fifth Circuit noted that, "in an unbroken and consistent line of precedent, this court has interpreted rates 'prevailing in the community' to mean what it says," meaning the prevailing rate in the forum. 649 F.3d at 381. The Court noted, however, the other circuits have

---

[19] Plaintiffs cite the Federal Judicial Center 2004 District Court Case Weights, which gives voting rights cases a weight of 3.86 (and non-employment, "other" civil rights cases a 1.92).

taken the position that out-of-district counsel may be entitled to the rates they charge in their home districts under certain limited circumstances. *Id.* at 381-82. The Fifth Circuit held that where "abundant and uncontradicted evidence prove[s] the necessity of . . . turning to out-of-district counsel, the co-counsel's 'home' rates should be considered as a starting point for calculating the lodestar amount." *Id.* at 382; *see also id.* at 383 ("[W]e here clarify our adherence to the common view of circuit courts that in the unusual cases where out-of-district counsel are proven to be necessary to secure adequate representation for a civil rights plaintiff, the rates charged by that firm are the starting point for the lodestar calculation."). The Court noted that the focus on local community rates "sets a floor for compensation, to emphasize that civil rights litigation under a fee-shifting statute is not a *pro bono* exercise," but on the other hand, counsel should not reap a windfall nor are they necessarily entitled to what "lions at the bar" command. *Id.* at 383. The Court found that out-of-district counsel was necessary where the record was "replete with affidavits from a variety of expert employment lawyers who swore that no Texas attorneys were willing and able to assist in such a large case that might drag on for years without any guarantee of financial remuneration," and no rebuttal evidence was presented. *Id.* at 383. The Court emphasized in its conclusion that the panel had no authority to abrogate the longstanding rule that attorneys for successful civil rights plaintiffs should presumptively receive local forum prevailing rates. *Id.* at 387. It stressed the "atypical" nature of the case "because an avalanche of unrebutted evidence established that (1) plaintiffs' counsel required assistance in prosecuting the case and (2) no lawyers within the district or state were available to assist on this particular case." *Id.*

Thus, *McClain* instructs that the Court must determine whether this is one of those "unusual cases" referred to by the *McClain* court where out-of-district counsel are proven to be necessary to secure adequate representation for Plaintiffs. Plaintiffs provide the following evidence to show that use of out-of-district counsel was necessary to secure adequate representation: (1) the affidavit of Plaintiff Pat Pangburn; (2) the affidavit of Plaintiff Roy Brooks; and (3) the affidavit of Plaintiffs' local counsel, David R. Richards. Pat Pangburn's affidavit states:

> I considered local counsel here in Texas, but I was unable to find anyone who had the degree of experience and expertise necessary to represent me and vindicate my rights. I could not find in-state legal counsel that was competent to take my case. I left it to Senator Wendy Davis and Representative March Veasey, two of my co-plaintiffs, to

find legal counsel for the group that became the Davis Plaintiffs. . . .  When I and the other Davis Plaintiffs retained Mr. Hebert, I was unaware of any other attorney in Texas who could represent me effectively.  While there are other attorneys in Texas who handle redistricting cases, I did not believe they would represent me effectively in this case. . . .  It is my opinion that in order for me to competently challenge the senate redistricting plan in this Court, it was necessary for me to request Mr. Hebert, an out of state counsel, to represent me.  In addition, I retained Jenner & Block because of their considerable experience litigating Supreme court cases. . . .  I knew there was a strong likelihood the case would make its way to the Supreme Court, and wanted to be prepared with counsel that had expertise in both election law and in Supreme Court practice.  I was unable to find Texas counsel with the necessary level of experience and expertise to handle the case in the U.S. Supreme Court.

Roy Brooks states that he "spoke with a number of people about who best could handle a case such as this" and that he "considered local counsel here in Texas," but was "unable to find anyone who had the degree of experience and expertise [he] felt was necessary to represent [him], challenge the 2011 senate plan, and vindicate [his] rights."  Brooks states that he left it to Davis and Veasey to find legal counsel, and they selected Hebert.  Brooks states, "Choosing Mr. Hebert made sense because I felt there was no one locally (*i.e.*, in Texas) who could represent me in two lawsuits (one here in Texas and one in D.C.) that would be necessary if we were going to overturn the Texas Legislature's 2011 senate plan."  He also states that he was "unaware of any other attorney in Texas who could represent me effectively in this case" and he "did not believe any of [the Texas attorneys who handle redistricting cases] could represent me and protect my voting rights."  He further states, "Given the unavailability of Texas counsel, it is my opinion that in order for me to competently challenge the senate redistricting plan in this Court, it was necessary for me to request Mr. Hebert, an out of state counsel, to represent me."  Brooks also states that he retained Jenner & Block "because of their considerable experience litigating Supreme Court cases," he "wanted to be prepared with counsel that had expertise in both election law and in Supreme Court practice," and he "was unable to find Texas counsel with the necessary level of experience and expertise to handle the case in the U.S. Supreme Court."

Defendants note that Plaintiffs did have local counsel who is an expert in voting rights cases.  Plaintiffs acknowledge that they did have Texas counsel, Mr. Richards, but note that he performed limited tasks in this case – "a fact that reflects the amount of time he had available to work on the

matter." Docket no. 212 at 15. Plaintiffs provide his declaration, in which he states that, "due to commitments in other pending cases and the workload associated with those cases, I was unable to handle this case and devote the time necessary to handle this case." Richards Decl. (docket no. 211-7) at 3. He states that, by the time the Senate case was filed, the "major redistricting case" involving the Texas and U.S. House plans was already underway, and that he and other Texas redistricting and voting rights attorneys were heavily involved in that "hotly contested, major litigation." Accordingly, Richards states, he agreed to serve a minor role in this case and served as local counsel. Richards states, "I am unaware of any other attorney in Texas who would have been able to handle this case, especially given the *Perez v. Perry* litigation." *Id.* Plaintiffs further note that even Texas employed two out-of-state firms in its efforts to defend the redistricting plans – three attorneys from a D.C. firm to handle the appeal to the Supreme Court and attorneys from a Chicago-based firm to lead the defense of the plans in the D.C. Court.

Defendants' expert, Scott Brister, opines that the affidavits of Pangburn and Brooks are "inadequate to constitute proof that competent local counsel were not available." Brister Report at 4 n.4. He asserts that "both merely aver that they left picking an attorney to Sen. Wendy Davis and Rep. Marc Veasey," but Davis and Veasey do not provide an explanation as to why competent Texas counsel could not be located. Thus, Brister asserts that local San Antonio rates must be used as the starting point for the lodestar analysis.

Although it might have been reasonable for Plaintiffs to hire D.C. counsel, Plaintiffs have failed to prove that it was necessary, as *McClain* requires. Pangburn and Brooks state that they were unable to find anyone with adequate experience, but they fail to state what measures they took to find counsel. Accordingly, their affidavits fail to prove that no competent Texas attorneys were available. Similarly, Richards's affidavit states only that he was unable to fully commit to the case and that he was unaware of any other Texas attorney who would have been able to handle the case. This evidence does not prove that no other attorneys were available. There is no evidence from Plaintiffs Davis and Veasey regarding their efforts to retain local counsel. In contrast, the *McClain* record was "replete with affidavits" establishing that no Texas counsel were available. Accordingly, the Court finds that local market rates should govern.

-39-

**b. prevailing market rate for redistricting/voting rights litigation**

Brister argues that "reasonable market rates for voting-rights cases in San Antonio are lower than most of [the rates] claimed, and rarely exceed $350 per hour." Brister acknowledges that redistricting litigation is important and often complex, but argues that "this case shows there are many attorneys and firms eager to participate" and "the importance of this litigation is in part the very reason that hourly rates are typically low." Brister Report at 6. Brister states that "there is a large supply of attorneys willing to appear in redistricting cases at or below customary rates," such that the "customary and reasonable rates for attorneys in the San Antonio area for cases like this generally fall in the range from $200 to $350 per hour. *Id.* at 7. Brister notes that Texas hired Paul Clement, whom Brister describes as "one of the most heralded advocates in the country," at an hourly rate of $520.

Although Brister asserts that there are "many attorneys eager to participate" at low rates, he provides no evidence to support this conclusory assertion. In fact, the only specific discounted rate he does cite is Clement's rate of $520, which is significantly higher than Brister's asserted $350 cap for a "reasonable fee" based on the forum market. Further, although Brister emphasizes that the Court must consider the type of litigation at issue, he provides no information concerning the rates sought by or awarded to attorneys in comparable litigation – redistricting challenges.[20] *See Balderas v. Texas*, 6:01-CV-158, docket no. 499 (E.D. Tex. Feb. 20, 2002) (noting that redistricting litigation is not like ordinary civil rights litigation). Thus, there appears to be no evidence to support Brister's

---

[20] Brister cites two cases in which the courts have awarded lower fees for voting rights work, but they did not involve statewide redistricting – *LULAC of Texas v. Texas Democratic Party*, No. SA-08-CA-389, 2010 WL 9435141, at *2 (W.D. Tex. April 7, 2010) (awarding a $250 rate, without analysis, to an experienced civil rights attorney in a case challenging the way in which the Texas Democratic Party distributed and allocated delegates for participation in the Party's nominating conventions), *vacated on other grounds* 428 F. App'x 460 (5th Cir. 2011), and *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2013 WL 2655071, at *5 (N.D. Tex. June 13, 2013) (in § 2 challenge to City's at-large system of electing city council members, court held that fees for voting rights and fees for commercial litigation are determined by different markets, and awarded $350 instead of requested $465 hourly rate). The Court also takes judicial notice that Rolando Rios and Jose Garza were awarded $350 per hour (the requested hourly rate) in 2007 for prevailing in a voting rights case concerning the date of a run off election. *LULAC v. Perry*, SA-06-CA-1046 (W.D. Tex. May 22, 2007) (docket no. 15).

assertion that numerous attorneys are eager to participate in this litigation at low or discounted rates.

Plaintiffs further note that Brister recently submitted an affidavit in another voting rights case in this district stating that a fee of $750 was reasonable for an attorney with eighteen years of experience and excellent credentials (and that hourly rates of $360 to $550 were reasonable for other attorneys in the firm). In his report in this case, Brister states that he was asked in the other case "only for an affidavit relating to fees generally charged by such firms" and was "not retained as an expert and reviewed none of the files." Brister contends that his expert opinion in this voting rights case is that $200 to $350 is the customary rate in the area, though a plaintiff may choose to pay more for an attorney much in demand.

The Court has also reviewed Richard Gray's affidavit filed in March 2013 in the *Fabela* case, which is cited by Defendants. *See Fabela v. City of Farmers Branch*, No. 3:10-CV-1425 (N.D. Tex.) (docket no. 69). Gray is an attorney who is very familiar with prevailing market rates for voting rights redistricting litigation in Texas. Gray states that "$400.00 to $450.00 an hour has been a more typical award by the federal courts to lawyers with extensive voting rights litigation experience." He states that the highest hourly rate of which he was aware at the time was $450 per hour to Jose Garza, who is a "30+ year redistricting litigator" with extensive voting rights experience. Gray also indicates that a typical fee for lawyers defending voting rates cases is lower (approximately $350) because government entities would attempt to secure the lowest possible fee.

Last, the Court has reviewed fee awards in past redistricting litigation for historical rates. In 2007, the three-judge court awarded LULAC attorneys Rios and Garza $375 per hour (their requested rate). *LULAC v. Perry*, 2:03-CV-354 (E.D. Tex. March 28, 2007) (docket no. 370; *see also* docket on. 340).[21] In the *Balderas v. Texas*[22] litigation, the State of Texas stipulated in 2001 that a reasonable hourly fee for Jose Garza and Rolando Rios for similar work was $325/hour.[23] Further, in 1996, in litigation following the 1990 census, the three-judge Court awarded $300 per hour to an

---

[21] Richard Gray also filed an affidavit in that litigation stating that a reasonable hourly rate for experienced voting rights attorneys such as Jose Garza, Rolando Rios, and George Korbel was $375 per hour.

[22] Civ. A. No. 6:01-CV-158 (E.D. Tex.).

[23] Stipulation available at 5:06-CV-1046 (W.D. Tex.), docket no. 12 at 16.

appellate attorney with more than 20 years of experience, and $400 to an appellate attorney with more than 30 years of experience. *Vera v. Bush*, H-94-0277 (S.D. Tex. Nov. 13, 1996).[24]  These awards do not demonstrate that hourly rates in redistricting litigation are "typically low," as asserted by Brister.

Having considered the record and the above evidence, the Court finds no basis for reducing the attorneys' hourly rates because of the fact that this is voting rights/redistricting litigation or because Defendants hired Clement at a discounted rate.  Brister's assertion that there are numerous attorneys willing to take this litigation at lower rates is unsupported, and all the available evidence indicates that highly experienced voting rights attorneys command hourly rates consistent with the prevailing market rates for complex litigation. Brister notes that this litigation attracts public interest groups and legal aid attorneys who generally charge or accept lower rates due to the public-service nature of their work.  But the Supreme Court has admonished that "Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization." *Blanchard v. Bergeron*, 489 U.S. 87, 94-95 (1989) (quoting *Blum*, 465 U.S. at 894).

"[T]he lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010).  A "reasonable" fee is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case. *Id.*  The reasonable hourly rate reflects the novelty and complexity of the issues, the special skill and experience of counsel, and the quality of representation. *Blum*, 465 U.S. at 898-900 (noting that these factors are subsumed within the lodestar calculation).  The Supreme Court indicated in *Purdue* that the lodestar calculation should "measure the attorney's true market value" and the attorney should be "compensated at the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes."  559 U.S. at 554-55.  "It is clear that Congress 'intended that the amount of fees awarded . . . be governed by the same standards which prevail in other types of equally complex Federal litigation . . . and not be reduced because the rights

---

[24] Opinion available at 2:03-CV-354 (E.D. Tex.), docket no. 340 at 19.

involved may be non-pecuniary in nature." *Blanchard*, 489 U.S. at 95.  Therefore, the Court rejects Defendants' assertion that the subject matter and importance of this litigation means that the hourly rates "are typically low" and should be low in this case.

### c. David Richards

David R. Richards, an Austin attorney, served as local counsel and seeks an hourly rate of $550.  Richards has been practicing trial law in Texas since 1957, focusing on constitutional and redistricting litigation.   Richards Decl. ¶ 3.   Richards states that he was recognized as an "acknowledged expert" in voting rights by the Fifth Circuit in *Flowers v. Wiley*, 675 F.2d 704 (5th Cir. 1982).

Defendants contend that the $550 rate requested by Richards is "well and above the usual and customary rate for redistricting cases in the San Antonio market."   Docket no. 208 at 17 n.6. Defendants rely on Gray's affidavit in *Fabela* and Brister's report, which concludes that, based on the Texas Lawyer's billing survey for 2013, a reasonable rate falls between $200 and $350 per hour. Plaintiffs contend that the $550 rate is reasonable and within prevailing market rates, relying on Brister's affidavit in *LULAC v. City of Boerne*, approving a rate of $700 per hour for attorneys with eighteen years or more of experience.  Plaintiffs further note that, in 2010, the Texas Speaker of the House retained Baker & Botts attorneys for non-litigation consulting work at the "blended" rate of $500 per hour.

To inform and assist the court in setting a reasonable hourly rate according to the prevailing market rates in the relevant community, a fee applicant is required to adduce evidence that the "requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11.  Generally, the reasonable hourly rate for a particular community is established through affidavits of other attorneys practicing there. *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002).  Other than the Brister affidavit from *LULAC v. Boerne*, Plaintiffs have not produced such affidavits indicating that the $550 rate sought by Richards is within the prevailing market rates for similar services by similar lawyers in San Antonio.  Given the extreme divergence of Brister's affidavits in *LULAC v. Boerne* and this litigation, the Court finds that neither affidavit is reliable evidence of prevailing market rates.

Plaintiffs provide no affidavits of their own to demonstrate that Richards' requested $550 hourly rate is within prevailing market rates for this forum.  In a recent commercial case in this district, the court concluded that $407 was a reasonable hourly rate for a partner at Haynes & Boone with almost thirty years of experience practicing as a litigator in San Antonio from 2010 to 2013.[25] The court took judicial notice of the State Bar of Texas, Department of Research & Analysis, 2011 Hourly Fact Sheet, which reflects median hourly rates by category.  *See Miller v. Raytheon Co.*, 716 F.3d 138, 149 (5th Cir. 2013) (holding that the district court is entitled to consider state bar surveys, fees in similar cases, and the skills of the attorneys in setting an hourly rate).  The 2011 Fact Sheet reflects that: (1) an attorney with twenty-one to twenty-five years of experience charges a median hourly rate of $268 ($240 in San Antonio), and an attorney with over twenty-five years of experience charges a median hourly rate of $258 ($228 in San Antonio); (2) the median rate for business litigation is $247 ($241 in San Antonio), for commercial litigation is $255 ($239 in San Antonio), for appellate litigation is $269 ($246 in San Antonio), and for "other" litigation is $238 ($246 in San Antonio); and (3) hourly rates for large firms (100+ attorneys) are $286 to $418 ($344 to $417 in San Antonio).

Based on the evidence before the Court, including the State Bar Fact Sheet, awards in other cases, and Richard Gray's affidavit in *Fabela*, which supports a rate between $400 and $450 per hour, the Court concludes that $418 is a reasonable hourly rate for the work performed by Richards in this case.  Therefore, his lodestar is reduced from $5,500 (10 x $550) to $4,180 (10 x $418).

### d. Hebert and Jenner & Block

Gerald Hebert is a solo practitioner who offices in Washington, D.C., and he seeks an hourly rate of $650, "given the complexity and novelty of the issues, the high visibility and importance of the case, and [his] experience handling cases such as this."  Hebert Decl. ¶ 11.  Mr. Hebert served as lead counsel during the trial phase of the case.  He has extensive experience in redistricting, and has represented clients in prior Texas redistricting and voting rights litigation for decades, including cases that have been decided by the Supreme Court.  He has also co-written a book on redistricting and organized and conducted a voting rights institute at American University Law School.  Mr.

---

[25] *Structural Metals, Inc. v. S&C Elec. Co.*, No. SA-09-CV-984-XR, 2013 WL 3790307 (W.D. Tex. July 19, 2013).

Hebert submits the affidavit of Bruce Spiva, who attests that Mr. Hebert "is one of our nation's most skilled and expert voting rights and redistricting litigators." Spiva Decl. ¶ 11. Spiva practices in the D.C. area and is familiar with the rates charged there. He states that Mr. Hebert's hourly rate of $650 is "quite reasonable, especially in light of his considerable experience and expertise." *Id.* ¶ 16. He further states that the rates charged for commercial litigation is significantly higher, and the Adjusted Laffey Matrix, often cited by and approved by the D.C. federal courts,[26] suggests an hourly rate of up to $771 would be reasonable for a lawyer with twenty or more years of experience. Steve Pershing also states that Hebert's hourly rate is reasonable, and that the adjusted Laffey matrix rate of $771 is low given that "Washington lawyers with lengthy, high-level federal litigation experience now charge significantly more, and some bill up to and in excess of $1,000 an hour." Pershing Decl. ¶ 15.

Jenner & Block, a D.C.-area firm, provided support during the trial phase of this litigation, but was primarily responsible for representing the Davis Plaintiffs in the United States Supreme Court when Defendants appealed (handling the motion for stay, legal research, and merits brief writing). Smith Decl. ¶ 5. Paul Smith, a partner at Jenner & Block, seeks an award at the following hourly rates: $875 (2011), $950 (2012), and $985 (2013). Smith Decl. ¶ 10. Jessica Ring Amunson seeks an award at the following hourly rates: $555 (2011) and $575 (2012). Caroline D. Lopez seeks an award at the following rates: $435 (2011) and $490 (2012). And Mark P. Gaber seeks an hourly fee award of $470 (2013). Smith attests that these hourly rates are consistent with the usual and customary hourly rates for the firm's work, and that these rates have been paid by the firm's commercial clients.

Plaintiffs' evidence assumes that the Court will apply D.C. market rates. Plaintiffs have not provided any evidence that the requested hourly rates are within the prevailing market rates for Texas or San Antonio. The Court finds, as it did for Mr. Richards, that an hourly rate of $418 is

---

[26] The "Updated Laffey Matrix" is a billing survey of District of Columbia market rates. *Bywaters v. United States*, 670 F.3d 1221, 1226 n.4 (Fed. Cir. 2012). The survey was conducted in 1988-1989 and has been recalculated in subsequent years using a methodology advocated by economist Dr. Michael Kavanaugh. *Id.* The Updated Laffey Matrix has been used by the United States District Court for the District of Columbia to determine the amount of a reasonable attorney fee. *Id.*

appropriate for Mr. Hebert and Mr. Smith because of their extensive experience.

With regard to Ms. Amunsun, the Court notes that the senior associate in the commercial litigation case referred to *supra* billed at an hourly rate of $360 from 2010 to 2013 and provided evidence that this rate was within the range of usual and customary rates for large law firms in San Antonio for similar work. *Structural Metals*, 2013 WL 3790307, at *9. However, based on the State Bar's 2011 Hourly Fact Sheet, the court concluded that the rate should be adjusted downward by ten percent. *Id.* Thus, the Court finds that $324 is an appropriate hourly rate for Ms. Amunsun. Similarly, the court in *Structural Metals* found that $252 ($280 discounted by ten percent) was a reasonable rate for a fourth-year associate, and thus awards that rate to Ms. Lopez and Mr. Gaber.[27]

**e. support staff hourly rates**

Because the Court has disallowed all of the requested fees for support staff and paralegals, the Court need not determine whether the requested hourly rates are reasonable at this time.

**3. Calculation of the Lodestar**

Based on the above analysis, the Court awards the following amounts:

Hebert attorney's fees: 434.6 hours x $418 = $181,662.80

AngleStrategies (legal support): $0

Richards attorney's fees: 10 hours x $418 = $4,180

Karina Esparza (paralegal): $0

Smith attorney's fees: 52.5 hours x $418 = $21,945

Amunson attorney's fees: 92 hours x $324 = $29,808

Lopez attorney's fees: 74.25 hours x $252 = $18,711

Gaber attorney's fees: 15 hours x $252 = $3,780

Cheryl Olson (paralegal): $0

[27] Brister's report also cites to a recent *Texas Lawyer* survey. Docket no. 208-2 at 5-6. According to his report, the survey shows that an average hourly rate for a 7th-year associate in San Antonio is $295 in general and $392 for large firms such as Jenner & Block. The award of $324 to Amunsun is within that range. Similarly, the report states that the survey reveals an average hourly rate for a 4th-year associate in San Antonio of $245, and $337 for large firms. The award of $252 for Lopez and Graber is within that range.

-46-

This results in the following total award for attorneys' fees of $260,086.80.[28]

**4. Adjustment of the Lodestar**

The lodestar amount is presumptively reasonable, but may be further adjusted using the twelve well-known *Johnson* factors. *See, e.g.*, *Saizan*, 448 F.3d at 800 & n. 18 (citing *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).  Plaintiffs do not seek an enhancement of the lodestar amount.  This case involved complex, difficult, unsettled areas of law and significant time expenditures, as well as time constraints.  Litigation of this matter required skilled attorneys with experience in redistricting litigation.  However, these factors do not require an upward adjustment of the lodestar because the hourly rates are high enough to compensate for these factors.  Further, the Court has already concluded that the Davis Plaintiffs obtained excellent results, and no downward adjustment is required based on the results obtained.  The Court concludes that the lodestar amount represents a reasonable and appropriate fee for the Davis Plaintiffs.

**5. Expenses and Other Costs**

The Davis Plaintiffs seek an award of expenses as follows: $10,000 in expert witness fees for Dr. Allan Lichtman, Mr. Hebert's and AngleStrategies' travel expenses and costs, depositions, and copies ($14,329.47); and Richards' costs ($350 filing fee and $300 for process server fees).[29]  Plaintiffs assert that these are expenses of the type normally billed to fee-paying clients, and note that a fee award under § 1988 includes an award of "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client."  Docket no. 193-1 at 17.

Under 28 U.S.C. § 1920, a court may tax as costs, among other things, the following: (1) fees of the clerk and marshal; (2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) and fees for exemplification and the costs of making copies of any materials where the copies are necessarily

---

[28] This results in a total reduction of the requested lodestar ($478,481.75) for the Davis Plaintiffs of $218,394.95

[29] Jenner & Block originally submitted expenses totaling $4,619.13 for research, printing, mailing, and "other costs in preparing for the Supreme Court appeal" in this case.  Smith Decl. ¶ 15 (and Exhibit C to Smith Decl.).  In their Reply, Plaintiffs revised the request "to exclude all . . . costs included in the original request."

obtained for use in the case. Further, all reasonable, out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone, are recoverable in section 1988 fee awards because they are part of the costs normally charged to a fee-paying client. *Assoc. Builders & Contractors of La. v. Orleans Parish Sch. Bd.*, 919 F.2d 374, 380 (5th Cir. 1990); *see also West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 395-96 (5th Cir. 2003) (discussing cases and noting that it had "affirmed awards of out-of-pocket travel expenses as components of attorney's fee recoveries under § 1988"). Prevailing parties in VRA cases are also entitled to "reasonable expert fees" and "other reasonable litigation expenses" as part of the costs. 42 U.S.C. § 1973*l*(e).

### a. filing fee and fees of the Clerk

Mr. Richards seeks $350 for the filing fee paid in this case. This cost is recoverable under § 1920 as a cost of the Clerk and is awarded. As discussed previously, the $25 *pro hac vice* fee is disallowed.

### b. process service fees

Mr. Richards seeks $300 for private process server fees for service upon Defendants Perry, Andrade, Richie, and Munisteri ($75 per service). Section 1920 allows costs for fees of the Marshal, but most private firms utilize private process servers to obtain service of process rather than the Marshal. Because this constitutes a reasonable out-of-pocket litigation expense, the Court awards these requested costs.

### c. expert witness fees

Mr. Hebert seeks an award of $10,000 in expert witness fees for Dr. Allan Lichtman. Defendants assert that at least $6,000 of this expert witness fee is unrecoverable insofar as Dr. Lichtman's February 2012 invoice reflects work on the § 5 claims. Dr. Lichtman's invoice states "Bill as per agreement for State Senate redistricting Section 5 litigation. Includes reports, preparation for deposition, and deposition testimony." Plaintiffs have not responded to Defendants' assertion that this fee should be disallowed. Dr. Lichtman was retained as an expert in this litigation as well as the § 5 litigation before the D.C. Court. It is unclear whether this invoice reflects work on this litigation or the D.C. Court litigation, but it appears to reflect work on the D.C. Court § 5 litigation. Therefore, Plaintiffs have not met their burden to show that this expert fee was reasonably expended on this litigation, and this portion of his fee is disallowed. Plaintiffs are therefore awarded $4,000

in expert witness fees for Dr. Lichtman.

### d. travel expenses

Defendants argue that no travel expenses should be awarded for AngleStrategies and Mr. Hebert because the Davis Plaintiffs had local counsel, citing *International Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255, 1276 (8th Cir. 1980). In that case, the court reduced an award of fees for travel time by fifty percent because "defendant should not be charged a premium for [the plaintiff's] choice of out of town counsel." Plaintiffs correctly note that this case is not on point, since it involves an award of fees for attorney travel time and not travel expenses. Moreover, this Court has already concluded that it was reasonable for Plaintiffs to hire out-of-town counsel for this case, and thus reasonable attorney travel expenses should be awarded.

Defendants noted that Plaintiffs did not originally produce documentation for $5,590.34 in travel-related expenses incurred by AngleStrategies. They assert that these expenses must therefore be disallowed. In response, Plaintiffs have submitted documentation and the declaration of Matthew Angle. (Docket no. 212, Ex. H). Nevertheless, the Court will not allow these costs because Plaintiffs have not demonstrated that travel expenses for non-paralegal support staff are recoverable, given that AngleStrategies' expenses have been excluded from a reasonable attorneys' fees.

### *airfare*

Mr. Hebert seeks $718.30 for airfare for himself. The airfare includes airfare from Austin to Washington on August 24, 2011 ($497.70) and airfare from San Antonio to Washington on January 27, 2012 ($220.60). However, Mr. Hebert's time records do not indicate any activity in this case between August 21, 2011 and September 17, 2011. In addition, it appears that receipts for this travel have also been submitted in the *Perez* case and that the submitted receipt is unreliable.[30] Thus

---

[30] Mr. Hebert's listed expenses for travel in *Perez*, docket no. 851-4 at 25, list the following: 8/22/2011 $734.40; 8/25/2011 $320.70. The supporting receipt, docket no. 852-1 at 6, shows an August 15 email confirmation for roundtrip travel from BWI to AUS on 8/22 and a return from AUS to BWI on 8/25 for $734.40. The next email confirmation is dated August 20 and is for the same return flight from AUS to BWI on 8/25, and shows a charge of $320.70. The receipt submitted in this case is an email confirmation dated August 24 for the return leg from AUS to BWI on the same flight a day earlier for $497.70. It appears impossible that Mr. Hebert flew from AUS to BWI on both August 24 and August 25. Mr. Hebert's submitted time records in *Perez* indicate that he actually traveled on August 25. There is no time entry for travel on August 24. Therefore, it does

the August 24, 2011 travel expense is not allowed. The January 27, 2012 travel expense appears to be return travel after the January 27, 2012 hearing. That travel expense is awarded.

### *hotel*

The hotel charges include a hotel charge for $504.22 on February 21, 2012 and a hotel charge for $435.40 on February 14, 2012. Defendants note that the February 21 charge lacks a receipt and there is no correlating time entry showing in-person work in Texas on that date. Defendants further note that the charge on February 14, 2012 lacks a receipt. The Court does not award these costs because they are not supported by receipts.

### *taxi*

Mr. Hebert submits the following taxi expenses: (1) February 6, 2012 ($28.00) (residence to airport); (2) February 10, 2012 ($29) (airport to residence); (3) October 2, 2012 ($32) (airport to the hotel); (4) June 30, 2012 ($30) (airport to hotel); and (5) July 2, 2013 ($30.42). These reasonable expenses are awarded, except for the October 2, 2012 taxi because the date does not correspond to any documented event in this case or any time record reflecting work on this case in San Antonio at that time. *See* Hebert time records (indicating no time was billed to this case between September 21, 2012 and December 3, 2012). The Court therefore awards taxi costs in the amount of $117.42.

### *gas*

Mr. Hebert requests an award of $28.16 for gas purchased on May 28, 2013 in Hammonton, New Jersey. The receipt states "travel to San Antonio" and "May 29, 2013 hearing." This cost is not allowed since its relationship to the hearing is not established.

**e. other expenses**

### *depositions and transcripts*

Mr. Hebert seeks $2,389.86 for depositions and transcripts. This includes the transcripts of the depositions of Senator Shapiro ($306.18), Senator Davis ($505.40), Senator John Corona ($449.83), and Senator Birdwell ($385.55). The Court finds that the Senators' deposition expenses were reasonable and were necessarily obtained for use in this case. The Court therefore awards $1,646.96 for deposition transcripts.

---

not appear that Mr. Hebert actually traveled on August 24 and that this receipt was submitted in error.

Mr. Hebert also seeks costs for the transcripts from the hearing on the interim plans on February 14 and 15, 2012 ($387.90) and the hearing on February 8, 2012 ($330).  The February 8 hearing was only for this case, and thus this cost is awarded.  Although the February 14 and 15 hearing was for both this and the *Perez* case, the Court will award the full amount of the cost for the transcript because Mr. Hebert would have obtained and paid for the entire cost of this transcript regardless of whether he also represented other plaintiffs in the *Perez* case.   The Court therefore awards  $717.90 for hearing transcripts.

*copies*

AngleStrategies requests an award of costs of $64.01 for photocopying.  However, this request is not supported by receipts or by other evidence allowing the Court to determine that the copies were necessarily obtained for use in this case or that the costs were reasonable.  This cost is not allowed.

**5. Conclusion - Davis Plaintiffs**

The Court therefore awards the following:

Gerald Hebert: $181,662.80 in attorney's fees and $6,702.88[31] in expenses and costs

David Richards: $4,180 in attorney's fees and $650 in costs

Jenner & Block: $74,244 in attorneys' fees and $0 in costs[32]

### B. LULAC Plaintiffs

The LULAC Plaintiffs ("LULAC") seek $77,340.00 in attorney's fees (193.35 hours x $400 per hour) for attorney Luis Vera; $22,200.00 (74 hours x $300 per hour) in expert fees for expert George Korbel; and $275.00 in copying/binder expenses.  Docket no. 194 at 2.

The Davis Plaintiffs filed their lawsuit on September 22, 2011.  LULAC filed its lawsuit on October 17, 2011, and the cases were consolidated on October 19.  LULAC acknowledges that the Davis Plaintiffs did the majority of the work in this litigation.  However, LULAC states that its counsel, Luis Vera, "actively participated in th[e] trial and hearings throughout."  It further states that

---

[31] This includes $4,000 for expert fees (for Lichtman), $220.60 in airfare, $117.42 for taxis, $1,646.96 for deposition transcripts, and $717.90 for hearing transcripts.

[32] As noted, Jenner & Block withdrew its requests for costs.

-51-

LULAC's "focus was to protect the interest of the Latino and all minority voters not only in Senate district 10 but also throughout the State" and the importance of "zero deviation in population and the cutting of the minimal amount of precincts in doing so." *Id.*

LULAC asserts that it has demonstrated billing judgment, as its counsel did not bill where other attorneys took the lead, nor did he bill for every phone call or conference in which he participated. He further states that he did not bill for time spent reading the trial record and filings. Vera states that he excluded over 40 hours of time, and did not bill for work of two co-counsel or of his support staff.

**1. Timeliness**

Defendants contend that LULAC's motion should be denied as untimely because it was filed at 1:18 a.m. on September 25, whereas the deadline was September 24. Although the motion is technically untimely, Defendants have shown no prejudice resulting from the tardiness. The motion will not be denied as untimely.

**2. Hours Reasonably Expended**

**a. whether unsuccessful claims must be excluded**

Defendants argue that LULAC did not succeed on its § 5 claims because the Supreme Court held in *Shelby County* that application of § 5 to Texas pursuant to § 4(b) was unconstitutional. This argument fails for the reasons explained *supra*.

Defendants argue that LULAC achieved minimal success on its claims. Defendants assert that LULAC challenged four Senate districts (Districts 8, 10, 12, and 25) and focused on zero deviation, but ultimately the Court changed only SD10 and no other parts of the map. Defendants further state that LULAC recognized that the Davis Plaintiffs did the majority of the work in this case, while LULAC had a broader focus of protecting all voters in Texas and obtaining zero deviation. Defendants note that LULAC's proposed plans changed all 31 Senate districts, yet LULAC achieved success on only one claim (SD10) and lost on the zero deviation goal. Further, Defendants assert that the boundaries adopted by the Court do not resemble any LULAC proposal.

LULAC's complaint is virtually identical to the Davis Plaintiffs' complaint. It raises the same claims: (1) Fourteenth Amendment equal protection; (2) Fourteenth Amendment privileges and immunities (asserted solely to preserve the claim for appeal); (3) the enacted plan cannot be

administered without preclearance; and (4) the plan violates § 2 of the VRA through vote dilution and racial discrimination with regard to SD 10 and Dallas-Tarrant County. LULAC sought declaratory relief that the existing, benchmark plan was malapportioned, that the enacted plan illegally dilutes minority votes in the Dallas-Tarrant Counties region in violation of § 2 and was enacted with a racially discriminatory purpose, and sought injunctive relief enjoining the enacted plan because it had not received preclearance. The Davis Plaintiffs resided in Districts 8, 10, 12, and 25, and contended that the benchmark plan was overpopulated as to those districts, in violation of one-person, one-vote principles. LULAC's Complaint similarly alleged that its members resided in those overpopulated benchmark districts. The crux of both lawsuits was SD 10, though the Complaints included an allegation that both the benchmark and enacted plans were malapportioned. Davis Compl. ¶ 45; LULAC Compl. ¶ 43. Thus, Defendants' assertion that the LULAC Plaintiffs challenged four districts in the enacted plan but only succeeded regarding SD 10 is inaccurate.

It is true that the LULAC Plaintiffs focused on the issue of zero deviation. They argued that the Court was obligated to enact interim plans with zero population deviation and submitted statewide Senate plans with zero precinct cuts and zero population deviation. *See, e.g.*, docket nos. 84, 85. The LULAC Plaintiffs "seek to recover attorneys' fees inasmuch as they prevailed on their claim in returning Senate district 10 to its benchmark and almost zero deviation in the Court ordered senate plan." Docket no. 194 at 4. As noted in this Court's order explaining the plan, Plan S172 remedied the changes to SD 10 by restoring that district to its benchmark configuration and by redrawing three adjacent senate districts as required to comply with one-person, one-vote principles and to accommodate the changes with respect to SD 10. But the other districts in Plan S172 are the same as in the enacted plan, and retained the population deviations. LULAC therefore obtained limited success on its zero deviation goal with regard to the statewide plan. As the Court explained previously, however, Plaintiffs prevailed on their claims, and *Hensley* instructs that fees should not be diminished simply because Plaintiffs did not succeed on every contention in support of their claims. Nevertheless, discrete time spent on statewide malapportionment issues and VTD cuts did not ultimately contribute to Plaintiffs' success in this litigation. Therefore, based on this fact and on the degree of success obtained on the issues on which LULAC focused, where discrete time entries can be identified, the Court will reduce the time accordingly. The Court will reduce the

-53-

entries as follows: November 10, 2011 by .25 for reading advisory regarding deviation; November 13, 2011 by .25 for conferring regarding population equality; November 14, 2011 by .25 for reviewing advisory regarding population equality. This is a reduction of .75 hours. The Court will also reduce Korbel's time spent on these tasks, *infra*.

**b. billing judgment**

*duplication*

Defendants contend that LULAC duplicated the efforts of the Davis Plaintiffs, and that one-third of the billed time was spent conferring with the Davis attorneys. However, Plaintiffs demonstrated that they worked to minimize duplication of effort by filing joint responses and advisories, which would require them to confer. Defendants have not shown that the overall effort expended was excessive, and the Court will not reduce the time based on alleged duplication of effort.

*specific time periods*

Defendants contend that time spent before June 17, 2011, when the Senate plan was signed into law, should be disallowed. This includes a .5 hour entry on May 17, 2011 for time spent conferring with Wendy Davis about a potential suit related to SD 10 and a 4 hour, 15 minute entry on May 18 for a meeting with Korbel regarding SD 10. The Texas Legislature adopted Plan S148 on May 17, but Governor Perry did not sign the plan into law until June 17. The Court finds that time expended after the Legislature adopted the Plan but before it was signed into law is time reasonably spent on this litigation and therefore allows this time.

Defendants further contend that all time after March 19, 2012, when the Court adopted the interim plan, should be disallowed because it did not lead to Plaintiffs' success. The March 19, 2012 plan was adopted as solely an interim plan, however. Plaintiffs continued to work on this case, including bringing the case to settlement and responding to Defendants' motion to dismiss for lack of jurisdiction, and this work did contribute to Plaintiffs' ultimate success. Accordingly, the Court will not disallow all time after March 19, 2012.

*vagueness/block billing/billing judgment*

Defendants assert that Vera's billing is vague (containing entries such as prepare for hearing, review pleadings, and trial preparation) and contains block-billed entries (75.35 hours, or 39% of

requested fees) for which the Court cannot assess reasonableness.

The Court has reviewed Vera's time records and notes that Vera's time records contain a column for "actual time expended," which is almost entirely in quarter-hour increments, and a "time charged" column in tenths.  The time charged is then rounded up to the nearest tenth of an hour. Thus, for example, an entry of "actual time" of "3 hrs 45 mins" is billed as 3.8 hours, and an entry of "actual time" of "3 hrs 15 min" is billed as 3.3 hours.  However, Vera apparently submits his requested fee awards based on the hours expended rather than the time billed.  Thus, Vera has billed in quarter-hour increments.  However, this method of billing does not require an across-the-board time reduction because there are not an excessive number of quarter-hour entries for small tasks and there is no indication that the billing has inflated the time billed.

Vera has also utilized block billing, which, as noted, makes it difficult for the Court to determine whether time spent on some specific tasks was reasonable.  In addition, some of the entries use disfavored terms such as "prepare for trial."  However, as before, the Court finds that most of the entries are sufficiently specific such that no across-the-board reduction is required.  The Court has reviewed the time entries and makes the following deductions:

• There are four entries that include time for "formulating Complaint"; "finalize complaint for filing"; and "final draft of complaint."; and "file complaint."  LULAC's Complaint is identical to the previously filed Davis Plaintiffs' Complaint, with only party name changes being made. Therefore, the Court finds that minimal time should be awarded for drafting and filing the Complaint.  It is not possible to determine how much time was billed for this task because these entries are block billed with other tasks.  The Court will therefore deduct 1.5 hours to reflect a reasonable total time for the block-billed tasks.

• The one-hour entry for "file complaint" and "prepare and file motion to consolidate" is reduced by .25 hours because filing is clerical.

• The November 1, 2011 entry for "catch up reading of all orders" is disallowed as vague and potentially duplicative, a reduction of 1 hour.

• The November 3, 2011 entry of .75 hours for "draft exhibit list" and "strategy session refined" is reduced by .25 because "draft exhibit list" is vague and potentially clerical.

• The November 4, 2011 block-billed entry of 2.5 hours is reduced by .5 because it is not

possible to determine whether the time spent on certain tasks was reasonable and because filing the exhibit list is clerical.

• The 6.5 hour entry for the hearing on November 4, 2011 is reduced from 6.5 to 5 hours to reflect actual time, a reduction of 1.5 hours.

• The 1-hour entry for reading a brief motion and several brief orders on November 8, 2011 is reduced from 1 hour to .25 hours as excessive, for a reduction of .75 hours.

• The 9-hour entry for the February 14, 2012 hearing is reduced by 1 hour to reflect actual time, less an hour for lunch.

• The 6.5-hour entry for the February 15, 2012 hearing is reduced by 1 hour to 5.5 hours to reflect actual time.

• The cumulative entries for "preparation for hearing" for the May 29, 2013 hearing are reduced from 3 to 1.5 hours because these entries are vague and it is unclear what preparation was needed, given that there was a settlement in principle at this time.

• The 3-hour entry for attending the May 29, 2013 hearing is reduced by .5 to 2.5 hours to reflect actual time.

• The 2.5-hour entry for attending the July 1, 2013 status conference is reduced by .3 hours to reflect actual time.

• The 9-hour time entry for preparing the fee motion is reduced by 3 hours as excessive.

*duplication with Perez litigation*

Defendants assert that time spent working on *Perez* must also be disallowed. Defendants point to an entry that includes working on a LULAC/NAACP compromise plan, but note that the NAACP is not a party in the Senate case. LULAC has not responded to this assertion, and therefore this entry is reduced by 2 hours.

This results in a total reduction of Vera's requested hours (193.35) by 15.8, for a total of 177.55 hours.

**3. Reasonable Hourly Rate**

Vera seeks an hourly rate of $400. Defendants assert that Vera's requested rate is excessive. Vera has twenty-one years of practice, spent primarily in voting rights and redistricting. Vera Decl. He has taught classes at St. Mary's and has served on panels on voting rights and redistricting. Vera

provides the Declaration of Frank Herrera, Jr., who states that Mr. Vera is an expert in this highly complex area and that a rate of $400 is reasonable and modest. Based on the analysis above for Mr. Richards, the Court finds that Mr. Vera's requested hourly rate is reasonable and is within the prevailing market rates. Accordingly, the Court awards Mr. Vera an hourly rate of $400.

### 4. Calculation of the Lodestar

The lodestar calculation results in an attorney's fee award of $71,020 (177.55 hours x $400/hour).

### 5. Adjustments to Lodestar

The court has considered the additional *Johnson* factors and finds that no adjustment to the lodestar is necessary.

### 6. Expenses and Costs

#### *expert fees*

Defendants state that it is unclear whether LULAC is seeking fees for its expert. However, it is clear that LULAC is requesting an award of $22,200 in expert costs pursuant to § 1973*l*(e) for its expert, George Korbel. LULAC states that Korbel prepared a report, prepared several *Gingles* maps and demonstration maps for LULAC and other groups, and testified at trial. LULAC states that Korbel's report and testimony at trial specifically addressed the issue of racially discriminatory purpose and impact of the State's enacted Senate plan and his expertise as to the Red Appl system. LULAC has submitted Korbel's time sheets seeking $22,200 in fees for 74 hours of work. Korbel's time sheets indicate a total of 92.5 hours, which have been discounted by twenty percent (18.5 hours). Defendants contend: that the fee award should be reduced for limited success; that there is no basis for Korbel's $300 hourly rate; that Korbel's time entries are vague and block billed; and that some time entries are potentially duplicative of work in *Perez* (the entries note work with the NAACP, who did not challenge the Senate plans). The Court has reviewed the time entries and finds that Defendants' concerns, including the zero-deviation issues discussed previously, are adequately addressed by the across-the-board twenty percent reduction applied by Korbel. The Court also finds that the requested hourly fee of $300 is a reasonable expert fee for Korbel given his credentials. Korbel attests that he has testified in redistricting during the last four redistricting cycles (*i.e.*, since the 1980s). He states that his last fee award in a voting rights case was $300 per hour.

Accordingly, the Court awards a reasonable expert fee of $22,200 (74 hours x $300 per hour).

*copy costs and binders*

LULAC seeks an award of $275 for copy and binder costs. Defendants assert that the requested $275 in out-of-pocket expenses for copies and binders is unsupported.  In LULAC's motion, Vera states that his secretaries downloaded every document filed in the case, copied it, bound them in binders, and he seeks his actual costs for the copies and binding ($.04 for regular copies and $.35 for color copies).  However, Vera has not supplied receipts for these costs, and thus they are disallowed.

**6. Conclusion - LULAC**

The Court awards the LULAC Plaintiffs $71,020.00 in attorney's fees for Mr. Vera, $22,200.00 in expert fees for Mr. Korbel, and $0 in costs.

**Conclusion**

Plaintiffs' motions for attorneys' fees (docket nos. 193 & 194) are GRANTED IN PART AND DENIED IN PART as explained herein.  The Davis Plaintiffs may supplement their motion as discussed herein within seven days of this Order.

SIGNED January 8th, 2014.


__/s/_____
JERRY E. SMITH
UNITED STATES CIRCUIT JUDGE


__/s/_____
ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE


__/s/_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE